UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**ORIGINAL**

-------------------------------------------------- JUDGE WOOD

SEDONA CORPORATION,
a Pennsylvania Corporation

:
:
:
        **COMPLAINT AND**
        **JURY DEMAND**

          Plaintiff,

**03 CV 3120**

- against -

:

No. _____

LADENBURG THALMANN & CO., INC.; PERSHING,
LLC; WESTMINSTER SECURITIES CORPORATION;
WM. V. FRANKEL & CO., INC.; RHINO ADVISORS,
INC.; MARKHAM HOLDINGS LIMITED; ASPEN
INTERNATIONAL LTD.; THE CUTTYHUNK FUND
LIMITED c/o OPTIMA FUND MANAGEMENT L.P.;
THE GEORGE S. SARLO 1995 CHARITABLE
REMAINDER TRUST; AMRO INTERNATIONAL, S.A.;
ROSEWORTH GROUP LIMITED; CAMBOIS
FINANCE INC.; THOMAS BADIAN; THOMAS TOHN;
DAVID BORIS; MICHAEL VASINKEVICH; DAVID
SIMS; and JOHN DOES 1 to 150

:
:
:
:
:
:
:
:
:
:
:
:
:
:

**RECEIVED**
**MAY 5 - 2003**
**U.S.D.C. S.D. N.Y.**
**CASHIERS**

          Defendants,

:

--------------------------------------------------x

       Plaintiff SEDONA Corporation, for its complaint against defendants Ladenburg

Thalmann & Co., Inc.; Pershing, LLC; Westminster Securities Corporation; Wm. V. Frankel &

Co., Inc.; Rhino Advisors, Inc.; Markham Holdings Limited; Aspen International Ltd.; The

Cuttyhunk Fund Limited c/o Optima Fund Management L.P.; The George S. Sarlo 1995

Charitable Remainder Trust; Amro International, S.A.; Roseworth Group Limited; Cambois

Finance Inc.; Thomas Badian; Thomas Tohn; David Boris; Michael Vasinkevich; David Sims;

and John Does 1 to 150 alleges as follows:

## I. PARTIES, JURISDICTION, AND VENUE

1.  Plaintiff SEDONA Corporation ("SEDONA") is a Pennsylvania corporation, with its principal place of business in King of Prussia, Pennsylvania.

2.  Defendant Ladenburg Thalmann & Co., Inc. ("Ladenburg") is a Delaware corporation and may be served with process through its registered agent, Joseph Giovanniello, Jr. General Counsel, at its principal place of business at 590 Madison Avenue, New York, New York 10022.

3.  Defendant Pershing, LLC ("Pershing") is a Delaware corporation and may be served with process through its registered agent or through any officer at its principal place of business at One Pershing Plaza, Jersey City, New Jersey 07399.

4.  Defendant Westminster Securities Corporation ("Westminster") is a New York corporation and may be served at its principal place of business at 100 Park Avenue, Suite 2800, New York, NY 10017.

5.  Defendant Wm. V. Frankel & Co., Inc. ("Frankel") is a New Jersey corporation and may be served upon Eugene P. Torpey, Vice President, at its principal place of business at 30 Montgomery St., Jersey City, NJ 07302.

6.  Defendant Rhino Advisors, Inc. ("Rhino") is a New York corporation and may be served with process through its registered agent, National Registered Agents Inc., 875 Avenue of the Americas, Suite 501, New York, NY 10001, or through any officer at its principal place of business at 130 W. 29th St., 5th Floor, New York, NY 10022.

7.  Defendant Markham Holdings Limited ("Markham"), is a foreign business entity that does business in the United States, and may be served with process upon

David Hassan, President, at its principal place of business at Suite 7B and 8B, 50 Town Range, Gibraltar.

8.     Defendant Aspen International Ltd. ("Aspen") is a foreign business entity doing business in the United States and may be served with process at its principal place of business at Charlotte House, Charlotte Street, Nassau Bahamas.

9.     Defendant The Cuttyhunk Fund Limited c/o Optima Fund Management L.P. ("Cuttyhunk") is a Bermuda corporation that does business in the United States and may be served with process at its principal place of business at 1285 Avenue of the Americas, New York, NY 10019.

10.    Defendant The George S. Sarlo 1995 Charitable Remainder Trust ("Sarlo") is a California Trust and may be served with process at its principal place of business at 750 Battery Street, 7th Floor, Suite 700, San Francisco, CA 94111.

11.    Defendant Amro International, S.A. ("Amro") is a foreign business entity doing business in the United States and may be served with process at its principal place of business in care of Ultra Finanz, PO Box 4401 Ch-8022, Zurich, Switzerland.

12.    Defendant Roseworth Group Limited ("Roseworth") is a foreign business entity doing business in the United States and may be served with process in care of Rhino Advisors, Inc., 130 West 29th Street, 5th Floor, New York, New York 10022.

13.    Defendant Cambois Finance Inc. ("Cambois") is a foreign business entity doing business in the United States and may be served with process in care of Rhino Advisors, Inc., 130 West 29th Street, 5th Floor, New York, New York 10022.

14.    Defendant Thomas Badian ("Badian") is an individual who may be served with process at his principal place of business at Rhino Advisors, Inc., 130 W. 29th Street, 5th Floor, New York, New York 10022.

15.    Defendant Thomas Tohn ("Tohn") is an individual who may be served with process at his principal place of business at Ladenburg Thalmann & Co., at 590 Madison Avenue, New York, New York 10022.

16.    Defendant David Boris ("Boris") is an individual who may be served at his principal place of business at Morgan Joseph & Co. Inc., 600 Fifth Avenue, New York, New York 10020.

17.    Defendant Michael Vasinkevich ("Vasinkevich") is an individual who may be served at his principal place of business at Rodman & Renshaw, Inc. at 330 Madison Avenue, 27th Floor, New York, New York 10017.

18.    Defendant David Sims ("Sims") is a natural person and believed to be a citizen of the British Virgin Islands. Sims can be served in care of Beacon Fund Advisors at Harbour House, 2nd Floor, Waterfront Drive, Post Office Box 972, Road Town, Tortola, British Virgin Islands.

19.    John Does 1 to 150 are fictitious names alleged for the purpose of substituting names of defendants whose identity will be disclosed in discovery and should be made parties to this action.

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case involves federal questions, including violations of the 1934 Securities and Exchange Act, and this Court has personal jurisdiction over the defendants.

21.     Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims herein occurred in this district.

## II. GENERAL ALLEGATIONS

### A)    *An Overview of the Defendants' Scheme*

22.     This case involves a scheme by multiple defendants to (a) defraud SEDONA into selling its Series G convertible preferred stock ("Series G Preferred") and other securities to certain defendants herein, with warrants and other related rights (and in subsequent traunches of financing); (b) cause SEDONA to issue (for less than fair market value) convertible debentures to the defendants, and in association therewith, pay very onerous consulting, investment banking, securities registration and placement fees and other consideration, including warrants and stock of SEDONA; and (c) manipulate downward the stock price of SEDONA with the cooperation of U.S. broker-dealers and market makers in order to profit from the manipulation and price decline and to take advantage of increased conversion rights resulting from the  manipulation.  This scheme has injured SEDONA and is in violation of federal and state law.

### B)    *An Overview of the Defendants' Previous Patterns Substantially Similar to Facts Herein*

23.     Both (a) Ladenburg and related and numerous affiliates and (b) Aspen, Markham and Rhino and related and numerous affiliates are accomplished practitioners of: (i) "death spiral," reset and related funding mechanisms; and (ii)   active practitioners of stock manipulation and stock fraud.

24. Repeatedly, entities created, represented, or advised, by Ladenburg and Rhino were encouraged to "invest" in micro-cap companies such as SEDONA, that were listed on the NASDAQ, AMEX and OTCBB, through "toxic convertibles" or issuance of convertible preferred stock and/or common stock with reset provision warrants, and/or convertible debentures. These types of financial instruments are the vehicles that permit all the defendants to then profit from a conspiracy to manipulate and ultimately cause the stock price of those companies to decline to mere pennies in most cases and potentially inhibit the ability of such companies to raise capital after the entities make their so-called "long-term," "for-the-benefit-of-the-company" "investments". The lower the price of the stock, the more stock could be acquired through the conversion, based on the conversion formula in the financial instruments, giving the defendants incentive to take action to cause the stock price to drop. Additionally, as share prices decline more shares will be received by defendants on conversion; allowing the defendants to profit from various manipulative techniques, illegal short-selling and/or massive naked short selling, which have the effect of counterfeiting shares of the issuer, and generating substantial windfalls for the defendants if the company goes out of business and the defendants are not required to cover the illegal naked short sales.

25. This type of activity has occurred hundreds of times as is evidenced by: (a) the article in *Forbes,* June 12, 2002 edition authored by Brandon Copple entitled "Sinking Fund," commencing on page 46; (b) *Canadian Business* article dated October 26, 2002, authored by Matthew McClearn, Volume 75, Issue 20, entitled "Predator or Prey?" commencing on page 66; and (c) recent opinions by (i) the

Honorable Judge Sand rendered on October 10, 2002, in Case No. 02 Civ. 0767

titled *Nanopierce Technologies, Inc. vs. Southridge Capital Management, LLC, et*

*al.,* in the United States District Court for the Southern District of New York, and

(ii) the Honorable Judge Robert Carter rendered on July 17, 2002, in Case No.01

Civ 6600 titled *Internet Law Library, Inc., et al. vs. Southridge Capital*

*Management, LLC, et al.*, also in the United States District Court for the Southern

District of New York, along with at least seven (7) other substantially similar

cases (now pending) filed in the Southern District of New York, and numerous

others nationwide.

### C) The February 2003 SEC Complaint
### Against Rhino and Badian

26.     More specifically, with respect to the stock of SEDONA, the Securities and

Exchange Commission ("SEC") recently filed a complaint against Rhino and

Badian (the "SEC Complaint").  Defendants Rhino and Badian settled the claim

in exchange for the payment of a fine in the amount of $1 Million.  In addition,

Rhino and Badian agreed to be permanently enjoined from engaging in any

fraudulent or misleading activity while purchasing or selling securities and to

comply with other terms as are set forth in their settlement agreement.    It is

important to note that the SEC Complaint alleged that:

> Rhino and Badian manipulated SEDONA's stock price to enhance
> a client's economic interests in a $3 million convertible debenture
> (the "Debenture") that SEDONA issued on November 22, 2000.
> SEDONA issued the Debenture to one of Rhino's clients.  The
> Debenture, negotiated by Badian, prohibited Rhino's client from
> selling short SEDONA's stock while the Debenture "remained
> issued and outstanding".  Despite this contractual provision, Rhino
> engaged in extensive short selling and pre-arranged trading on
> behalf of its client prior to exercising the conversion rights under

the Debenture. This short selling increased the supply of the shares in the market and depressed SEDONA's stock price. As a result of the depressed stock price, Rhino's client received more shares from SEDONA when it exercised its conversion rights under the Debenture than it otherwise would have received. Following the conversions, Rhino engaged in wash sales and matched orders to cover the short positions and conceal the client's involvement in the scheme.

More specifics pertaining to the actionable activities of the defendants herein (as articulated in the SEC Complaint) will be set forth hereinafter. It is similar behavior that SEDONA complains of herein.

### D)    *Indictments and Regulatory Actions Substantiating the Pattern*

27.    A two-year Federal Bureau of Investigation and Royal Canadian Mounted Police sting operation known as "Operation Bermuda Short" is one example of the magnitude of stock manipulation and fraud willfully engaged in by parties manipulating the U.S. stock markets. Operation Bermuda Short resulted in the indictments of fifty-eight (58) individuals that were issued in the Southern District of Florida, one of which involved Paul Lemmon (who recently plead guilty) and Mark Valentine, chairman of Thomson Kernaghan & Co., a company that formerly was a securities broker-dealer located in Toronto, Ontario, Canada and recently closed by the Ontario Securities Commission, and also an affiliate of one of the perpetrators herein, as is hereinafter explained. This indictment is filed under Case Number 02-80088, Magistrate Judge Snow, United States District Court for the Southern District of Florida, for violations of 18 U.S.C. 371, 18 U.S.C. 2, 15 U.S.C. 78j(b), and 15 U.S.C. 78ff(a). Mr. Valentine and others are accused of:

[A] conspiracy for the defendants to unlawfully enrich themselves by defrauding the undercover agent's mutual funds and by fraudulently causing the price of C-Me-Run, SoftQuad Software Ltd., and JagNotes.com Inc. to be artificially increased through payoffs and kickbacks through brokers that were undisclosed to the undercover agent's mutual fund so that the defendants, C-Me-Run, SoftQuad Software Ltd., and JagNotes.com Inc. stock could be sold at a higher value than it was actually worth. It was also the object of the conspiracy for the defendants to unjustly enrich themselves by defrauding the shareholders of C-Me-Run, SoftQuad Software Ltd., and JagNotes.com Inc. . . . and is also part of a conspiracy that . . . Mark Valentine would cause brokers to receive undisclosed kickbacks for manipulating and artificially increasing the prices of C-Me-Run, SoftQuad Software Ltd., and JagNotes.com Inc.'s stock, and for maintaining the artificially high prices of C-Me-Run, SoftQuad Software Ltd. and JagNotes.com Inc. stock for a period of months by arranging for the sale of C-Me-Run, SoftQuad Software Ltd. and JagNotes.com Inc. stock to customers of brokers . . . caused to be listed in this scheme by bribing them.

28.    Additionally, the Ontario Securities Commission in its separate ongoing investigation into stock trading by Valentine stated on July 31, 2002 that it was:

> . . . satisfied that Staff has provided sufficient evidence of conduct that may be <u>harmful to the public interest</u> and, accordingly justifies an extension of the temporary order. There is little doubt that additional time is required to complete the investigation and, unless the temporary order is extended, there is a reasonable likelihood that Valentine's alleged objectionable conduct may continue. Such conduct would present a <u>serious risk to the integrity of Ontario's capital markets as well as to the protection of the public interest.</u>

### E)    Ladenburg and Rhino's Setup/"Bait and Switch"

29.    As is typical for Ladenburg and Rhino and other like perpetrators, Ladenburg setup SEDONA using a "bait and switch" technique. Ladenburg enticed SEDONA with the promise of a great deal of investment money from established investors, as well as market support and research coverage; however, Ladenburg

and Rhino only delivered a very insubstantial and insufficient portion of those funds to SEDONA through offshore shell companies, and never provided the promised market support or research coverage. Specifically, they persuaded SEDONA to increase its shelf registration of stock to a value of $50 Million and initially contracted in writing to provide much more cash to SEDONA than they really intended to invest. This all commenced with a letter SEDONA signed with Ladenburg on January 24, 2000 ("January 24, 2000 Ladenburg Letter," the entire contents of which is incorporated herein by reference).

30.     In the January 24, 2000 Ladenburg Letter, Ladenburg, in its capacity <u>as financial advisor to SEDONA</u>, agreed to provide up to $15 Million in financing. It was Ladenburg who induced SEDONA to increase its shelf registration to $50 Million based on the representation that Ladenburg would ultimately (over a reasonable period of time) obtain investors to fund up to $50 Million ("March 8, 2000 Ladenburg Letter"). Unfortunately for SEDONA, the original funding placed through Ladenburg investors was only $3 Million in the Series G Preferred, which was purchased by purported investors who are defendants herein. This original $3 Million was termed "bridge financing" and was to be followed by the balance that was promised in the January 24, 2000 Ladenburg Letter and the March 8, 2000 Ladenburg Letter.

31.     It is important to note that all the investors in the Series G Preferred, Amro International, S.A., Markham Holdings, Aspen International, Ltd., The Cuttyhunk Fund Limited c/o Optima Fund Management L.P., and The George S. Sarlo 1995 Charitable Remainder Trust, were investors placed by or through Ladenburg

("Ladenburg Investors").  Accordingly, Ladenburg previously represented and was also representing at the time of the occurrences described in this suit, all of the Ladenburg Investors, including Badian and Rhino, in its dealings with SEDONA.

32.    The "bait-and-switch" activity described in this section commences by "baiting" the potential client - promising a substantial capital investment from well-known and established entities, as well as market support and research coverage. The "bait" is then followed by the "switch".  What the client actually receives at closing is only a minor capital investment from an offshore nominee shell company, and no market support or research coverage is provided. This activity has been repeated numerous times by Ladenburg and Rhino.

### F)    Some of the Public Companies the Defendants "Financed/Invested In" through "Death Spiral Financing Contracts"

33.    Other examples of the defendants' "long-term" and "for the benefit of the company" investments used on AMEX, NASDAQ, or OTCBB companies demonstrate significantly declining stock prices after receiving investments and/or financing from either Ladenburg, Rhino, Markham or Amro or other clients of Ladenburg or affiliated entities.  A sampling of those transactions is set forth in the following chart:

## TABLE OF DEATH SPIRAL INVESTMENTS
## BY DEFENDANTS AND THEIR AFFILIATES

| Company Name | Purchasing Parties Involved | 1st SEC Filing Date Naming One or More Purchasing Parties Involved | Highest Share Price Following SEC Filing Date | Price as of 3/13/03 |
|---|---|---|---|---|
| Advanced Viral Research Corp. | Roseworth\BNC Bach | 11/17/00 | 1.75 | 0.06 |
| ALPNET, Inc. | Ladenburg\Resonance Ltd. | 7/14/00 | No Data Available as appears to be out of business | 0.00 |
| American International Petroleum Corporation | Amro\Canadian Adv. Ltd. Partnership\Dominion Cap\Sovereign Partners | 9/9/99 | 7.13 | 0.0118 |
| Ameriquest Technologies, Inc. | Ladenburg\Wanquay Ltd. (Batliner) | 8/14/00 | .50 | 0.001 |
| Brightcube, Inc. | Amro\Aspen | 7/31/00 | No Data Available as appears to be out of business | 0.00 |
| Brilliant Digital Entertainment, Inc. | Amro\Roseworth\Curzon Capital (Rhino) | 12/11/98 | 14.93 | 0.16 |
| Calypte Biomedical Corporation | Amro\Ladenburg | 11/3/00 | 2.84 | 0.05 |
| Detour Media Group, Inc. | Amro\Markham | 7/3/01 | No Data Available as appears to be out of business | 0.0001 |
| Ecogen Inc. | Amro\Markham\Aspen | 3/16/00 | Approx. 5.25 | 0.11 |
| Esynch Corporation | Amro\Aspen\Batliner\Rhino | 10/28/99 | 16.38 | 0.03 |
| Famous Fixins, Inc. | Amro\Roseworth | 11/23/99 | 1.94 | 0.016 |
| FOCUS Enhancements, Inc. | Amro\Roseworth\BNC Bach | 6/21/99 | 9.81 | 0.66 |
| Group Management Corp. | Amro\Markham | 4/18/01 | 27.60 | .019 |
| General Magic, Inc. | Ladenburg\Paul Revere Capital (David Sims) | 9/14/00 | 8.50 | 0.001 |

| Company Name | Purchasing Parties Involved | 1st SEC Filing Date Naming One or More Purchasing Parties Involved | Highest Share Price Following SEC Filing Date | Price as of 3/13/03 |
|---|---|---|---|---|
| Imaging Diagnostic Systems Inc. | Amro\Aspen | 4/12/99 | 6.50 | 0.18 |
| Imaginon, Inc. | Ladenburg\Southshore Capital Fund\Tailwind Fund\Resonance Ltd. | 1/12/00 | 14.79 | 0.01 |
| MW Medical, Inc. | Roseworth\Batliner\Markham | 9/3/99 | 4.91 | 0.01 |
| ObjectSoft Corporation | Amro\Aspen\Roseworth | 8/16/99 | Approx. 9.25 | 0.0007 |
| Pet Quarters, Inc. | Ladenburg\Amro\Batliner\Markham | 6/8/00 | Approx. 4.00 | 0.0002 |
| Viragen, Inc. | Amro\Ladenburg\Markham | 12/9/99 | 5.00 | 0.07 |
| WaveRider Communications, Inc. | Amro\Ladenburg\Batliner | 10/28/99 | 15.84 | 0.1 |

### G) *About SEDONA - originally NASDAQ SmallCap (now OTCBB) - Company Symbol SDNA*

34.     SEDONA is a leading provider of Customer Relationship Management (CRM) application software and services for small to mid-sized businesses. The Company designed and built a comprehensive CRM solution specifically tailored for its first target market – small to mid-sized financial services institutions, comprised primarily of community banks, credit unions, insurance companies and brokerage firms.   In fact, SEDONA is one of the top providers of CRM application software for financial institutions with total asset value/annual premium volume of $3 Billion or less.   During all times relevant to this Complaint, SEDONA formed key business relationships with IBM and E.piphany as well as other leading software providers for the financial services market such as Fiserv, Inc., Sanchez Computer Associates, Inc., Open Solutions Inc., COCC,

Financial Services, Inc. and AIG Technologies, Inc. Had the technology and business plan of SEDONA not been sound: (a) these business relationships would not have been formed; and (b) the defendants herein would not have identified SEDONA as a target "victim" to attempt to destroy. To maximize profit by this scheme, the defendants needed a fundamentally sound company with strong market liquidity so as to maximize the amount they could drain of the target company's market capitalization and share price. SEDONA proved to be a good target for their downward death spiral manipulation scheme. SEDONA was in a position to be an industry leader when it was preyed upon by defendants who orchestrated its downfall.

### H)    *The Chronology and Salient Facts*

35. Commencing in the fall of 1999, SEDONA became aware that the CIMS business unit ("CIMS") of Acxiom Corporation was potentially available for acquisition. CIMS was a provider of Marketing Customer Information File systems to banks and credit unions. At the time, SEDONA saw the acquisition of CIMS as an enhancement to SEDONA's plan to develop and market its CRM software to the financial services market. This acquisition, combined with SEDONA's aggressive internal software development plan, would enable SEDONA to be the first company to introduce a comprehensive CRM solution for the small to mid-sized market and establish itself as a leading technology provider in the CRM market. If SEDONA could secure appropriate capital funding to build its personnel infrastructure and to implement its sales and marketing strategies, it

would have a formidable opportunity to capture a significant share of the multi-billion dollar CRM application software market.

36.    Immediately preceding the acquisition of the CIMS business unit from Acxiom Corporation, SEDONA began to look for potential sources of capital funding to ensure that it would be properly capitalized after the acquisition to execute its business and technology plans.

37.    On August 19, 1999, Vasinkevich, of Ladenburg, sent SEDONA a letter ("August 19, 1999 Ladenburg Letter") soliciting its business. The August 19, 1999 Ladenburg Letter was actually a follow up to an unsolicited proposal, dated July 1, 1999, sent to SEDONA by Vasinkevich and Tohn, then at Paul Revere Capital Corp., offering their investment banking services. In the August 19, 1999 Ladenburg Letter, Vasinkevich represented: *(a) Ladenburg is a "123-year old full-service investment bank and one of the oldest members of the New York Stock Exchange"; (b) Ladenburg can perform a full range of investment banking services, with research analysts covering over 80 companies; (c) Ladenburg has access to more than $50 Billion in investment capital; and (d) Ladenburg specializes in providing a method of financing that "offers market ambiguity as to timing and dollars raised, keeping short sellers and arbitrageurs at bay".*

38.    Accompanying the August 19, 1999 Ladenburg Letter was a promotional brochure ("Brochure"), which represented in writing that since 1991 Ladenburg had raised over $6.3 Billion in public and private financings.  The Brochure is incorporated herein by reference.  All the representations in the August 19, 1999 Ladenburg Letter and Brochure were made by Vasinkevich.  Vasinkevich and

Tohn also personally corroborated and attested to everything Ladenburg said and made such representations as agents of Ladenburg.

39.    Further, in approximately August of 1999, Vasinkevich made representations to Bill Williams, Chief Financial Officer of SEDONA ("Williams"), that Ladenburg had done suitable financing for PLC Medical Systems, Inc., Kafus Industries Ltd., Valance Technology, International Isotopes Inc., ImaginOn, Inc., Adrenalin Interactive, Inc., Pharmos Corporation, Supergen Inc., and Zila, Inc. Sadly, at or about the same time SEDONA executives and the undersigned attorneys were performing due diligence, immediately prior to filing this complaint, its best efforts show only three of those companies are still trading on the NASDAQ (having suffered huge price declines), while three are trading in the Pink Sheets with prices below $0.02 and $0.01. Three of the companies cannot be found anywhere.

40.    In a conference call on September 29, 1999 attended by Vasinkevich and Tohn, as well as Williams, Vasinkevich and Tohn represented Ladenburg as the "Goldman Sachs of small cap companies". Vasinkevich and Tohn reiterated to Williams that the funding methods that they participated in with their clients and the clients of Ladenburg, were of a non-toxic method that minimized dilution, while keeping short sellers and arbitrageurs at bay. This conference call and other communications were followed by a December 28, 1999 letter ("Deal Letter") where Vasinkevich again expressed the strong desire to provide financing to SEDONA. In writing, Vasinkevich was clear: "I believe we are well positioned to provide you with a complete suite of services including fund raising, research,

market making, strategic advice, and introductory services to synergistic business partners."

41.     What SEDONA now knows is that Ladenburg, Vasinkevich, and Tohn omitted to tell SEDONA: a) they all had prior significant relationships with Rhino and other defendants herein; b) most if not all of the companies in which Rhino and Ladenburg (including other investors and clients of Ladenburg and Rhino) had invested or placed investments have suffered from price declines and illegal naked short selling; c) Rhino and other clients of Ladenburg, inclusive of Ladenburg, were known shorters of stock and manipulators of stock; and d) Ladenburg, Rhino and other of their clients intended to have SEDONA ultimately contract with an offshore entity as the purchaser of the securities thereby limiting the ability of SEDONA to hold such entity accountable.

42.     As a result of the foregoing representations, notwithstanding that SEDONA had several other companies from whom it could have engaged to procure financing, SEDONA's Finance Committee of Board of Directors chose to hire Ladenburg as its investment banker and financial advisor.

43.     Pursuant to this decision by the Finance Committee of the Board of SEDONA, Vasinkevich introduced Badian, on behalf of Rhino, as a potential participant in the SEDONA funding.   At such time, Badian, on behalf of Rhino and Vasinkevich, represented that: a) Rhino had been involved in a number of fundings; b) substantially all the companies Rhino funded were doing well with respect to stock price; c) Rhino was (along with all other investors) an accredited

investor; and d) Rhino was a long-term investor and was only interested in what was in the best long-term interest of SEDONA.

44. Based on the above representations, SEDONA countersigned the January 24, 2000 Ladenburg Letter, which provided for Ladenburg to be the "placement agent and financial advisor" to SEDONA.

45. Subsequent to the date of the January 24, 2000 Ladenburg Letter, Vasinkevich and Tohn convinced SEDONA, and Williams, in his capacity as CFO of SEDONA, to increase the gross proceeds of the shelf registration to $50 Million, which agreement was codified in the March 8, 2000 Ladenburg Letter, executed by Boris, the Executive Vice President of Ladenburg. In reliance on the March 8, 2000 Ladenburg Letter, SEDONA spent a substantial sum of money and an extraordinary amount of time getting the shelf registration accomplished. SEDONA now knows that Ladenburg, Rhino, and all the other defendants herein never had any intention of funding any significant portion of this $50 Million, but instead used this as a part of the "bait and switch" method they had used previously in numerous other deals. In doing so, Ladenburg and Rhino sought to convince SEDONA that it needed to eliminate the pursuit of any other financiers, stating that all the financing SEDONA could ever need would be produced by these defendants or other investors of Ladenburg.

46. In March 2000, SEDONA began preparing a press release in reliance on the above referenced representations to announce to the investment community the increase of its shelf registration to $50 Million and thereby indicate that SEDONA was on its way to a much more substantial level of funding, which would allow

SEDONA to take advantage of the favorable CRM application software market conditions.

47.  In reviewing the stock trading activities in hindsight, it is apparent that several irregularities occurred (some of which are set forth in the SEC Complaint), with respect to the stock of SEDONA. For example, the stock of SEDONA went on a rapid rise and traded unprecedented volumes in or around the time when the first traunche financing for the purchase of Series G Preferred Convertible Shares closed and Ladenburg suggested the shelf registration be increased to $50 Million. It is now SEDONA's belief that the initial investment coupled with the misrepresentation regarding the commitment to obtain the additional $50 Million of financing was used as a trick to also mislead the market, thereby spiking the share price up and allowing the manipulators and participants in the conspiracy to defraud SEDONA by illegally manipulating and shorting the stock of SEDONA down from a higher stock price, knowing that the same group of defendants herein (in addition to others who may be determined by SEDONA) never intended to fund any material part of this $50 Million.

48.  As a nutshell example of the type of activity experienced by SEDONA, the following table reflects volume of trades per day during the period referenced above:

| | |
|---|---|
| March 1, 2000 | 2,931,800 shares |
| March 2, 2000 | 1,241,700 shares |
| March 3, 2000 | 2,070,400 shares |
| March 6, 2000 | 4,741,300 shares |
| March 7, 2000 | 3,956,600 shares |
| March 8, 2000 | 1,451,800 shares. |

49.    It is peculiar that these volumes represent the six highest volume trading days in the history of SEDONA, yet SEDONA had no material or substantive news to report other than the shelf registration. During this trading period, the high share price peaked at $10.25, before beginning its long continuous slide to its current level of $0.20.  This time period began the "pump" portion of the transaction by the named defendants (in addition to others yet to be identified) herein.  It took only until June/July of 2000 (approximately 90 days) for the stock to be manipulated down to a consistent and declining closing price of around $3.00 per share, a decline in market capitalization of $195,000,000 in approximately 90 days.

50.    The Common Stock underlying the Series G Preferred was registered by way of a Prospectus that went "effective" on June 27, 2000.  The Series G Preferred had a minimum conversion price of $3.50 until June 27, 2000, after which time there was no minimum conversion price and the conversion would be determined according to a formula based on the market price of SEDONA's stock. As such, on the date that the shelf registration became effective, Defendants, Markham, Aspen, Cuttyhunk, Sarlo and Amro were free to convert their Series G Preferred stock holdings, under the terms and conditions set forth in the Convertible Stock and Warrants Purchase Agreement and Certificate of Designations, in the aggregate amount of $3 Million, without a minimum conversion price. The Series G Preferred was intended to be the bridge financing SEDONA required until the shelf registration representing the balance of the $50 million commitment would become effective, and would, therefore, be available to retire the Series G

Preferred and enable the Company to sell blocks of registered stock to Ladenburg investors over time, as needed by SEDONA. It is important to reiterate that after the date of June 27, 2000 (with respect to the Series G Preferred), the minimum conversion price of $3.50 was no longer in force.

51.    SEDONA now believes that, in a pattern similar to that set forth in the SEC Complaint, the Series G Preferred holders benefited enormously by illegally short-selling stock at the higher prices (which they were contractually prohibited from doing in their agreement, as no short sales were allowed) all the way down to and below the minimum conversion price of $3.50, and benefited by not reporting the illegal short sales as such, but rather presented them to the marketplace as regular-way ("long") sales. This occurred between the time period of the initial funding of the Series G in February 2000 up to and including June 27, 2000 and beyond.

52.    In essence, such holders, through dummy and nominee shell corporations (and agents) counterfeited SEDONA stock by illegally short-selling stock that was neither registered nor owned by them, with an intent, if need be, to cover with conversion shares or not cover at all. Such holders would then sell at a high of approximately $10.25 a share, then orchestrate the price down to the minimum of $3.50 to make the maximum amount of profit of $6.75 (between the shorted price of approximately $10.25, more or less, and the $3.50 conversion price), presumably on millions of shares, based upon patterns described in the SEC Complaint. When the $3.50 minimum conversion expired on June 27, 2000, defendants were then able to increase their profits beyond the $6.75 spread, and

perhaps more importantly, increase the amount of shares the preferred stock was convertible into. Note that the SEC Complaint only deals with manipulation occurring for 31 trading days in 2001 when approximately 1.2 Million shares were illegally shorted and not delivered for settlement. SEDONA believes that this type of manipulation started occurring at the time when it became involved with the defendants.

53.    Not surprisingly, SEDONA received conversion notices from Markham, Amro, and Aspen on June 28, 2000, Cuttyhunk on August 4, 2000, Markham on August 28, 2000, Aspen on September 5, 2000, Cuttyhunk on October 3, 2000 and on October 8, 2000, Aspen again on October 16, 2000, with more conversions from series G participants on October 31, 2000, November 2nd, 6th, and 22, 2000. The remainder of the Series G holders were thereafter paid by the company in cash totaling $2,246,000 in the hope that the stock manipulation would stop and this raid on SEDONA, intentionally inflicted by the defendants herein in a massive conspiracy (including others yet to be identified), would cease. Unfortunately, SEDONA could not determine who was manipulating its stock, since defendants continued to represent that they were not the cause for the price decline. Today, SEDONA knows it was (as is set forth in the SEC Complaint) the defendants herein manipulating its stock, cloaked by the use of other names, nominee shell companies, and dummy accounts, along with cooperating U.S. and Canadian broker-dealers and market participants.

54.    The Finance Committee of the Board of SEDONA held a meeting right after its shareholders' annual meeting, on June 28, 2000, in New York, that Vasinkevich

was invited to and attended.  The purpose of the meeting was to: a) question his knowledge about market irregularities; b) discuss new financing; and c) ask Vasinkevich about other Ladenburg services he represented would be available to SEDONA, most notably market support and research coverage. Minutes of this meeting show that the Finance Committee recommended the company move ahead as soon as possible with a first take down of the shelf registration by raising $3 Million per the January 24, 2000 Ladenburg Letter, again based upon Vasinkevich's representations that his investors were not causing this market manipulation.   Furthermore, the minutes show further representations by Vasinkevich regarding commencement of market support and research coverage by Ladenburg. It was at this time that SEDONA also made Ladenburg aware that SEDONA had formalized relationships with IBM and E.piphany.  Even after public release of this information, SEDONA's stock continued to decline. SEDONA finds it most bizarre that based on its discussions with Ladenburg regarding increasing the shelf registration its stock rose to $10.25, yet upon the biggest event in SEDONA's history, its new relationship with IBM, the stock continued its downward spiral.  The clear explanation for this is the continuation of the manipulative conspiracy and scheme by the defendants herein (including others yet to be identified).

55.    When SEDONA questioned Vasinkevich as to the perplexing stock action, Vasinkevich replied with assurance that:  a) the Ladenburg Investors were long-term investors; b) the Ladenburg Investors were not responsible for any manipulation or any events which were not in the best interest of SEDONA; and

c) those investors did not cause, directly or indirectly, any aspect of SEDONA's continuing stock decline.

56.    However, in an attempt to address SEDONA's concerns and out of an abundance of caution, the funds that Vasinkevich represented he could use to replace the Series G shareholders were from Roseworth and Cambois.  Based upon these representations, SEDONA agreed to continue to allow Ladenburg, again as its fiduciary, investment banker and financial advisor, to begin formalizing the financing with Roseworth and others.

57.    SEDONA has recently learned that Roseworth and Cambois are in fact wholly owned subsidiaries of Creon Management ("Creon"), a British Virgin Island company managed in the United States by Rhino. Creon creates shell companies to "invest" in U.S. companies.  A Director or Authorized Signatory of such shell companies is defendant Sims. Additionally, Creon is a guarantor of another shell company investment in a U.S. publicly traded company, which shell company uses the address of H. U. Bachofen ("Bachofen") in Zurich, Switzerland. Bachofen is the President and Director of AMRO.  Rhino manages Amro in the United States.

58.    Sims is a known participant in illegal stock sales and stock manipulation schemes, who is also involved in *Internet Law Library, Nanopierce* (see paragraph 25), and numerous other cases pending in the Southern District of New York. Sims (who operates through Navigator Management, among other entities) is an Authorized Signatory and Director for various companies created by Rhino, Creon, Badian and other perpetrators of the death spiral finance scheme, and has substantial links

to Mark Valentine ("Valentine"), Badian, Steve Hicks ("Hicks"), Paul Lemmon ("Lemmon") and Ladenburg evidenced by public filings, either as officer, director, fund manager, or other agency relationship in various companies and various transactions to fund U.S. publicly traded companies. A small sampling of U.S. companies financed by entities connected to Sims are illustrated in the chart below:

**INVESTING ENTITIES AFFILIATED THROUGH DAVID SIMS**

| U.S. Company "Investment" | Trading Symbol | Investing Entity and Signatory |
|---|---|---|
| Altair International Inc. | ALTI | Anderson LLC/David Sims c/o Beacon Fund |
| America's Senior Financial Services, Inc.<br>Litigation: 01 Civ. 1051, SDNY; *Fennell Avenue LLC v. Americas Senior Financial Services* | AMSE | Fennell Avenue LLC, Cayman Islands/David Sims |
| ATSI Communications, Inc.<br>Litigation: 02 Civ. 8726, SDNY; *ATSI Communications, Inc. v. The Shaar Fund, Ltd., et al.* | AI | Binkley LLC/Navigator Management/David Sims |
| BestNet Communications Corp. (formerly Wavetech International, Inc.) | BESC | Cedar Avenue LLC, Cayman Islands/David Sims, Director, Navigator Mgt; Thomson Kernaghan |
| Bionutrics, Inc. | BNRX | Justicia Holdings Limited/David Sims, authorized signatory |
| Biopulse International, Inc. | BIOP | Hunts Drive LLC/Navigator Mgt Ltd/David Sims |

| U.S. Company "Investment" | Trading Symbol | Investing Entity and Signatory |
|---|---|---|
| International BioChemical Industries, Inc. (formerly Bioshield Technologies Inc.) | IBCL.PK | Wilson LLC, c/o CITCO Trustees, Grand Cayman/David Sims, Director, Navigator Mgt |
| Calypte Biomedical Corporation | CALY | Townsbury Investments Limited/David Sims, Director |
| CEL-SCI Corporation | CVM | Paul Revere Capital Partners Inc., David Sims, Authorized Signatory; Epstein Becker & Green, Robert F. Charron, Escrow Agent |
| C3D Digital Inc. (formerly Chequemate International, Inc.) | CDDT | Crooks Hollow Road LLC, Grand Cayman/David Sims, Director, Navigator Mgt |
| ColorMax Technologies, Inc. Litigation: *Brook Road LLC v. Tenney, et al.*, C.A. 18655, Delaware Chancery Court, New Castle County | CXTE | Brook Road LLC, Grand Cayman |
| Composite Holdings, Inc. (formerly Composite Industries of America, Inc.) Litigation: *Composite Industries of America, Inc., v. Lenore Avenue LLC, Navigator Mgt., Southridge Capital Mgt., vFinance, Steve Hicks, Christy Constabile, et al.*; CV-S-02-0482 PMP-RJJ; USDC, District of Nevada | COHIA.PK | Lenore Avenue LLC, Grand Cayman/Burlington Street LLC, Tortola BVI |
| Computerized Thermal Imaging, Inc. | CIO | Beach Boulevard LLC, Cayman and Tortola/David Sims, Navigator Management |

| U.S. Company "Investment" | Trading Symbol | Investing Entity and Signatory |
|---|---|---|
| DG Jewelry, Inc.<br><br>Litigation: *Haymarket LLC, v. D. G. Jewelry of Canada, ltd., a/k/a D. G. Jewelry, Ltd., a/k/a D. G. Jewelry, Inc.*; In the Supreme Court for the State of New York; County of New York; Justice Ira Gammerman, Part 27, Index No. 605762/99, PC No.15971 | DGJLQ.PK | Haymarket LLC, c/o CITCO Trustees, Grand Cayman/David Sims, Navigator Mgt. |
| e.Digital Corporation | EDIG | Immanual Kant International Ltd, Tortola/David Sims |
| Equidyne Corp.<br>(formerly American Electromedics Corporation) | IJX | Dominion Capital Fund Ltd. by InterCaribbean Services Ltd, controlled by David Sims |
| eSat Inc. | ASAT | Wentworth LLC, Grand Cayman |
| EuroGas, Inc. | EUGS | Arkledun Drive LLC, Dominion Capital Fund (signed by Mark Valentine), Director is David Sims |
| Eurotech, Ltd. | EUOT | Woodward LLC , Grand Cayman/David Sims, Navigator Mgt. |
| Focus Enhancements, Inc | FCSE | Folkinburg Investments/David Sims, Director; Euston Investments Holdings Ltd/David Sims, Director |
| Fonix Corporation | FNIX.OB | Queen LLC "controlled by David Sims"; Queen LLC/Navigator Mgt. by David Sims, Director; Dominion Capital Fund Ltd/David Sims, Director; Dominion Investment Fund LLC/Navigator Mgt Director, by David Sims |

| U.S. Company "Investment" | Trading Symbol | Investing Entity and Signatory |
|---|---|---|
| General Magic, Inc. | GMGC | Paul Revere Capital Partners Ltd./David Sims, Director, c/o Epstein Becker & Green, 250 Park Ave., NYC 10177 |
| Global Intellicom, Inc. Litigation: *Global Intellicom v. Thomson Kernaghan, et al.*, No. 99 Civ 0342, SDNY | GBITQ | Dominion Capital Fund Limited by Livingstone Asset Management by Navigator Mgt Ltd its President by David Sims, Director |
| Global Maintech Corporation (formerly Singlepoint Systems Corp.) | GBMT | Nash LLC/Navigator Mgt by David Sims/Thomson Kernaghan |
| Homecom Communications, Inc. | HCOM.OB | MacNab LLC/Navigator Mgt, David Sims; Jackson LLC/Navigator Mgt, David Sims |
| Hyperdynamics Corporation | HYPD | Wellington LLC |
| Imaging Diagnostics Systems, Inc. | IMDS | Charlton LLC/Navigator Mgt, David Sims; Minglewood Capital, Director CTC; Livingstone Asset Mgt/Navigator, David Sims |
| Infinite Group, Inc. | IMCI | Cockfield Holdings LLC/David Sims |
| ITIS Holdings Inc. (formerly Internet Law Library Inc.) Litigation: *Internet Law Library, Inc. v. Southridge Capital Management, LLC, et al.*; Case No. 01 Civ 6600, SDNY | ITHH | Cootes Drive LLC/Navigator Mgt. Ltd, David Sims |
| Interiors, Inc. | INTXA | Limeridge LLC/Navigator Mgt., David Sims |

| U.S. Company "Investment" | Trading Symbol | Investing Entity and Signatory |
|---|---|---|
| LecStar Communications Corporation (formerly Corzon Inc., formerly Tanner's Restaurant Group) | LCST | Atlantis Capital Fund by Navigator/David Sims; Sherman LLC by Navigator; Bonham Drive LLC by Navigator Mgt./David Sims |
| Lumenon Innovative Lightwave Technology, Inc. | LUMMQ | Crossover Ventures, Inc. |
| Med Diversified, Inc. (formerly e-Medsoft.com) | MDDVQ.PK | Hoskin International Ltd, Tortola/David Sims, Authorized Signatory |
| Metropolitan Health Networks, Inc. | MDPA | Copira Investments, David Sims |
| MigraTEC, Inc. | MIGR | Ironhead Investments, Inc., David Sims |
| Mobile P.E.T. Systems, Inc. Litigation in San Diego | MBPT | York LLC/Navigator Mgt., David Sims, Arlene DeCastro |
| NanoPierce Technologies, Inc. Litigation: 02 Civ. 0767, SDNY; *NanoPierce Technologies, Inc. v. Southridge Capital Management, LLC, et al.* | NPCT | Harvest Court LLC/Navigator Mgt, David Sims |
| National Scientific Corporation | NSCT | Coriander Enterprises Ltd., controlled by David Sims and Lamberto Banchetti |
| NCT Group, Inc. (formerly Noise Cancellation Technologies, Inc.) | NCTI | Crammer Road LLC, Navigator Mgt., David Sims (listing investors in Crammer Road LLC: Advantage Bermuda Fund, Atlantis Capital Fund, CALP, Dominion Capital Fund Ltd., Sovereign Partners LP) |

| U.S. Company "Investment" | Trading Symbol | Investing Entity and Signatory |
|---|---|---|
| Imergent, Inc. (formerly Netgateway Inc.) | IMGG.OB | King William LLC/Navigator Mgt, David Sims |
| Network Commerce Inc. | NWKC | Cody Holdings Inc., David Sims |
| Rich Coast Inc. | KRHC | Dominion Capital Fund Ltd., David Sims |
| Robotic Vision Systems, Inc. | ROBV | Radyr Investments, 130 West 29th Street - 5th Fl New York, NY 10001 |
| SoftQuad Software, Ltd. (formerly American Sports Machine. Acquired by Corel Corp. in March 2002) Litigation: *U.S. v. Paul D. Lemmon and Mark Valentine* | CORL (formerly SXML, prior to acquisition) | Ashland Resources and Aberdeen Avenue LLC, both by Voyageur Financial Services, David Simms [sic]; Striker Capital Ltd by Voyageur Financial Services by Paul Lemmon; Pinetree Capital, VC Advantage by VCA Mgt. Ltd. by Hammock Group Ltd. by Voyageur Financial Services, by Paul Lemmon and Thomson Kernaghan, signed by Mark Valentine |
| Stemcells, Inc. (formerly Cytotherapeutics Inc.) | STEM | Sativum Investments Limited, David Sims |
| Swissray International, Inc. | SRMI.PK | Hillcrest Avenue LLC by Navigator Mgt., by Livingstone Asset Mgt Ltd., controlled by Sims |
| Technest Holdings, Inc. | THNS | Garth LLC, Southshore Capital Fund,, Navigator Marlene R. Goldberg/David Sims; also Greenfield Investment Consultants LLC (Hicks), Rearden Trust |

| U.S. Company "Investment" | Trading Symbol | Investing Entity and Signatory |
|---|---|---|
| 24/7 Media, Inc. | TFSM | Maya Cove Holdings by David Sims |
| Valicert, Inc. | VLCT | Rellian Investments, David Sims |
| Vie Financial Group, Inc. (formerly Ashton Technology Group, Inc.) | VIEF | Jameson Drive LLC, Cayman Islands/David Sims |
| WaveRider Communications Inc. | WAVC | Radyr Group Investments/Hans Gassner, Director |
| Universal Communications Systems, Inc. (formerly World Wide Wireless Communications, Inc.) | UCSY | Splendid Rock Holdings Ltd., David Sims |

59.    It is important to note that Valentine has been indicted for stock fraud in the Southern District of Florida, has been ordered by the Ontario Securities Commission ("OSC") to cease trading, and is currently defending numerous lawsuits in New York, Atlanta, and other states for activities similar to those complained of herein. The OSC allegations against Valentine state that an offshore company named Ashland Resources was used in the manipulation of U.S. traded company C-Me-Run, with Valentine-affiliated companies on one side of the manipulation, and companies with Valentine as Registered Representative on the other side of the manipulation. Ashland Resources and Valentine used Lemmon in Bermuda as the broker (who has plead guilty in Operation Bermuda Short). Defendant Sims has signed on behalf of Ashland Resources.

60.     Thomson Kernaghan funds purchased the C-Me-Run shares, while the offshore accounts, including Ashland, were the sellers on the other side of the trades: "The net effect of the fund's numerous trades of C-Me-Run was a loss of almost $4.5-million, while the net effect for Ashland Resources was a trading profit of almost $6.4-million," stated the OSC.  The OSC allegation describes pre-arranged trading and indicates a pre-arrangement to share in the profits from the manipulation. The enterprise used cross-border transactions from Canada to Bermuda, into the United States through U.S. market participants, and illegally obtained profits were moved out of the United States through more cross-border transactions.

61.     This complicated trading and movement of transactions could not have occurred without U.S. cooperating participants. The nature of the convoluted transactions and the creation of numerous shell companies by Valentine, Lemmon, Rhino, Sims and others, demonstrate a compelling need for complete, transparent and intense discovery of the records of the SEDONA transactions.

62.     SEDONA now knows that the representations made by Vasinkevich, who had prior working experience with Valentine, Sims, Hicks and Badian, were untrue, and that Vasinkevich omitted advising SEDONA that all of the defendants herein and others associated with these parties were: a) known by Vasinkevich as illegal shorters of stock; b) known perpetrators of stock manipulation; c) participants in past financings with Rhino and were affiliated with Valentine of Thomson Kernaghan and Hicks of Southridge Capital (all of whom are defendants in numerous complaints pending in the Southern District of New York and in many more that have been filed to date in other states); d) working for the benefit of the

defendants and not for the benefit of SEDONA; and e) conspiring to destroy the stock price of SEDONA. Without the benefit of such knowledge, SEDONA entered into agreements with Roseworth and Cambois to sell equity off their existing shelf registration. The fact that Roseworth and Cambois are wholly-owned by Creon, which is a company managed by Rhino, was a misrepresentation by omission of Vasinkevich, Badian, Ladenburg, Roseworth, Cambois and Rhino, as the U.S. Manager of Creon. SEDONA now knows that the Roseworth and Cambois shares were instructed to be delivered into the same brokerage account at Pershing as used by Rhino on behalf of Amro.

63.     Amro, advised by Rhino and represented by Ladenburg, entered into a Convertible Debentures and Warrant Purchase Agreement ("Purchase Agreement") with SEDONA (also containing a covenant not to engage in short sales and other prohibitions), which resulted in a $3 Million gross funding to SEDONA less fees paid to Ladenburg. However, net proceeds actually received by SEDONA were much less, as approximately $2,246,000 was used to retire the Series G Preferred. It is this Debenture and activities (over a 27-day period), upon which the SEC Complaint is based.

64.     Further, SEDONA now believes that the activity described in the SEC Complaint occurred from the inception of its relationship with Ladenburg, with all other preferred and equity shelf purchases, and all the other defendants herein. The SEC Complaint states that between March 1st and March 29th, 2001, "Rhino and Badian directed a series of short sales of SEDONA stock through an account at a U.S. broker-dealer held in the Client's name and controlled by Badian". At the

time, <u>the client owned no SEDONA stock.  Rhino did not deliver the shares that it was selling short by settlement day and the broker neither bought nor borrowed stock to cover the sales</u> ("Counterfeit Naked Short Sales").  In violation of the Purchase Agreement's prohibition against short selling, Rhino placed sale orders with the U.S. broker-dealer, who thereafter placed sale orders with another broker-dealer (the "Cooperating Broker Dealer") in SEDONA stock.  Each day in March 2001, the Cooperating Broker Dealer executed sales of SEDONA stock in its proprietary account.  The Cooperating Broker Dealer often placed these sales through various Electronic Communications Networks (ECNs), which <u>provided anonymity to traders wishing to conceal their identity from the market</u>.  At the time of these sales, the Cooperating Broker-Dealer did not possess any shares of the SEDONA stock that it was selling.

65.     The Cooperating Broker Dealer covered its short sales through the ECNs by purchasing the shares from Rhino's client's account at the U.S. broker-dealer. The Cooperating Broker-Dealer executed the purchases after the sales had been effected through the ECNs and after the market had closed.

66.     The Cooperating Broker-Dealer would purchase the shares at prices slightly below the average prices of sales through the ECNs, thus ensuring itself a profit. As a consequence, these purchases were not printed to the NASDAQ tape and were not included in the reported volume for the day.

67.     Since the client did not own SEDONA stock, the sale transactions resulted in short positions in the client's account.  However, because the sales were not

reported as short sales or the purchases printed on the NASDAQ tape, <u>the short sales were not reported to the market as short sales.</u>

68.     Rhino continued thereafter to execute short sales in the client's account, despite repeated failure to deliver shares by settlement date. In sum in March 2001, through Badian's trades, the client sold short 872,796 shares of SEDONA stock. Of those shares, the client sold short 785,536 prior to its first exercise of its conversion rights under the debenture.

69.     These failures to deliver shares triggered clearing failures at the Depository Trust and Clearing Corporation. As a result of the clearing failure, on March 22, 2001, the NASDAQ placed a short restriction on SEDONA stock that required that any future sales of SEDONA would be subject to a mandatory closeout if there was a failure to deliver the securities after ten (10) days.

70.     It is important to note that the Ladenburg Investors, including Rhino and its investors, by failing to deliver shares they sold, caused this short restriction that the SEC Complaint refers to. During the manipulation period SEDONA is complaining of, short sale restrictions were placed on shares of SEDONA for the following extended periods of time: 8/28/00 through 2/15/01; 3/22/01 through 7/19/01 and 9/11/01 through 5/24/02.

71.     After the NASDAQ placed the March 22, 2001 short restriction on SEDONA stock, Rhino sold short SEDONA shares from the account it controlled on behalf of the client at a "Canadian Broker-Dealer." Upon information and belief, SEDONA believes this Canadian broker-dealer is Thomson Kernaghan, an entity previously controlled by Mark Valentine and others. Canadian Broker-Dealers

are not members of the NASD and are not subject to its short sale restrictions put in place by the NASDAQ on SEDONA's stock.  Beginning on March 30th and continuing through mid-April 2001, Rhino executed short sales through the Canadian account.

72.    All of this activity continued to put downward pressure on SEDONA's stock price.  This resulted in Rhino, through two accounts it controlled on behalf of the client, accumulating an open and undelivered short position in SEDONA stock of 1,193,296 shares in just 31 trading days.

### I.    Some Other Examples of Manipulations by Defendants Herein

73.    Although the manipulative activity in March, April and May 2001 (substantiated by the SEC Complaint) is compelling, SEDONA now believes that this activity was begun much earlier by all defendants herein, and that it was occurring on or about December 7, 2000, when SEDONA announced a customer service agreement with IBM at 3:20 p.m.  December 7, 2000 was an unremarkable day in the trading of SEDONA shares until 3:22 p.m. Prior to the announcement, 70,714 SEDONA shares were traded in 64 trades. Following the announcement, and with only 38 minutes left in market time, 646,648 SEDONA shares were traded in 474 trades.

74.    Multiple sell orders in 50,000 and 100,000 share blocks appeared on the ECNs and ECN Island, Inc., which SEDONA believes has a history of stacking blocks of stock on the ask side of SEDONA's trading, inhibiting upward price momentum.  After rising to a price of $1.34, these large block sell orders, along with other manipulation techniques, put downward pressure on the stock,

intimidating bonafide purchasers, and creating a false market appearance, thereby lowering the price of SEDONA stock during the balance of the 30 minute trading session.  Prior to the announcement, the SEDONA share price was $1.06. 38 minutes and 474 trades later, the price ended the day at $1.06, after moving to a high of $1.34. Prior to the announcement, Frankel, a market maker, made only one trade for the day. Following the announcement, Frankel made 106 sale trades for 138,800 shares with an after-hours cleanup trade of a purchase of 155,000 shares. This trading technique is described in the SEC Complaint.

75.     This form of manipulation continued the next trading day when the stock opened and closed at $1.1562 and experienced a low of $0.875 on a volume of 440,800 shares. On this day, Frankel sold 13,500 shares, and purchased none until an after-hours cleanup trade purchase of 12,500 shares. The same pattern is found in a NASDAQ Equity Trade Journal for December 6, 2000, where Frankel sold 20,000 shares, and purchased none until an after-hours cleanup trade of a purchase of 20,000 shares.

76.     Other representative examples of positive company announcements resulting in stock declines due to high volume selling activity subsequent to the time period of the SEC investigation (March, 2001) are as follows:  a) on April 18, 2001, the Company announced that year 2000 results would be up 600 percent.  The previous day's volume was 287,200.  The stock opened at $0.95, reached a high of $1.00, and closed down at $0.88 on a volume of 487,300 shares; b) on April 19, 2001, the Company announced that it had achieved Advanced Business Partner level with IBM, which designation less than 200 companies enjoy,

whereupon the stock opened at $0.98, reaching a high of $1.02 and a low of $0.94, only to close at $0.96 on a volume of 452,600 shares; and c) on May 7, 2001, SEDONA announced a contract with Dime Bank of New York, a $27 Billion financial institution. The previous day's volume was 36,300 shares. On this day the stock had an opening price of $1.16, a high of $1.32, and a close at $1.24 on a volume of 372,200 shares. The stock opened the next day at $1.33, traded to a high of $1.38, a low of $1.20, and closed at $1.24 on a volume of 268,400.

77.     This same type of pummeling stock trading activity in connection with positive developments at SEDONA was carried out on May 14, 2001, May 16, 2001, and during the months of February and April of 2002. Despite all of these developments, SEDONA's stock behaved in a similar manner each and every time. The stock peaked early, after news, and then declined each time resulting in little or no gain, or a loss. It is the belief of SEDONA that this pattern was due to the defendants herein (in addition to others) manipulating SEDONA stock by illegally selling short, failing to deliver securities of SEDONA, laddering the offer to prevent any upward momentum, illegally selling shares at the bid price as if they were actual "long" shares, not reporting large volumes of illegal stock trading outside of the marketplace, intimidating bonafide purchasers, engaging in other non-economically feasible transactions, in most cases, selling stock they did not own, entering into massive counterfeit sales and using multiple manipulation techniques to control the free market pricing of SEDONA's stock.

78.     The following further illustrates the long-term nature of the manipulation used against SEDONA, commencing in the Fall of 2000 through May of 2001 and beyond. During the Fall of 2000, SEDONA stock began to experience numerous aftermarket trades. These trades amounted to a large percentage of volume traded each day, and were printed in an after-market trade (most often by Frankel). This same pattern is described in the 2001 trading of SEDONA shares in the SEC Complaint. SEDONA also requested and received Market Maker Volume Report data from NASDAQ which shows that in October 2000, Frankel accounted for 28.7 percent of all volume in SEDONA, in November 2000, Frankel accounted for 30.4 percent of all volume, and in December 2000, Frankel accounted for 27.9 percent of all volume. It is important to note that Vasinkevich and Badian represented to SEDONA that they had no trading relationship with Frankel. Upon information and belief, SEDONA now believes this representation was and is untrue and that agents for these parties were effecting transactions with Frankel.

79.     In late 2001 SEDONA found out that Westminster, at relevant times herein, shared office space in New York City with Rhino and the two funds it manages, Amro and Creon, and that entities affiliated with Sims used the address of Westminster. Based upon information received by SEDONA, SEDONA now knows that Westminster was an active broker-dealer for Amro and Rhino. Upon information and belief, SEDONA alleges that Westminster also acted as a broker-dealer for other defendants herein as well. During the time frame under the SEC Complaint, Westminster traded over 1,800,000 SEDONA shares as a non-reporting market maker. SEDONA also believes that Westminster through its

clearing firm, Pershing, illegally converted short positions into false long positions, was responsible for stacking bids and/or offers in an effort to manipulate the stock up or down, and likewise was responsible for the manipulation of SEDONA's stock herein. Upon information and belief, Pershing is a direct participant in the manipulation, in that Westminster clears its trades, including but not limited to the trades set forth herein, through Pershing, and that Pershing, among other potential violations, failed in its duty as "gatekeeper to the public markets", to report these large suspicious transactions to its superiors, the market regulators.

80.   In September 2001, SEDONA received a report alleging that manipulation and fraud had been perpetrated against it. After reviewing the report, in October 2001, SEDONA refused to honor any more conversions from the Debenture, and asked the SEC to investigate the allegations expressed in the report. On October 24, 2001, Amro filed suit in the United States Southern District Court of New York against SEDONA seeking to force SEDONA to honor its conversion notices relating to the Debenture.   SEDONA immediately responded, before Judge Buchwald, that the stock may have been manipulated and that it needed subpoena and discovery power to prove such allegations.   Judge Buchwald allowed the argument and granted limited power of subpoena to SEDONA. As SEDONA began to send out the subpoenas, and those named began receiving them, SEDONA was notified that the action would be vacated by the complainants, and power of discovery was dropped.   Shortly thereafter, a settlement on the Debenture was reached.

81.     Roseworth, Cambois, Amro and Rhino ("Released Parties") each obtained a release from SEDONA, and in exchange for such releases, Amro agreed to accept a payout of the Debenture at a discounted rate, all of which SEDONA has paid to date. It is SEDONA's belief that the releases were obtained by fraud and duress, and are void and unenforceable, as the Released Parties continued to manipulate SEDONA's stock, as before, during and after the releases were entered, and took advantage of SEDONA at a time when SEDONA's finances were very limited due to the fraudulent misrepresentations and market manipulation of the defendants.

82.     On January 9, 2003, SEDONA was de-listed from the NASDAQ SmallCap Market. This was a very negative event for SEDONA which also had a positive effect on the defendants herein, as market participants were now governed by a less-regulated atmosphere in which to conduct their manipulative activity. SEDONA believes that the de-listing directly resulted from the illegal price and market capitalization manipulation of its stock caused by the defendants and their affiliates.

83.     On various occasions in October through December 2001, SEDONA requested that the SEC formally investigate trading activities in the stock of SEDONA. This request was honored and an informal investigation over the next five months resulted in the SEC issuing a June 5, 2002 formal Order Directing Private Investigation and Designating Officers to Take Testimony, followed by the SEC ultimately filing its own complaint based upon their finding of extensive stock manipulation from Rhino and Badian.

84.    In the SEC cause of action, a settlement was reached by the SEC and Rhino and

Badian, in February 2003.    Upon information and belief, there are other

individuals and companies the SEC is presently investigating (all referenced in

general in the SEC Complaint), against whom the SEC may file complaints

similar to the one it filed against Rhino and Badian. For example, James Coffman,

assistant director of enforcement at the SEC, was quoted in a *Financial Times*

article entitled "SEC widens probe into 'death-spiral' schemes" by John Labate

dated March 9, 2003, in regards to the Rhino/Badian SEC matter, as saying:

"[t]hese are the kind of violations that often occur with the assistance of other

market professionals. Where that's the case, the commission intends to pursue

matters and bring enforcement actions as appropriate."

85.    SEDONA believes that full discovery of its trading records will reveal that

SEDONA's publicly traded securities are still being controlled and manipulated

today in an effort to protect a previously established and illegally counterfeited

stock position in SEDONA. In January, February and March of 2003, two market

makers accounted for 57% of the trading volume in SEDONA's stock.  February

27, 2003, the very day the SEC announced its action and manipulation claims

against Rhino and Badian in the securities of SEDONA, buying pressure came

into the stock of SEDONA with 561,300 shares trading, which was over 10 times

SEDONA's prior 20-day average trading volume of 52,245 shares.  Similar to the

trading pattern previously described in connection with SEDONA's positive news

announcements, downward pressure on the price of the stock was asserted,

exemplified as SEDONA opened at .19 cents, traded up to .29 cents, only to close

at .23 cents, which SEDONA alleges is the result of manipulation of the defendants herein along with others. Following the SEC announcement on February 27th, SEDONA traded 1,377,500 shares to close on March 28, 2003 at SEDONA's February 27th opening price of .19 cents.

86.     Due to all of the above, it has been virtually impossible for SEDONA to obtain additional financing or an investment of any type, except on a limited basis through existing shareholders.   SEDONA believes that this inability to obtain financing or legitimate investment on behalf of SEDONA is a direct result of the defendants' plans and actions.   With additional investment and financing, SEDONA believes that it could have substantially increased its business with its key customers described above as well as with similar like customers who have expressed concern about SEDONA's continued viability due to the manipulated depression of SEDONA's stock price.

### III.    CLAIMS FOR RELIEF
#### First Claim for Relief
#### (Violation of Section 10(b) and Rule 10b-5 Against Ladenburg, Rhino, Markham, Aspen, Cuttyhunk, Sarlo, Amro, Roseworth, Cambois, Badian, Tohn, Boris and Vasinkevich)

87.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 86 as if fully set forth herein.

88.     Defendant Ladenburg, by and through its principals, officers, directors, or agents, including, without limitation, Badian, Tohn, Boris and Vasinkevich made the misrepresentations and omissions alleged in paragraphs 22 through 86.

89.     Defendants Badian, Tohn, Boris and Vasinkevich personally knew at the time of these misrepresentations and omissions that the same were untrue. They also

reconfirmed individually the representations they had made as agents of Ladenburg in paragraphs 37 through 45.

90.     The misrepresentations and omissions identified above were made in connection with the sale of securities by SEDONA to Ladenburg and its clients, the Ladenburg Investors, and in so doing, Ladenburg employed the means and instrumentalities of interstate commerce and communication.

91.     Defendants Ladenburg, Rhino, Markham, Aspen, Cuttyhunk, Sarlo, Amro, Roseworth, Cambois, Badian, Tohn, Boris and Vasinkevich acted with *scienter* in making the foregoing misrepresentations and omissions. As alleged above, the structure of the financing agreement gave the defendants both the motive and the opportunity to defraud SEDONA.

92.     All the above named defendants intended that SEDONA rely, and SEDONA did reasonably rely, on each of the defendants' misrepresentations and omissions, and was injured thereby. The misrepresentations and omissions caused SEDONA to sell securities to Ladenburg and the Ladenburg Investors, and, in doing so, dramatically and adversely affected the price and terms of those sales.

93.     Defendants Ladenburg, Rhino, Markham, Aspen, Cuttyhunk, Sarlo, Amro, Roseworth, Cambois, Badian, Tohn, Boris and Vasinkevich, in connection with the purchase or sale of securities and in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder:

   a)     Employed a device, scheme, or artifice to defraud SEDONA;
   b)     Made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c) Engaged in acts, practices, or courses of business that operated or would operate as a fraud or deceit upon SEDONA, in connection with the purchase or sale of a security.

All of the above acts were in violation of law and Defendants Ladenburg, Rhino, Markham, Aspen, Cuttyhunk, Sarlo, Amro, Roseworth, Cambois, Badian, Tohn, Boris and Vasinkevich are liable to SEDONA for damages caused by the violations.

### Second Claim for Relief - Violation of Section 10(b) and Rule 10b-5 (Manipulation Claim Against All Defendants)

94.     SEDONA repeats and realleges paragraphs 1 through 93 as if fully set forth herein.

95.     All defendants participated in a scheme to defraud SEDONA by manipulating the price of SEDONA stock. The scheme was carried out by use of the mails and wires in interstate commerce.

96.     As is exemplified in paragraphs 45 through 58 and 73 through 85 hereof, starting in February 2000 through May 2001 and beyond, all defendants including without limitation, Ladenburg, Markham, Rhino, Aspen, Cuttyhunk, Sarlo, Amro, Roseworth, Cambois, Westminster and Pershing, and each of their affiliates and agents, manipulated the price of SEDONA's stock by causing large volumes of stock to be sold with the intent to artificially depress the price of SEDONA stock. This methodology is also set forth in detail in the SEC Complaint, described in Paragraphs 64 through 72 hereof.  By dumping a large volume of stock on the market, and by using pre-arranged sales, engaging in non-economically feasible trades and washed sales, failing to obtain the best price in covering short positions, painting the tape, creating false buy-ins, using devices to intimidate bonafide purchasers, using after hours trades, using trades unreported to the

NASD, and employing Counterfeit Naked Short Sales, as is explained in paragraphs 40 through 50 and 64 through 85 hereof, the defendants were able to inject false information into the marketplace concerning trading in and sales of SEDONA stock. That false information dramatically and artificially lowered the price of SEDONA stock from a peak of $10.25 down to $0.20, as set forth in paragraph 49 hereof.

97.    All defendants acted with scienter, as each defendant had the motive to engage in this scheme, because of the structure of the financing agreement, and the opportunity to engage in this scheme, because of the stock issued by SEDONA. Defendants' scienter is further confirmed by their involvement in similar schemes in the past, as alleged in paragraphs 23 through 28, 33 and 56 through 72 hereof.

98.    Plaintiff was damaged by the Defendants' manipulation, because it bought or sold stock during the time when the stock price was artificially depressed by that manipulation, in reasonable reliance on the market price for SEDONA stock.

**Third Claim for Relief - Tortious Interference with Contract
and Tortious Interference with Business Relationship
(Against All Defendants)**

99.    SEDONA repeats and realleges the allegations of paragraphs 1 through 98 as if fully set forth herein.

100.   All defendants herein drove down the price of the stock of SEDONA to such a level that it substantially precluded SEDONA from maximizing its ability to profit from certain contracts, including those agreements with existing partners, acquired targets such as Acxiom Corporation, and potential partners,

implementing various parts of its business plan, completing transactions with third parties or obtaining additional financing.

101.    Further, defendants herein, with knowledge and forethought, drove down the price of SEDONA's stock so much that it precluded SEDONA from obtaining additional financing for which SEDONA had signed agreements, and on which SEDONA could have closed, but for the actions of defendants herein.

102.    Defendants herein knew or should have known that their actions described above would proximately cause SEDONA to be unable to complete such business or financing transactions.

103.    Further, such actions of defendants interfered with the contracts and business relationships of SEDONA with all entities who SEDONA intended would become business partners, transaction targets and/or financiers, and have jeopardized those relationships and contracts and caused SEDONA to lose credibility in those relationships.

**Fourth Claim for Relief: Violation of Title 70 Chapter 1.5**
**Pennsylvania Securities Act of 1972 Part IV Section 1-401 Sales and Purchases**
**(hereinafter the "Pennsylvania Act")**
**(Against All Defendants)**

104.    SEDONA repeats and realleges paragraphs 1 through 103 as if fully set forth herein.

105.    Defendants, directly or indirectly, have used or employed, in connection with the purchase or sale of SEDONA's securities, manipulative or deceptive devices or contrivances, and have made untrue statements of material fact and have omitted to state material facts necessary to make statements made, in light of the circumstances in which they were made, not misleading, and have engaged in acts

and practices that operate as a fraud and a deceit, in contravention of Pennsylvania law. Without limitation, defendants have, as alleged above:

a)     Employed a device, scheme, or artifice to defraud;
b)     Made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and
c)     Engaged in acts, practices, and courses of business that operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

106.     Defendants' misrepresentations and omissions, as detailed above, were material.

107.     SEDONA reasonably relied on those misrepresentations and omissions.

108.     SEDONA has been injured by the defendants' conduct.

109.     As a result of these violations, defendants, and each of them, are liable to SEDONA pursuant to the Pennsylvania Act.

**Fifth Claim for Relief: Common Law Fraud and Deceit**
**(Against Defendants Ladenburg, Rhino, Markham, Aspen, Cuttyhunk,**
**Sarlo, Amro, Roseworth, Cambois, Badian, Tohn, Boris and Vasinkevich)**

110.     SEDONA repeats and realleges the allegations of paragraphs 1 through 109 as if fully set forth herein.

111.     As alleged above, defendants Ladenburg, Rhino, Markham, Aspen, Cuttyhunk, Sarlo, Amro, Roseworth, Cambois, Badian, Tohn, Boris and Vasinkevich made the misrepresentations of material facts and omissions of material facts, knowing that such representations were false and knowing that SEDONA was unaware of the falsity, with the intent that SEDONA rely on such false representations.

112.     As alleged above, SEDONA did reasonably rely, to its detriment. Plaintiff seeks actual and punitive damages therefor.

### Sixth Claim for Relief:  Civil Conspiracy to Commit Fraud
### (Against All Defendants)

113.    SEDONA repeats and realleges the allegations of paragraphs 1 through 112 as if fully set forth herein.

114.    The defendants conspired to commit the tort of fraud against SEDONA. This conspiracy claim is predicated on the tort of fraud, in that the object of the conspiracy was to defraud SEDONA as alleged above, and, by doing so, to acquire the initial shares, warrants, cash, and other consideration, including additional shares, to profit illegally therefrom and/or to gain eventual control or destruction of SEDONA. The unlawful acts as alleged above were committed in furtherance of that conspiracy, predicated on the tort of fraud, and caused damage to SEDONA.

### Seventh Claim for Relief: Breach of Contract
### (Against Ladenburg, Markham, Aspen, Cuttyhunk, Sarlo, Amro, Roseworth, Cambois and Boris)

115.    SEDONA repeats and realleges paragraphs 1 through 114 as if fully set forth herein.

116.    Ladenburg and Ladenburg Investors promised in writing, in transactional agreements, to fund up to $50 Million, as is evidenced by the March 8, 2000 Ladenburg Letter.  The defendants herein failed to fully fund this contract. SEDONA received only a small portion of these monies so committed, less fees and expenses dictated by defendants, leaving a significant difference between funds so committed by the Ladenburg and Ladenburg Investors and the funds actually "invested."

117.    Further, Ladenburg and the Ladenburg Investors entered into oral and written agreements with SEDONA as stated above and breached most of such agreements, including but not limited to the following breaches:

a)    Selling more stock of SEDONA than agreed;
b)    Shorting stock of SEDONA;
c)    Not being an accredited investor;
d)    Not investing for the long term;
e)    Failing to obtain the best price for SEDONA stock;
f)    Failing to fund what they committed to fund; and
g)    Other acts that were not in the best interest of SEDONA hereinbefore mentioned, in violation of state and federal law, rules, and regulations of the Securities and Exchange Commission, American Stock Exchange, National Association of Security Dealers (NASD), including but not limited to, Rule 10(a) of the Securities Exchange Act of 1934, as amended, and Rules 3350, 3370 and 3310 of the NASD.

118.    SEDONA has been damaged in the amount of at least $160 Million by defendants' breach of contract, in addition to attorney's fees and interest pursuant to the contract transactional documents.

**Eighth Claim for Relief: Disgorgement and Restitution - Securities Exchange Act of 1934 Section 3(a) (4,5), 15 (c) (1), 28 (a) as amended 15 U.S.C.A Section78c (a) (4,5), 780 (c) (1), 78 bb(a). (Restitution Claim Against All Defendants)**

119.    SEDONA repeats and realleges paragraphs 1 through 118 as if fully set forth herein.

120.    Defendants and each of them made profits from their fraudulent and or manipulative conduct.

121.    Each defendant: (a) engaged in more than ministerial functions and (b) has a repetitive pattern of behavior of defrauding public companies.    Clearly a reasonable man and plaintiff would have considered these functions and the

disclosures of such pattern important, prior to purchasing and or selling SEDONA's stock.

122.    SEDONA was damaged by virtue of each defendant's conduct under 15 U.S.C. 78 bb(a). The damages therein are the difference between the fair market value of the shares without the fraud and or manipulative conduct of defendants and the price of the shares sold with such fraudulent and/or manipulative conduct, except for the situation where the defendants received more than the sellers' actual loss, wherein the damages are the defendants' profit. Upon information and belief SEDONA states that defendants herein have profited by materially more than the actual damages of SEDONA. Therefore, SEDONA sues all defendants herein, jointly and severally, for disgorgement and restitution in accordance with the holding in *Affiliated Ute Citizens v. United States*, 406 U.S.128 (1972).

**Ninth Claim for Relief: Breach of Fiduciary Duty By Ladenburg**

123.    SEDONA repeats and realleges the allegations in paragraphs 1 through 122 as if fully set forth herein.

124.    Based upon the January 24, 2000 Ladenburg Letter, Ladenburg was to act as financial advisor to SEDONA. This agreement to act as financial advisor created a special relationship of trust between Ladenburg and SEDONA. In acting as financial advisor, Ladenburg had a duty to protect the financial interest of SEDONA first and foremost. In relying on Ladenburg, SEDONA relied and believed that the transactions in question were fair and equitable (when in fact SEDONA now knows that they were not, based upon all facts set forth above).

125.    SEDONA had confidence in and relied upon Ladenburg based upon Ladenburg's 100-plus years of existence, the alleged billions of dollars it had previously funded, its alleged pristine track record, and other factors as stated above.

126.    SEDONA understood that Ladenburg would act in utmost good faith and exercise scrupulous honesty towards SEDONA.

127.    SEDONA understood that Ladenburg would place the interests of SEDONA before the interests of Ladenburg and Ladenburg Investors, not take advantage of its position with SEDONA to gain any benefit for themselves at the expense of SEDONA, and that Ladenburg would not place itself in any position where the self-interest of Ladenburg or the Ladenburg Investors might conflict with Ladenburg's obligation as financial advisor and fiduciary to SEDONA.

128.    SEDONA now knows that the transactions in question were not fair and equitable, that Ladenburg exploited the confidence that SEDONA placed in it, that Ladenburg acted in bad faith and exercised unscrupulous conduct, that Ladenburg placed the interest of itself and Ladenburg Investors prior and foremost before the interest of SEDONA, while taking advantage of its position for its own personal gain and the gain of Ladenburg Investors, all at the expense of SEDONA, and, in doing so, breached its fiduciary duty. Finally, Ladenburg failed to disclose all-important information concerning the transactions to SEDONA. Because of the above, Ladenburg has breached its fiduciary duty to SEDONA, and SEDONA incurred substantial damages as a proximate cause of such breach.

**Tenth Claim for Relief: Negligent Misrepresentation**
**(Against Ladenburg, Rhino, Cuttyhunk, Markham, Sarlo,**
**Amro, Roseworth and Cambois)**

129.    SEDONA repeats and realleges the allegations in paragraphs 1 through 128 as if fully set forth herein.

130.    As alleged above, defendants Ladenburg, Rhino, Cuttyhunk, Markham, Sarlo, Amro, Roseworth and Cambois all: a) made misrepresentations in the course of their business in which they had respective pecuniary interests; b) made those misrepresentations by knowingly supplying false information intended for the reliance and use of SEDONA and its business activities.  All the above-named defendants in this ninth claim made such representations, and, in doing so, did not exercise reasonable care or competency in obtaining or communicating the information so misrepresented to SEDONA. SEDONA reasonably relied on such misrepresentations of the defendants and incurred substantial damages as a result.

131.    Based on the above, SEDONA has a claim for negligent misrepresentation against the defendants stated above.

**Jury Demand**

SEDONA asserts its right under the Seventh Amendment of the United States Constitution and demands a trial by jury on all issues, in accordance with Federal Rule of Civil Procedure 38.

WHEREFORE, SEDONA prays that upon the trial of this action SEDONA recover from each defendant, jointly and severally, as follows:

a)    Rescission of all agreements between the parties;

b)    Damages in the amount of at least Five Hundred Million Dollars ($500,000,000), representing the decline in SEDONA's market value caused by the conduct of the

defendants and any subsequent decline in SEDONA's market value as a result of the defendants' wrongful conduct;

c)      Damages in the amount of at least One Hundred Sixty Million Dollars ($160,000,000), representing the contractual damage for the failure of Ladenburg and Ladenburg Investors to honor its contracts with SEDONA;

d)      Recovery of SEDONA's costs incurred in legal, accounting, and other fees occasioned by the filing of the S-3 registration statements and other related filings required by the defendants and SEDONA being delisted by the NASDAQ Exchange;

e)      Injunctive relief enjoining the defendants from engaging in transactions in SEDONA's securities and from engaging in short sales of SEDONA's stock pending final resolution of this action;

f)      An accounting for all profits made by the defendants in transactions in securities issued by SEDONA, and disgorgement and restitution of those profits;

g)      Recovery of all of SEDONA's attorney's fees, expert witness fees, and costs and disbursements of suit;

h)      Pre-judgment and post-judgment interest at the maximum rate provided by law;

i)      Exemplary damages from each of the defendants, jointly and severally, in the amount of Two Billion Dollars ($2,000,000,000.);

j)      Damages in an amount to be determined representing the loss incurred by SEDONA for tortious interference with contracts or business relationships of SEDONA;

k)      Damages in an amount to be determined representing the loss incurred by SEDONA for breach of fiduciary duty of Ladenburg; and

l)      Such other and further relief to which Plaintiffs are deemed entitled by the Court and/or
        the jury.


DATED:      May 5, 2003
            New York. New York


                                    Respectfully submitted,

                                    KOERNER SILBERBERG & WEINER,
                                    LLP
                                    By:
                                    MARYANN PERONTI (MP-4929)
                                    Attorneys for SEDONA Corporation
                                    112 Madison Avenue, 3rd Floor
                                    New York, New York  10016

ORIGINAL

AO 440 (Rev. 10/93) Summons in a Civil Action · SDNY WEB 4/99

# United States District Court

_____ SOUTHERN _____    DISTRICT OF _____ NEW YORK _____

SEDONA CORPORATION,
a Pennsylvania Corporation

### SUMMONS IN A CIVIL CASE

**v.**

LADENBERG THALMANN & CO., INC.;
PERSHING, LLC; WESTMINSTER SECURITIES
CORPORATION; WM. V. FRANKEL & CO., INC.;
RHINO ADVISORS, INC.; ET AL

CASE NUMBER: JUDGE WOOD

03 CV 3120

TO: (Name and address of defendant)

LADENBERG THALMANN & CO., INC.
590 MADISON AVENUE
NEW YORK, NEW YORK 10022

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

MARYANN PERONIT, ESQ.
KOERNER SILBERBERG & WEINER LLP
112 MADISON AVENUE - 3RD FLORR
NEW YORK, NEW YORK 10016

an answer to the complaint which is herewith served upon you, within _____ 20 (TWENTY) _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

CLERK _Melanie L. Lopez_

(BY) DEPUTY CLERK

MAY 5 - 2003

DATE

ORIGINAL.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK **JUDGE WOOD**
----------------------------------------------------------

SEDONA CORPORATION
a Pennsylvania Corporation,

                Plaintiff, :

    - against -

LADENBURG THALMANN & CO., INC.; PERSHING,
LLC; WESTMINSTER SECURITIES CORPORATION;
WM. V. FRANKEL & CO., INC.; RHINO ADVISORS,
INC.; MARKHAM HOLDINGS LIMITED; ASPEN
INTERNATIONAL LTD.; THE CUTTYHUNK FUND
LIMITED c/o OPTIMA FUND MANAGEMENT L.P.;
THE GEORGE S. SARLO 1995 CHARITABLE
REMAINDER TRUST; AMRO INTERNATIONAL,
S.A.; ROSEWORTH GROUP LIMITED; CAMBOIS
FINANCE INC.; THOMAS BADIAN; THOMAS TOHN;
DAVID BORIS; MICHAEL VASINKEVICH; DAVID
SIMS; and JOHN DOES 1 to 150,

                Defendants.

---------------------------------------------------------------- X

**03 CV 3120**

**RULE 1.7 PLAINTIFF
DISCLOSURE STATEMENT**

No. _____



      Pursuant to Rule 1.7 of the Local Rules of the U.S. District Court for the Southern and
Eastern District of New York and to enable Judges and Magistrate Judges of the Court to evaluate
possible disqualification or recusal, the undersigned counsel for Plaintiff SEDONA Corporation
certifies that SEDONA Corporation is a publicly-held company that has no parent but that has these
subsidiaries:

           SEDONA GeoServices, Inc.
           Technology Resource Centers, Inc.

Dated:  New York, New York
        May 5, 2003

                    KOERNER SILBERBERG & WEINER, LLP

           By: _____
                Maryann Peronti (MP-4929)
                *Attorneys for Plaintiff*
                112 Madison Avenue, 3rd Floor
                New York, New York 10016-7424
                (212) 689-4400