UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**ORIGINAL**

SEDONA CORPORATION,

        Plaintiff,

  - v -

     No. 03 Civ. 3120 (LTS)(THK)

LADENBURG THALMANN & CO., INC., et al.,

        Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-9-05

OPINION AND ORDER

APPEARANCES:

KOERNER, SILBERBERG &
WEINER, LLP
  By: Maryann Peronti, Esq.
     Carl Selden Koerner, Esq.
112 Madison Avenue, 3rd Floor
New York, New York 10016

*Attorneys for Plaintiff*

CHRISTIAN SMITH & JEWELL
  By: Gary M. Jewell, Esq.
     James Christian, Esq.
     Stephen R. Smith, Esq.
2302 Fannin, Suite 500
Houston, TX 77002

*Attorneys for Plaintiff*

HEARD, ROBINS, CLOUD, LUBEL &
GREENWOOD, LLP
  By: Denman Heard, Esq.
500 Dallas, Suite 3100
Houston, TX 77002

*Attorneys for Plaintiff*

TATE MOERER & KING, LLP
  By: Richard Tate, Esq.
206 South 2nd Street
Richmond, TX 77469

*Attorneys for Plaintiff*

HANLY CONROY BIERSTEIN &
SHERIDAN, LLP
  By: Thomas I. Sheridan, III, Esq.
112 Madison Avenue
New York, NY 10016

*Attorneys for Plaintiff*

PROSKAUER ROSE LLP
  By: Stephen L. Ratner, Esq.
      Peter J. W. Sherwin, Esq.
      Brian Friedman, Esq.
1585 Broadway
New York, NY 10036

*Attorneys for Defendant Pershing, LLC*

BAHN, HERZFELD & MULTER, LLP
  By: Richard L. Herzfeld, Esq.
555 Fifth Avenue, 14th Floor
New York, NY 10017

*Attorneys for Defendant Wm. V. Frankel &
Co., Inc.*

SILLER WILK LLP
  By: Jay S. Auslander, Esq.
      Eric Snyder, Esq.
      Natalie Shkolnik, Esq.
675 Third Avenue, 9th Floor
New York, NY 10017

*Attorneys for Defendants Thomas Tohn,
Michael Vasinkevich, and Joseph Smith*

ARKIN KAPLAN LLP
  By: Howard J. Kaplan, Esq.
590 Madison Avenue, 35th Floor
New York, NY 10022

*Attorneys for Defendants Ladenburg
Thalmann & Co. and David Boris*

DLA PIPER RUDNICK GRAY CARY US
LLP (NYC)
  By: Caryn G. Mazin, Esq.
      Howard S. Schrader, Esq.
1251 Avenue of the Americas
New York, New York 10020

*Attorneys for Defendants Westminster
Securities Corporation, Rhino Advisors, Inc.,
Amro International, S.A., Roseworth Group
Ltd., Cambois Finance Inc., Thomas Badian,
Ultrafinanz AG, Creon Management, S.A.,
and H.U. Bachofen*

THE LAW OFFICE OF SHELDON
EISENBERGER
  By: Sheldon Eisenberger, Esq.
30 Broad Street, 27th Floor
New York, New York 10004

*Attorneys for Defendants Markham Holdings
Ltd. and J. David Hassan*

LAW OFFICES OF MICHAEL S.
ROSENBLUM
  By: Michael S. Rosenblum, Esq.
      Karen A. Clark, Esq.
1875 Century Park East, Suite 700
Los Angeles, CA 90067

*Attorneys for Defendant David Sims*

LAW OFFICES OF KENNETH A. ZITTER
  By: Kenneth A. Zitter, Esq.
260 Madison Avenue
New York, NY 10016

*Attorneys for Defendants Dr. Batliner and*
*Partner, Dr. Herbert Batliner, and Hans*
*Gassner*

LAURA TAYLOR SWAIN, United States District Judge

Plaintiff Sedona Corporation ("Plaintiff" or "Sedona") brings this securities action against defendants Ladenburg Thalmann & Co., Inc. ("Ladenburg"); Pershing, LLC ("Pershing"), Westminster Securities Corporation ("Westminster"); Wm. V. Frankel & Co., Inc. ("Frankel"); Rhino Advisors, Inc. ("Rhino"); Markham Holdings Limited ("Markham"); Aspen International Ltd. ("Aspen"); Amro International, S.A., Roseworth Group Limited, and Cambois Finance Inc. (collectively, the "Amro Defendants"); Creon Management, S.A. ("Creon"); Thomas Badian ("Badian"); Thomas Tohn ("Tohn"); David Boris ("Boris"); Michael Vasinkevich ("Vasinkevich"); David Sims ("Sims"); H.U. Bachofen ("Bachofen") and Ultrafinanz AG (collectively, the "Ultrafinanz Defendants"); Dr. Batliner and Partner, Hans Gassner, and Dr. Herbert Batliner (collectively, the "Batliner Defendants"); Joseph A. Smith ("Smith"); J. David Hassan ("Hassan"); Anthony L.M. Inder Rieden ("Rieden"); and John Does 1 to 150 ("John Does")[1] (collectively, "Defendants").[2] Sedona's First Amended Complaint ("Compl.") asserts the following claims for relief against various combinations of the Defendants:[3]

---

[1]     "John Does 1 to 150 are fictitious names alleged for the purpose of substituting names of defendants whose identity will be disclosed in discovery and should be made parties to this action." (Compl. ¶ 29.)

[2]     Defendants Geoffrey M. Lewis ("Lewis"), The Cuttyhunk Fund Limited c/o Optima Fund Management L.P. ("Cuttyhunk"), and the George S. Sarlo 1995 Charitable Remainder Trust (the "Sarlo Trust"), were dismissed from the action pursuant to a stipulation so ordered by District Judge Kimba M. Wood on December 2, 2003. Defendants Aspen and Rieden have apparently been served, but have yet to appear or move in this action.

[3]     Sedona asserts claims 2-4, 6, and 8 against all Defendants; claim 12 against the Ultrafinanz Defendants, Rhino, Badian, the Batliner Defendants, Creon, Sims, Hassan, Rieden, Vasinkevich, Boris, Tohn, and Smith; claims 1 and 5 against Ladenburg, Rhino, Markham, Aspen, the Amro Defendants, Badian, Tohn, Boris, Vasinkevich, and Smith; claim 7 against Ladenburg, Markham, Aspen, the Amro Defendants, and Boris; claim 11 against Ladenburg, Rhino, Markham, Aspen, and

misrepresentation in violation of Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act"), 15 U.S.C. § 78j(b) ("Section 10(b)"), and Rule 10b-5 ("Rule 10b-5")

promulgated by the Securities and Exchange Commission ("SEC") thereunder (First Cause of

Action); manipulation in violation of Section 10(b) and Rule 10b-5 (Second Cause of Action);

tortious interference with contract and tortious interference with business relationship (Third

Cause of Action); violation of Section 1-401 of the Pennsylvania Securities Act of 1972

("Pennsylvania Act"), 70 Pa. Stat. Ann. § 1-401 (Fourth Cause of Action); common law fraud

and deceit (Fifth Cause of Action); civil conspiracy to commit fraud (Sixth Cause of Action);

breach of contract (Seventh Cause of Action); disgorgement of profits from fraudulent and

manipulative conduct and restitution under various provisions of the Exchange Act (Eighth

Cause of Action); breach of fiduciary duty (Ninth Cause of Action); negligence (Tenth Cause of

Action); negligent misrepresentation (Eleventh Cause of Action); and control person liability

under Section 20 of the Exchange Act (Twelfth Cause of Action). (Compl. ¶¶ 107-67.) Among

other relief, Sedona seeks an accounting of Defendants' profits from sales of Sedona stock,

injunctive relief, and damages of at least $2,660,000,000.00. (Id. at 68-69.) This Court has

jurisdiction of the instant action pursuant to 28 U.S.C. § 1331.

Defendants have interposed a number of motions to dismiss the Complaint in its

entirety with prejudice, moving pursuant to Rules 12(b)(2), 12(b)(6), and 9(b) of the Federal

Rules of Civil Procedure, as well as under the Private Securities Litigation Reform Act of 1995

("PSLRA"). Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, certain

---

the Amro Defendants; and claims 9 and 10 solely against Ladenburg. (Compl. ¶¶
107-67.)

defendants also move to dismiss the Plaintiff's state statutory and common law claims for lack of subject matter jurisdiction under 28 U.S.C. § 1367(c)(3). Defendants Vasinkevich, Smith, and Tohn further move for costs and attorneys' fees. Plaintiff also moves for partial relief from the discovery stay imposed by the PSLRA,[4] to obtain document preservation subpoenas and Wells submissions.

For the following reasons, Defendants' motions to dismiss are granted in part and denied in part. Defendants Vasinkevich, Smith, and Tohn's motions for costs and attorney's fees are denied. Plaintiff's motions are denied as moot.


## BACKGROUND

Plaintiff's allegations in its first Amended Complaint as to the facts underlying this action are taken as true for the purposes of these motions. Pennsylvania corporation Sedona, headquartered in King of Prussia, Pennsylvania, provides "Customer Relationship Management (CRM) application software and services for small to mid-sized businesses," specifically targeting institutions that provide financial services. (Compl. ¶ 44.) Sedona was a leading provider of CRM application software, but needed to secure more capital in order to fully capture its own substantial corner of the CRM application software market. (Id.)

On July 1, 1999, Sedona was solicited by defendants Vasinkevich and Tohn, who

---

[4] "In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C.A. § 78u-4(b)(3)(B) (West 2005).

submitted a proposal to Sedona offering their investment banking and capital financing services. (Id. ¶ 47.) One month later, Vasinkevich, who was a principal of defendant Ladenburg, again solicited Sedona. In an August 19, 1999 letter, Vasinkevich depicted Ladenburg as a "123-year old full-service investment bank" that "ha[d] access to more than $50 Billion in investment capital," and "specialize[d] in providing a method of financing that 'offers market ambiguity as to timing and dollars raised, keeping short sellers and arbitrageurs at bay.'" (Id.) Sedona accepted Vasinkevich and Tohn's solicitations. Following the August letter, Bill Williams ("Williams"), Sedona's Chief Financial Officer, engaged in discussions with Vasinkevich and Tohn, who described Ladenburg as the "Goldman Sachs of small cap companies" with funding methods that were "non-toxic" and "minimized dilution." (Id. ¶ 51.) In a letter dated December 28, 1999, Vasinkevich reiterated Ladenburg's desire and ability to help Sedona realize the capital investment it required to achieve its business goals. (Id.)

On the basis of these communications, Sedona decided to hire Ladenburg as its financial advisor and investment banker. (Id. ¶ 53.) It was at this time that Vasinkevich introduced defendant Badian to Sedona as a major investor. (Id. ¶ 54.) Badian, a principal of defendant Rhino, assured Sedona that Rhino was an accredited and long-term investor that had only Sedona's best interest in mind. (Id.) Sedona memorialized its hiring decision by signing a January 24, 2000, engagement letter. (Id. ¶ 55.) Shortly thereafter, Vasinkevich and Tohn persuaded Sedona to "increase the proceeds of the shelf registration to $50 Million," and Williams and defendant Boris, Ladenburg's Executive Vice President, executed an amended

engagement letter, dated March 8, 2000 ("Engagement Letter"),[5] reflecting the increase in the anticipated funding. (Id. ¶ 56.)

Ladenburg and Rhino convinced Sedona that they, along with other investors they would procure, including Markham, Aspen, Amro, Cuttyhunk, and the Sarlo Trust, would provide the $50 million. (Id. ¶¶ 56-57.) The initial financing was arranged through a February 25, 2000, purchase agreement for convertible debentures and warrants ("Purchase Agreement") executed by defendant Hassan on behalf of Markham, defendant Rieden on behalf of Aspen, defendant Bachofen on behalf of Amro, and Lewis on behalf of Cuttyhunk. (Id. ¶¶ 57-62.) Sarlo Trust also invested in the initial tranche. (Id. ¶ 57.) The Series G convertible preferred shares ("Series G") issued pursuant to the Purchase Agreement "were issued as a bridge loan to fund Sedona until it could draw down on the $50 million shelf registration promised by Ladenburg." (Pl.'s Mem. of Law in Opp'n to Defs. Rhino's and Badian's Mot. to Dismiss at 9 ("Pl.'s Opp'n"); Compl. ¶ 67.) Sedona, however, never received the full amount of funding from the investors, and Sedona now contends that the defendant investors "never intended to fund any material part of this $50 million." (Compl. ¶ 64.)

During the first week of March 2000, around the time the initial financing for the Series G closed, Sedona's stock traded at its highest volume in history. (Id. ¶¶ 64-66.) "[I]n hindsight," Sedona claims that this "irregularit[y]" was a result of the Defendants' manipulation of the market. (Id. ¶ 64.) That is, Sedona views this high level of trading as representing what it characterizes as the "pump" portion of the Defendants' alleged scheme, with the stock peaking at

---

[5]      The March 8, 2000 amendment increased the gross proceeds from the proposed offering from $15,000,000.00 to $50,000,000.00. (Compl. ¶ 56.)

a share price of $10.25, "before beginning its long and continuous slide to its February 2003 level of $0.19," as the stock was systematically "dumped." (Id. ¶ 66.) Sedona did not have to wait until February of 2003 to see its stock plummet, however, as by "June and July of 2000 . . . the stock . . . [was] down to a consistent and declining closing price of around $3.00 per share, a decline in market capitalization of $195,000,000.00 in approximately 90 days." (Id.)

In the Complaint, Plaintiff principally alleges that the Defendants "manipulate[d] downward the stock price of Sedona with the cooperation of U.S. broker-dealers and market makers in order to profit from the manipulation and price decline and to take advantage of increased conversion rights resulting from the manipulation." (Id. ¶ 32.) According to Sedona, this type of "death spiral" scheme[6] was not novel to the Defendants, who are allegedly "accomplished practitioners of . . . stock manipulation and stock fraud." (Id. ¶ 33.) In support of its assertion, Sedona includes in its Complaint a chart listing a number of companies with drastic reductions in stock price, all of which, Sedona claims, were the result of similar manipulations by Defendants. (Id. ¶ 43.) In addition, Sedona refers to a February 26, 2003, SEC Complaint ("SEC Complaint") against defendants Rhino and Badian concerning their involvement with Sedona.[7]

---

[6]   For descriptions of "death spiral schemes," see, for example, Endovasc Ltd., Inc. v. J.P. Turner & Co., LLC, et al., No. 02 Civ. 7313(LAP), 2004 WL 634171 (S.D.N.Y. Mar. 20, 2004); Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC, No. 02 Civ. 9767(LBS), 2004 WL 31819207 (S.D.N.Y. Oct. 10, 2002); Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC, 223 F. Supp. 2d 474 (S.D.N.Y. 2002); and Global Intellicom, Inc. v. Thomason Kernaghan & Co., No. 99 Civ. 642(DLC), 1999 WL 544708 (S.D.N.Y. July 27, 1999).

[7]   Although the SEC Complaint deals specifically with alleged actions of defendants Rhino and Badian on behalf of their client, Amro, Sedona asserts that the alleged fraudulent actions taken against Sedona were conducted by all of "the defendants herein . . . , cloaked by the use of other names, nominee shell companies, and dummy accounts, along with cooperating U.S. and Canadian broker dealers and

The SEC Complaint includes allegations that Rhino and Badian ignored a Purchase Agreement provision prohibiting short sales and "engaged in extensive short selling and pre-arranged trading on behalf of [their] client prior to exercising the conversion rights under the [Purchase Agreement]." (Id. ¶ 36; SEC Compl., Howard J. Kaplan Aff. ("Kaplan Aff.") Ex. F ¶ 2.) As a result, "Rhino and Badian manipulated Sedona's stock price to enhance a client's economic interest." (Id.) Rhino and Badian paid a $1 million dollar fine to settle the SEC claim. (Compl. ¶ 36.)

On November 22, 2000, Sedona entered into a second convertible debenture purchase agreement with Amro, which provided Sedona with $3 million dollars in gross funding. (Kaplan Aff. Ex. E.) Sedona used approximately $2,246,000 of the proceeds from that transaction to "retire the Series G." (Compl. ¶ 82.) Following the execution of the second purchase agreement, Rhino and Badian allegedly conducted so many short sales in Amro's account, that "on March 22, 2001, the [National Association of Securities Dealers Automatic Quotation system ('NASDAQ')] placed a short restriction on Sedona stock that required that any future sales of Sedona would be subject to a mandatory closeout if there were a failure to deliver the securities after ten (10) days." (Id. ¶ 88.) Nonetheless, the NASDAQ restrictions did not prevent Defendants from continuing to sell Sedona's stock short. Rhino held an account for Amro with a Canadian broker-dealer who was not a member of the National Association of Securities Dealers, Inc. ("NASD"), and thus was not subject to the short sale restriction. (Id. ¶ 90.) It was through the Canadian account that Rhino continued to sell short Sedona's stock, from March 30, 2001 through mid-April 2001. (Id.)

---

market participants." (Compl. ¶ 70.)

Several months later, in September 2001, Sedona received an anonymous report "alleging that manipulation and fraud had been perpetrated against it." (Id. ¶ 100.) In October 2001, based upon the allegations contained in the report, Sedona "refused to honor any more conversions from the [Purchase Agreement], and asked the SEC to investigate the allegations." (Id.) Amro sued Sedona in the Southern District of New York on October 24, 2001, Amro Int'l, S.A. v. Sedona Corp., No. 01 Civ. 9344(NRB) (the "Amro action"), for Sedona's failure to honor the conversions. (Id.) The Amro action was ultimately terminated and Sedona entered into settlement agreements with Roseworth, Cambois, Amro, and Rhino (collectively, the "Amro Settlement Defendants"), that included a release from future related liability ("the Release") for each of those defendants and their affiliates.[8] (Id. ¶ 101.)

In the instant action, Sedona asserts that the Defendants' alleged market manipulation and fraudulent acts have made it "virtually impossible for Sedona to obtain additional financing or an investment of any type, except on a limited basis through existing shareholders." (Id. ¶¶ 102, 106.) Further, Sedona alleges that Defendants directly caused Sedona to be de-listed from the NASDAQ SmallCap Market on January 9, 2003, allowing Defendants more freedom to engage in illegal behavior, "as market participants were now governed by a less-regulated atmosphere in which to conduct their manipulative activity." (Id. ¶ 102.)

---

[8]     The Release by its terms also relieves the "officers, directors, and employees of such affiliates" from liability. Thus, the terms of the Release also cover director defendants Badian (Rhino), Sims (Roseworth and Cambois), and Bachofen (Amro).

DISCUSSION

## Motion to Dismiss Standard

In deciding the Defendants' motions brought pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must take as true all well-pleaded facts alleged in Sedona's First Amended Complaint and draw all reasonable inferences in Sedona's favor. <u>Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit</u>, 507 U.S. 163, 164 (1993); <u>Hernandez v. Coughlin</u>, 18 F.3d 133, 136 (2d Cir. 1994). The Court must not dismiss the complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).

Although the Court generally should not look outside of the pleadings to decide a motion to dismiss a complaint, the Court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in [the complaint] by reference." <u>Rothman v. Gregor</u>, 220 F.3d 81, 89 (2d Cir. 2000). Further, in securities actions, the Court may consider "public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." <u>Id.</u> (citations omitted).

## Claims Against the *Amro* Settlement Defendants

The <u>Amro</u> Settlement Defendants move to dismiss the Complaint as against them on the basis of the Release executed and delivered by Sedona in connection with the settlement of the <u>Amro</u> litigation. In apparent anticipation of such a motion, Sedona pleads in the Complaint that the Release is void and unenforceable by reason of having been entered into

under "fraud and duress," at a time when "Sedona felt that it had no other option but to settle the outstanding litigation." (Compl. ¶ 101.) Sedona further argues that construction of the Release to cover the instant fraud and related claims would be inequitable because the Amro Settlement Defendants were actively working to conceal the relevant facts as to their conduct at the time the Release was given.

Because the Release contains a New York choice of law provision and the parties rely on New York case law in their briefs, the Court interprets the Release in accordance with New York law. See, e.g., Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc., 165 F. Supp. 2d 514, 526 (S.D.N.Y. 2001) (finding that courts in the Second Circuit "have routinely enforced similar choice of law provisions even when a party challenges the contract as fraudulent" (citations omitted)). Under New York law, "a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a private agreement between parties." DuFort v. Aetna Life Ins. Co., 818 F. Supp. 578, 581 (S.D.N.Y. 1993) (quoting Skluth v. United Merchs. & Mfrs., Inc., 559 N.Y.S.2d 280, 282 (1st Dept. 1990)). Such a release will be binding on the parties unless a legal defense such as fraud or duress is adequately asserted. Id.

The Release provides in pertinent part that:

> Sedona Corporation and its officers and directors in their individual capacity . . ., in consideration of good and valuable consideration received from Amro International, S.A., its officers, directors, affiliates, employees, agents, and advisors, including Rhino Advisors, Inc. (as well as the officers, directors, and employees of such affiliates and advisors) (collectively, the "Releasees"), . . . in full satisfaction hereby waive all claims, offsets, and defenses that they may have or have had against Releasees and hereby release, forever discharge and agree to hold harmless Releasees from and against all actions, causes of action, claims, suits, contracts, controversies, penalties, offsets, or damages, whether in law or equity, and whether known or unknown, that may have occurred prior to the date

of this Release, including, but not limited to, those arising in connection with the Convertible Debentures and Warrants Purchase Agreement, dated as of November 22, 2000, . . . Sedona Corporation's 5% Convertible Debentures Due March 22, 2001 (as amended by an Agreement, dated as of April 26, 2001), and related Warrants and those asserted or that could have been asserted as a claim, counterclaim, offset or defense in, the [Amro action]. . . . This Release shall be governed by the laws of the State of New York.

(Maryann Peronti Decl. in Support of Pl.'s Mem. of Law in Opp'n to Amro Defs.' Mot. to Dismiss ("Peronti Decl.") Ex. 2 (emphasis added).)

*Breadth of the Release*

The Release clearly and unambiguously provides that Sedona waives all claims, "known and unknown," against the Releasees, "including but not limited to" those claims "asserted or that could have been asserted as a claim, counterclaim, offset or defense in, the [Amro action]." (Id.) Although Sedona argues that the Release should not be construed to cover the alleged fraud at issue in this litigation because Defendants' alleged market manipulation was being concealed from Sedona at the time the Amro case was settled, the Complaint makes it clear that Sedona was aware of, and raised with the court the possibility of, market manipulation activity in the course of the Amro litigation. (See Compl. ¶ 100.) In addition, the settlement agreement itself includes a provision under which Amro agreed not to sell short Sedona stock either directly or through Rhino. Short sales are central to Plaintiff's market manipulation allegations in this case.

Furthermore, the broad language of the Release specifically includes claims that may not have been known to the Plaintiff at the time of execution, such as those asserted herein. Accordingly, the terms of the Release cover Sedona's current claims. Because Sedona may, however, be able to prove that it executed the Release under duress, the Court will not dismiss

Sedona's claims against the <u>Amro</u> Settlement Defendants, pursuant to the Release, at this stage of the litigation.

*Duress & Fraud Allegations*

Under New York law, a contract may be voided on grounds of duress upon proof that the defendant exerted an unlawful threat, which precluded the plaintiff's exercise of free will, during a situation in which the circumstances permitted no other alternative for the plaintiff. <u>See</u> <u>Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc.</u>, 165 F. Supp. 2d 514, 527 (S.D.N.Y. 2001). Sedona claims that the Release was entered into under economic duress, alleging that "[t]he defendants . . . took advantage of Sedona, and threatened litigation and a default action, at a time when Sedona's finances were very limited due to the fraudulent misrepresentations and market manipulations of the defendants." (Compl. ¶ 101.) Sedona also quotes a January 4, 2002, e-mail from Badian to Marco Emrich, Sedona's then President and CEO, which "threaten[ed], 'as I am sure you are aware, a public company that defaults on any debt security loses its eligibility for S-3 registrations and must file the more cumbersome and expensive SB-2 or S-1 if it wishes to register shares. There are of course other consequences.'" (<u>Id.</u>)

It is well-settled that "[a] threat to do that which one has the right to do does not constitute duress." <u>DuFort v. Aetna Life Ins. Co.</u>, 818 F. Supp. 578, 582 (S.D.N.Y. 1993) (quoting <u>Gerstein v. 532 Broad Hollow Road Co.</u>, 429 N.Y.S.2d 195, 199 (1st Dep't. 1980)). However, although such threats are not inherently unlawful, a claim of economic duress may be viable where threats are made in conjunction with a financial situation unlawfully caused by a defendant. <u>See</u> <u>Weinraub v. Int'l Banknote Co., Inc.</u>, 422 F. Supp. 856, 860 (S.D.N.Y. 1976)

(denying summary judgment and finding a genuine issue of material fact as to whether Plaintiff was a victim of economic duress following the court's determination that, "[i]f the marked decrease in the value of that stock which jeopardized [plaintiffs'] loan was due to the misrepresentation and omissions of defendants, then one could well argue that plaintiffs' position [of financial hardship] . . . was occasioned by the fraudulent acts of defendants"). "The alleged duress must [ultimately] be proven to have been the result of defendant's conduct and not of the plaintiff's own necessities." Id. at 859 (citation omitted). Plaintiff claims such duress here.

The very basis of Sedona's action is the claim that Defendants', including the Amro Settlement Defendants', manipulation of its stock led to financial hardship for Plaintiff. Sedona claims that, once placed in this situation, it was unable to exercise its free will by choosing not to settle and execute the releases. (See Compl. ¶ 101.) This lack of free choice is "[a] crucial element of coercion or duress." Korn v. Franchard Corp., 388 F. Supp. 1326, 1333 (S.D.N.Y. 1975). Sedona further alleges that "the [Settlement Defendants] continued to manipulate Sedona's stock, as before, during and after the releases were entered, intentionally concealing the manipulation from Sedona at the time it entered into the releases." (Compl. ¶ 101.) The Court finds that Sedona has sufficiently pled facts on the basis of which it may be able to defeat enforcement of the Release. Accordingly, the motion of the Amro Settlement Defendants to dismiss the Complaint on the basis of the Release is denied.


Sedona's Federal Securities Claims Are Not Time Barred

The moving Defendants' principal assertion in their motions to dismiss is that Sedona brought its federal securities claims outside of the relevant statute of limitations period,

and that the claims thus must be dismissed as time barred. After a thorough review of the Complaint, documents incorporated therein, and relevant public disclosures, the Court finds that Plaintiff's federal securities law causes of action, as presented in the current pleadings, are not clearly untimely. Therefore, for the reasons explained below, Defendants' motions to dismiss Sedona's federal securities fraud claims as time barred are denied.

*Relevant Statute of Limitations*

Pursuant to Section 804(b) of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of . . . the [federal] securities laws . . . may be brought not later than the earlier of – (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C.A. 1658(b) (West 2002). This statute of limitations applies to all federal securities actions brought on or after July 30, 2002, the enactment date of Sarbanes-Oxley. Id. The instant action was commenced on May 5, 2003.

*Whether Sedona Was on Notice of the Alleged Violations Prior to May of 2001*

The passage of the Sarbanes-Oxley Act did not change the well settled law in this Circuit as to what constitutes "discovery of facts" sufficient to trigger the statute of limitations in a securities fraud action. The statute of limitations begins to run "when a reasonable investor of ordinary intelligence would have discovered the existence of fraud." Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003) (quoting Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 (2d Cir. 1993)). Discovery of facts constituting a violation of the securities laws "includes constructive or inquiry notice as well as actual notice." Id. at 193 (quoting Rothman v. Gregor, 220 F.3d 81, 96 (2d Cir. 2000) (internal quotation marks omitted)). Inquiry notice arises when

"the circumstances are such as to suggest to a person of ordinary intelligence the probability that the person has been defrauded." Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697, 701 (2d Cir. 1994) (quoting Armstrong v. McAlpin, 699 F.2d 79, 88 (2d Cir. 1983) (internal quotations omitted)). However, "[t]he fraud must be probable, not merely possible." Newman, 335 F.3d at 193.

If the relevant information is contained within the Complaint and the papers incorporated by reference therein, the question of whether Sedona had notice of Defendants' alleged fraud may be determined as a matter of law at the motion to dismiss stage. See, e.g., LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 156 (2d Cir. 2003) (noting that it is appropriate on a motion to dismiss for the Court to determine whether Plaintiff was aware of the fraud as long as that information is contained within the complaint and incorporated papers) and cases cited therein. The Court must utilize an objective standard to determine whether the available information was sufficient to put the plaintiff on inquiry notice. See, e.g., Clark v. Nevis Capital Mgmt., LLC, No. 04 Civ. 2702(RWS), 2005 WL 488641, at *7 (S.D.N.Y. Mar. 2, 2005) ("The test as to when fraud should with reasonable diligence have been discovered is an objective one.") (citing Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 (2d Cir. 1993)).

While Defendants argue that Sedona had knowledge of the alleged manipulation "no later than June 2000," when Sedona's Finance Committee questioned Vasinkevich about perceived market manipulation, Sedona, pointing to the lapse of time between its late 2001 requests that the SEC investigate trading activities in the company's stock and the filing of the SEC Complaint against Rhino and Badian, argues that, if "it took the SEC 17 months . . . to bring its complaint" against Badian and Rhino, "[i]t would not be just to believe that members of a

computer software company could unravel this labyrinth of deceit in less time." (Pl.'s Opp'n at 8.) Nonetheless, it is not necessary for Sedona to "have notice of the entire fraud being perpetrated to be on inquiry notice." Dodds, 12 F.3d at 351-52. Rather, "the information provided must trigger notice 'with sufficient storm warnings to alert a reasonable person to the probability'" of fraud. Morin v. Trupin, 809 F. Supp. 1081, 1097 (S.D.N.Y. 1993) (quoting Quantum Overseas, N.V. v. Touche Ross & Co., 663 F. Supp. 658, 664 (S.D.N.Y. 1987)).

Although Sedona's Complaint and incorporated documents indicate that Sedona was aware of such storm warnings, it cannot be said that those initial storm warnings were sufficient to "alert a reasonable person to the probability" that defendants in the instant action were the perpetrators of that fraud. Further, there is nothing on the face of the Complaint or in the documents that are relevant at this stage of the litigation to indicate that reasonable inquiry prior to May 2001 would have been effective to uncover sufficient facts to have enabled Sedona to bring suit against identifiable perpetrators within a limitations period measured from these early storm warnings. This is particularly so in light of Sedona's allegations of the measures certain Defendants took to hide their alleged fraudulent activity.

For example, Sedona twice queried Vasinkevich, in his capacity as a Ladenburg representative, about market irregularities. (See Compl. ¶¶ 71-72.) Vasinkevich denied any wrongdoing, and allegedly "assur[ed Sedona] that the investors placed through Ladenburg, which included Markham, Aspen, and Amro, "were long-term investors," "were not responsible for any manipulation or any events which were not in the best interest of SEDONA; and [that] . . . those investors did not cause, directly or indirectly, any aspect of SEDONA's continuing stock decline." (Id. ¶ 72.) Vasinkevich then represented he could replace the current investors with

new investors, specifically defendants Roseworth and Cambois,[9] which were wholly-owned subsidiaries of defendant Creon. (Id. ¶¶ 73-74.)

The Second Circuit has stated that "reassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty." LC Capital Partners, 318 F.3d at 155. Such prevention occurs "only if a[ plaintiff] of ordinary intelligence would reasonably rely on the statements to allay the [plaintiff's] concern." Id. Plaintiff's allegations could support a determination that Vasinkevich's alleged representations on behalf of the Ladenburg Investors[10] serve to dissipate Sedona's duty to inquire, as an investor of ordinary intelligence could reasonably rely on its financial advisor's statements that its affiliated investors were not involved in any fraudulent conduct.

Therefore, on the facts as plead by Plaintiff in the Complaint and shown in incorporated documents, it cannot be said that moving Defendants are entitled to judgment as a matter of law on statute of limitations grounds, and Plaintiff is entitled to litigate the question of timeliness of the action.

Certain of the Defendants also move to dismiss Sedona's Pennsylvania state fraud claim as untimely and, for substantially the reasons discussed above, those motions are denied.

The Court now turns to the elements of Defendants' motions that are directed to

---

[9]  Defendants Gassner, Batliner, Batliner Partners, and Sims all "had the power to direct or cause the direction of the management and policies of each of Roseworth and Cambois." (Id. ¶ 76.) Sedona claims that this new group of defendant investors, who were "known perpetrators of stock manipulation," continued the "conspir[acy] to destroy the stock price of Sedona." (Id. ¶ 81.)

[10]  The term "Ladenburg Investors" is defined by Sedona to include Defendants Markham, Aspen, Amro, Roseworth, Cambois, and Boris. (Id. ¶ 41.)

Sedona's pleading of its claims for relief.

<u>Certain of Sedona's Fraud Claims Must be Replead</u>

All moving Defendants request the Court to dismiss Plaintiff's Complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted and pursuant to Rule 9(b) for failure to plead fraud with particularity. For the following reasons, Defendants' motions to dismiss are granted in part and denied in part. Plaintiff will be afforded an opportunity to replead the claims.

*Claims for Relief*

In its First Claim for Relief, Plaintiff alleges that Defendants Ladenburg, Rhino, Markham, Aspen, the <u>Amro</u> Defendants, Badian, Tohn, Boris, Vasinkevich, and Smith violated Section 10(b) and Rule 10b-5 in connection with Plaintiff's sales of securities to Ladenburg and the Ladenburg Investors. Plaintiff asserts that "Defendant Ladenburg, by and through its principals, officers, directors or agents, including, without limitation, Badian, Tohn, Boris, Vasinkevich and Smith made the misrepresentations and omissions alleged" in specified paragraphs of the Complaint. (<u>See</u> Compl. ¶¶ 108, 110 and allegations referenced therein.) Plaintiff asserts that Defendants Badian, Tohn, Vasinkevich, and Smith each knew the misrepresentations and omissions were untrue at the time they were made, and that each reconfirmed individually misrepresentations he had made as an agent of Ladenburg, as detailed in specified paragraphs of the Complaint. (<u>Id.</u> ¶ 109 and allegations referenced therein.) These Defendants and Ladenburg are alleged to have acted, together with the other Defendants named in the First Claim for Relief, with scienter; Plaintiff further asserts that their actions "dramatically

and adversely affected the price and terms of" Plaintiff's sales of securities to Ladenburg and investors placed by Ladenburg. (Id. ¶¶ 111-12.)

Plaintiff's Fifth Claim for Relief accuses the same group of Defendants of common law fraud and deceit, specifically, making the misrepresentations and omissions of material fact alleged in the preceding portions of the Complaint. (Id. ¶¶ 130-32.)

Plaintiff's Second Claim for Relief, asserted against all of the Defendants named in the Complaint, accuses all Defendants of violating Section 10(b) and Rule 10b-5 by participating in a scheme to defraud Plaintiff by manipulating the price of Plaintiff's stock. (Id. ¶¶ 114-18.)

*Legal Standards*

The elements of a Section 10(b) and Rule 10b-5 cause of action premised on material misstatements or omissions of fact are as follows:  Defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."  Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005) (quoting In re IBM Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998)).  Similarly, a properly pled market manipulation claim under Section 10(b) and Rule 10b-5 requires allegations of:

> (1) damage [to the plaintiffs], (2) caused by reliance on defendants' misrepresentations or omissions of material facts, or on a scheme by the defendants to defraud, (3) scienter, (4) in connection with the purchase or sale of securities, (5) furthered by the defendants' use of the mails or any facility of a national securities exchange.

Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC, No. 02 Civ. 0767(LBS), 2002 WL 31819207, at *6 (S.D.N.Y. Oct. 10, 2002) (quoting Schnell v. Conseco, Inc., 43 F. Supp. 2d 438,

448 (S.D.N.Y. 1999)). "The essence of a market manipulation claim is the allegation of conduct intended to deceive or defraud investors by conditioning or artfully affecting the market for securities." Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC, 223 F. Supp. 2d 474, 486 (S.D.N.Y. 2002).

In order properly to plead a claim for common law fraud and deceit under New York law, the plaintiff must allege that (1) the defendant made a material misrepresentation, (2) the defendant knew the representation was false, (3) the defendant made the misrepresentation with the intent to defraud the plaintiff, (4) the plaintiff reasonably relied upon the defendant's material misrepresentation, and (5) as a result of such reliance, the plaintiff suffered damages. See City of New York v. Cyco.Net, Inc., No. 03 Civ. 383(DAB), 2005 WL 174482, at *33 (S.D.N.Y. Jan. 27, 2005). If plaintiff fails to adequately plead one of these five essential elements, the claim must be dismissed. In re Simon II Litig., 211 F.R.D. 86, 139 (E.D.N.Y. 2002), vacated on other grounds by 407 F.3d 125 (2d Cir. 2005).

The pleading standard set forth in Rule 9(b) must also be met with respect to each of these fraud-based claims. See Fed. R. Civ. P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."); Olsen v. Pratt & Whitney Aircraft, A Div. of United Techs. Corp., 136 F.3d 273, 276 (2d Cir. 1998) ("Fed. R. Civ. P. 9(b) requires that all fraud claims be pleaded with particularity."); see also AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC, 254 F. Supp. 2d 373, 389 (S.D.N.Y. 2003) ("A claim for common law fraud under New York law must also satisfy the requirements of Fed. R. Civ. P. 9(b)."). To satisfy the Rule 9(b) pleading standard, a fraud claim alleging material misstatements or omissions must: "(1) detail the statements (or omissions) that the plaintiff

contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 187 (2d Cir. 2004) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 347 (2d Cir. 1996)); see also Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC, No. 02 Civ. 0767(LBS), 2002 WL 31819207, at *3 (S.D.N.Y. Oct. 10, 2002). Further, while "market manipulation claims are subject to a more relaxed pleading standard than other claims involving alleged affirmative misrepresentations[,] . . . 'because the facts relating to a manipulation scheme are often known only by the defendants[,]' . . . [a]t a minimum, it is 'clear that a market manipulation claim must still specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue."'" Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC, 223 F. Supp. 2d 474, 486 (S.D.N.Y. 2002) (citations omitted).

Certain of the Defendants also move to dismiss the Complaint pursuant to the PSLRA, which incorporates the pleading requirements of Section 10(b), Rule 10b-5, and Rule 9(b). Under the PSLRA, a complaint alleging material misrepresentations and/or omissions "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C.A. § 78u-4(b)(1) (West 2005). As to scienter, the PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." Id. § 78u-4(b)(2).

The Complaint, which details many alleged misrepresentations and omissions and the nature of the alleged scheme, as well as the effect the scheme allegedly had on the market, Plaintiff's own business prospects, and financing opportunities, is generally sufficient to address the securities nexus, reliance, causation, and damages elements of the relevant standards. As explained below, it also adequately alleges scienter as to certain Defendants. It fails, however, sufficiently to allege common law fraud, misrepresentations or omissions, and/or market manipulation, by a number of the named defendants.

*Material Misrepresentations & Omissions of Fact*

In Plaintiff's First and Fifth Claims for Relief, Sedona alleges material misrepresentations and omissions of fact made by certain Defendants. However, of those particular Defendants, the only ones as to whom these misrepresentations and omissions are pled with the requisite particularity are Ladenburg, Rhino, Badian, Tohn, and Vasinkevich. With respect to these Defendants, the Complaint specifies statements made, as well as when and to whom statements were made, and details allegedly material omissions in connection with such statements. (See, e.g., Compl. ¶¶ 39 (Ladenburg), 47-48 (Ladenburg, Vasinkevich, and Tohn), 50 (Vasinkevich and Ladenburg), 51 (Vasinkevich and Tohn), 52 (Ladenburg, Vasinkevich, and Tohn), 54 (Badian, Rhino, and Vasinkevich), 56 (Ladenburg, Rhino, Vasinkevich, and Tohn), 57 (Ladenburg), 71 (Vasinkevich and Ladenburg), 72 (Vasinkevich), 73 (Vasinkevich and Ladenburg), 82 (Vasinkevich, Badian, Ladenburg, Roseworth, Cambois, Rhino, and Creon), 97 (Vasinkevich and Badian), 108 (Ladenburg), 109 (Badian, Tohn, Vasinkevich, and Smith).)

The Complaint does not, however, make any specific allegations of material misstatements or omissions by any of the other Defendants named in counts One and Five.

Rather, Plaintiff alleges simply that Ladenburg represented and acted as "agent for each" of the Ladenburg Investors (defined in paragraph 41 to comprise Amro, Markham, Aspen, Cuttyhunk, and the Sarlo Trust) "in connection with the transactions complained of herein." (Id. ¶ 41.) The generalized references to agency in connection with "transactions" and representation are insufficiently specific to meet the requirements of Rule 9(b) as to alleged misrepresentations or omissions by those defendants, particularly where, as here, Ladenburg is alleged to have acted on those parties' behalf in connection with specific financial transactions. The Complaint is similarly deficient with respect to Boris, as to whom its allegations are confined to his position and alleged control relationship with Ladenburg and his having signed the document increasing the funding commitment to $50 million, and Smith, as to whom the Complaint's allegations are confined to control. In Paragraph 81, Plaintiff alleges merely that Roseworth and Cambois failed to disclose their affiliation with Creon, a company managed by Rhino, in connection with their agreement with Sedona "to sell equity off their existing shelf registration." (Id. ¶ 81.) Plaintiff does not spell out the materiality of this omission. The Complaint is devoid of allegations of misrepresentations or omissions by any of the other named Defendants.

In a case such as this one, where misrepresentation claims are asserted against numerous defendants, "[b]road allegations that several defendants participated in a scheme, or conclusory assertions that one defendant controlled another, or that some defendants are guilty because of their association with others, do not inform each defendant of its role in the fraud and do not satisfy Rule 9(b)." Kolbeck v. LIT America, Inc., 923 F. Supp. 557, 569 (S.D.N.Y. 1996). Such allegations fail to adequately inform the individual defendants of the charges against them, and "[t]his type of 'clump[ing] [of] defendants together in vague allegations of fraud' is the very

type of inadequate pleading that Rule 9(b) . . . sought to prevent." <u>Endovasc Ltd., Inc. v. J.P.</u>
<u>Turner & Co., LLC</u>, No. 02 Civ. 7313(LAP), 2004 WL 634171, at *6 (S.D.N.Y. Mar. 30, 2004)
(quoting <u>In re Blech Sec. Litig.</u>, 928 F. Supp. 1279, 1294 (S.D.N.Y. 1996) (alterations in
original)). Accordingly, Defendants Markham, the Amro Defendants, Boris, and Smith's
motions to dismiss Claims for Relief One and Five of the Complaint are granted. Ladenburg,
Rhino, Badian, Tohn, and Vasinkevich's motions are denied. Plaintiff has leave to replead to the
extent specified below.

*Market Manipulation*

Plaintiff's Second Claim for Relief, asserted against all Defendants, alleges
violations of Section 10(b) and Rule 10b-5 on the basis of market manipulation. As noted above,
the Rule 9(b) pleading standards are construed in a more relaxed fashion for market manipulation
claims. A plaintiff must, however, "still specify 'what manipulative acts were performed, which
defendants performed them, when the manipulative acts were performed, and what effect the
scheme had on the market for the securities at issue.'" <u>Internet Law Library</u>, 223 F. Supp. 2d at
486 (citation omitted).

Here, the Complaint provides a great deal of detail regarding the nature of the
conduct and techniques allegedly employed in the market manipulation scheme, and numerous
details regarding transactions and/or the participation of specific defendants in transactions.
Specific allegations regarding the entry into, or facilitation of, transactions in aid of the alleged
scheme are made as to defendants Ladenburg, Rhino, the Amro Defendants, Markham, Aspen,
Vasinkevich, Badian, Tohn, Boris, Frankel, Westminster, and Pershing. As to the remaining
individual and commercial entity defendants, however, Plaintiff's allegations are confined to

ability to control the alleged bad actors, or generalized allegations that "all defendants" engaged in, or are believed to have engaged in, various categories of manipulative conduct. Neither allegations of ability to control or lumped-together accusations of wrongdoing by undifferentiated groups of defendants, is sufficient to satisfy Rule 9(b). See, e.g., Endovasc Ltd., Inc. v. J.P. Turner & Co., LLC, No. 02 Civ. 7313(LAP), 2004 WL 634171, at *6 (S.D.N.Y. Mar. 30, 2004) (quoting In re Blech Sec. Litig., 928 F. Supp. 1279, 1294 (S.D.N.Y. 1996) (omissions in original)); Kolbeck v. LIT America, Inc., 923 F. Supp. 557, 569 (S.D.N.Y. 1996). Accordingly, the motions of Defendants Creon, the UltraFinanz Defendants, Smith, Sims, the Batliner Defendants, and Hassan, to dismiss Plaintiff's second claim for relief, are granted. Plaintiff has leave to replead as specified below.

*Scienter*

Certain of the Defendants further argue that the Complaint fails to plead the scienter element of Plaintiff's common law, market manipulation, and misrepresentation and/or omission fraud claims with sufficient particularity. Fraud claims brought under the common law and pursuant to Section 10(b), Rule 10b-5, and the PSLRA, must include allegations that defendants' misrepresentations or omissions, or challenged schemes, were undertaken with the intent to defraud the plaintiff. See Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005) (quoting In re IBM Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998)); GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 214 (3d Cir. 2001) (quoting Rosen v. Communication Serv. Group, Inc., 155 F. Supp. 2d 310, 321 n.14 (E.D.Pa. 2001)); City of New York v. Cyco.Net, Inc., No. 03 Civ. 383(DAB), 2005 WL 174482, at *33 (S.D.N.Y. Jan. 27, 2005). The complaint must "plead those events which give rise to a strong inference that the defendant[] had an intent to

defraud, knowledge of the falsity, or a reckless disregard for the truth." <u>Caputo v. Pfizer, Inc.</u>, 267 F.3d 181, 191 (2d Cir. 2001) (quoting <u>Connecticut Nat'l Bank v. Fluour Corp.</u>, 808 F.2d 957, 962 (2d Cir. 1987) (internal quotation marks and citation omitted)). A plaintiff may support such inference by sufficiently pleading that the defendant had "either (a) . . . both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." <u>Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC</u>, No. 02 Civ. 0767(LBS), 2002 WL 31819207, at *4 (S.D.N.Y. Oct. 10, 2002) (quoting <u>Kalnit v. Eichler</u>, 264 F.3d 131, 138-39 (2d Cir. 2001)). However, Sedona alleges facts sufficient only to support a strong inference of intent to defraud on the part of Ladenburg, Rhino, Markham, Aspen, the Amro Defendants, Boris, Frankel, and Westminster, to the extent that they were holders of or managed Sedona's stock.

Sedona alleges that "the structure of the financing agreement gave the defendants both the motive and the opportunity to defraud Sedona." (Compl. ¶ 111.) Specifically, the structure of the convertible stock and debentures was such that, if Sedona's stock price were pushed downward, the defendants could acquire more stock through the conversion, thus providing an incentive to manipulate Sedona's stock downward. (<u>Id.</u> ¶ 34.) Indeed, this allegation does give rise to a strong inference of motive and opportunity as to the direct holders of the Debentures and their fund managers, such as Rhino and Ladenburg.[11] However, that strong inference is lacking as to those entities' representatives, Badian, Tohn, and Vasinkevich.

---

[11]    According to the settlement agreement between Amro and Sedona, "Sedona issued and delivered . . . Warrants to Ladenburg . . . for 167,576 shares, expiring November 12, 2003." (Peronti Decl. Ex. 1.) "Rhino is listed as the fund manager of Amro in publicly-filed documents with the SEC." (Compl. ¶ 62.)

While the Court could surmise that Badian, Tohn, and Vasinkevich could profit from these transactions, it is Plaintiff's duty to allege specifically the relevant connections. Without more specific allegations as to why Ladenburg's officers would want to manipulate Sedona's stock, Sedona fails to plead adequately the motive requirement as to these three defendants. Therefore, the motions to dismiss Sedona's Second Claim for Relief are granted as to Defendants Badian, Tohn, Vasinkevich, and Pershing, with leave to replead, and denied as to Defendants Ladenburg, Rhino, Markham, Westminster, Frankel, Boris, and the Amro Defendants.

<u>Sedona's Claim for Relief Pursuant to Section 1-401 of the Pennsylvania Act Must be Replead</u>

In its Fourth Claim for Relief, Plaintiff asserts a claim against all Defendants for violation of the Pennsylvania Act. The Pennsylvania Act makes it "unlawful for any person, in connection with the offer, sale or purchase of any security in [Pennsylvania], directly or indirectly: (a) [t]o employ any device, scheme or artifice to defraud; [and] (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading." 70 Pa. Stat. Ann. § 1-401. This provision is "'functionally identical' to . . . Section 10(b) of the Exchange Act," and "is modeled after Rule 10b-5 . . . and requires virtually the same elements of proof." <u>GFL Advantage Fund, Ltd. v. Colkitt</u>, 272 F.3d 189, 214 (3d Cir. 2001) (quoting <u>Rosen v. Communication Serv. Group, Inc.</u>, 155 F. Supp. 2d 310, 321 n.14 (E.D.Pa. 2001)).

The parties disagree as to whether this claim for relief is precluded by the New York choice-of-law provisions of: (1) the Engagement Letter between Sedona and Ladenburg;

(2) the Purchase Agreement between Sedona, Markham, Amro, Aspen, and Cuttyhunk; (3) the

Settlement Agreement among, Sedona and Amro; and (4) the Releases between Sedona and the

Settlement Defendants.[12]  The forum selection clause and choice-of-law provision contained

within the Engagement Letter provides in pertinent part that

> [Sedona] hereby irrevocably:  (a) submits to the jurisdiction of any court of the
> State of New York or any federal court sitting in the State of New York for the
> purposes of any suit, action or other proceeding arising out of the Agreement
> between [Sedona] and [Ladenburg] which is brought by or against [Sedona] or
> [Ladenburg]; (b) agrees that all claims in respect of any suit, action or proceeding
> may be heard and determined in any such court. . . . This [Engagement Letter]
> shall be governed by and construed in accordance with the laws of the State of
> New York, without regard to conflicts of law principles.

(Engagement Letter, Kaplan Aff. Ex. B at 10.)  The choice-of-law provision in the Purchase

Agreement provides that the "[Purchase Agreement] shall be governed by and construed in

accordance with the laws of the State of New York applicable to contracts made in New York by

persons domiciled in New York City and without regard to its principles of conflicts of laws."

(Purchase Agreement, Kaplan Aff. Ex. C § 10.1.)  Similarly, the choice-of-law provision

contained in the Settlement Agreement states that the "[Settlement Agreement] shall be governed

by and construed and enforced in accordance with the internal laws of the State of New York."

(Settlement Agreement, Peronti Decl. Ex. 1 ¶ 7(e).)

When deciding conflict of laws issues arising in diversity cases, a federal court

must look to the laws of the forum state.  See, e.g., Klaxon Co. v. Stentor Elec. Mfg. Co., 313

U.S. 487, 496 (1941); Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000); CAP Gemini

---

[12]     Because Sedona's claim of duress raises a legitimate question as to whether the
Release is invalid, the Court will not, at this stage of the litigation, grant motions
to dismiss Sedona's Pennsylvania law claim based on the choice of law provision
contained in the Release.

<u>Ernst & Young U.S. LLC v. Nackel</u>, No. 02 Civ. 6872(DLC), 2004 WL 569554, at *3 (S.D.N.Y. Mar. 23, 2004). Under New York law, contractual choice-of-law provisions are generally valid and enforceable. <u>Terwilliger</u>, 206 F.3d at 245 (quoting <u>Marine Midland Bank, N.A. v. United Missouri Bank, N.A.</u>, 643 N.Y.S.2d 528, 530 (N.Y. App. Div. 1996)). Where, as here, there is an express choice-of-law provision in a contract, "a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." <u>Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.</u>, 230 F.3d 549, 556 (2d Cir. 2000). However, "[u]nder New York law, a choice-of-law provision indicating that the <u>contract</u> will be governed by a certain body of law does not dispositively determine that law which will govern a claim of <u>fraud</u> arising incident to the contract." <u>Krock v. Lipsay</u>, 97 F.3d 640, 645 (2d Cir. 1996) (citations omitted). Rather, "in order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties." <u>Id.</u> (finding that choice-of-law provision providing that "[t]his Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts," was not sufficiently broad to apply to a claim of fraudulent misrepresentation).

   Here, Sedona's securities fraud claims asserted under Pennsylvania law arise incident to transactions contemplated by the Engagement Letter, Purchase Agreement, and the Settlement Agreement. The language of the choice-of-law provisions contained in the Purchase Agreement and the Settlement Agreement, which merely refer to actions arising directly from those contracts, is not sufficiently broad for the Court to apply the New York choice-of-law provisions contained therein to defeat Sedona's Pennsylvania securities law claim. Further the

broader language in the forum selection clause of the Engagement Letter, which refers to any actions arising out of the Engagement Letter, does not serve to expand the scope of the narrower choice-of-law provision contained in the same contract. See Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc., __ F.3d __, 2005 WL 1619852, at *7 (2d Cir. July 12, 2005) ("Under New York law, . . . tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract, even when the contract also includes a broader forum-selection clause." (citations omitted).) Accordingly, the Court denies the motions to dismiss Sedona's Pennsylvania Act claim for relief to the extent the motions rely on the choice-of-law provisions of the Engagement Letter, Purchase Agreement, and Settlement Agreement.

However, as noted above, the Pennsylvania Act "requires virtually the same elements of proof" as a federal claim brought pursuant to Rule 10b-5. See GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189, 214 (3d Cir. 2001) (quoting Rosen v. Communication Serv. Group, Inc., 155 F. Supp. 2d 310, 321 n.14 (E.D.Pa. 2001)). [Therefore, the motions of Defendants Boris, Creon, Hassan, Smith, Sims, the Amro Defendants, the Batliner Defendants, and the UltraFinanz Defendants to dismiss Sedona's state claim are granted, with leave to replead.]

Further, there is no private right of action under the statutory provision Plaintiff cites and Sedona's fourth claim for relief must for that reason be dismissed. See, e.g., In re Catanella & E.F. Hutton & Co., Inc. Sec. Litig., 583 F. Supp. 1388, 1439 (E.D.Pa. 1984) (finding that the Pennsylvania Act "do[es] not expressly grant a private remedy"). Nonetheless, Pennsylvania courts have found that a private right of action under Section 1-401 is available through Section 1-501 of the Pennsylvania Act. See, e.g., Feret v. First Union Corp., 1999 WL

80374, at *16 (E.D.Pa Jan. 25, 1999) ("§ 1-401 of the Pennsylvania Securities Act, . . . provides

a private cause of action in § 1-501."). Accordingly, the Fourth Claim for Relief is dismissed,

with leave to amend the Complaint to assert the Pennsylvania state fraud claim under Sections 1-

401 and 1-501 of the Pennsylvania Act, as well as to include allegations sufficient to adequately

plead a securities fraud claim under the Pennsylvania Act.


<u>The Motions to Dismiss Sedona's Control Person Liability Claim are Denied in Part</u>

Plaintiff's Twelfth Claim for Relief, pursuant to Section 20 of the Exchange Act,

alleges control person liability as against the UltraFinanz Defendants, Rhino, Badian, the Batliner

Defendants, Creon, Sims, Hassan, Rieden, Vasinkevich, Boris, Tohn, and Smith. For the

following reasons, Defendants' motions to dismiss Sedona's control person liability claim are

granted only as to Defendant Creon.

Pursuant to Section 20(a) of the Exchange Act,

[e]very person who, directly or indirectly, controls any person liable under any
provision of this chapter or of any rule or regulation thereunder shall also be liable
jointly and severally with and to the same extent as such controlled person to any
person to whom such controlled person is liable, unless the controlling person
acted in good faith and did not directly or indirectly induce the act or acts
constituting the violation or cause of action.

15 U.S.C.A. § 78t(a) (West 2005). A plaintiff may establish a prima facie case of control person

liability under Section 20(a) by showing (1) "a primary violation . . . by the controlled person";

(2) "control of the primary violator by the targeted defendant"; and (3) "that the controlling

person was in some meaningful sense a culpable participant in the fraud perpetrated by the

controlled person." <u>Ganino v. Citizens Utils. Co.</u>, 228 F.3d 154, 170 (2d Cir. 2000) (quoting

<u>SEC v. First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1472 (2d Cir. 1996)). A plaintiff's pleading as to

these elements must meet the requirements of Federal Rule of Civil Procedure Rule 8(a), which requires only a "short and plain statement," rather than the particularity requirements of Rule 9(b), since "[n]either the PSLRA (because scienter is not an essential element), nor Rule 9(b) (because fraud is not an essential element), apply to a Section 20(a) claim." In re Initial Public Offering Sec. Litig., 358 F. Supp. 2d 189, 208 (S.D.N.Y. 2004).

In the Complaint, Sedona describes various officer, director, and other authority relationships with alleged perpetrators of fraud in support of its control person liability claim. (See, e.g., Compl. ¶¶ 158 (UltraFinanz Defendants, Rhino, and Badian), 159 (Batliner Defendants), 160 (Sims, Creon, Rhino, and Badian), 161 (Hassan), 162 (Rieden), 164 (Vasinkevich, Boris, Tohn, and Smith), 165 (Badian).) However, Sedona's Section 20(a) claim is not pled sufficiently as against Defendant Rieden, as Sedona has not alleged an underlying primary violation of either Section 10(b) or Rule 10b-5 by Aspen. Sedona's claim is also insufficient as to Defendant Creon, since Sedona has failed to allege facts sufficient to show that Creon was "in some meaningful sense a culpable participant in the fraud" allegedly perpetrated by Defendants Roseworth and Cambois. Rather, in support of its allegation of control person liability against Creon, Sedona merely states that "publicly-filed documents with the SEC indicate that Roseworth and Cambois are wholly-owned subsidiaries of Creon." (Id. ¶ 160.) Therefore, Defendant Creon's motion to dismiss Sedona's Twelfth Claim for Relief as against Creon is granted with leave to replead.

As for the remaining Defendants named in the claim, it cannot be said that Sedona has not alleged control and culpable participation, particularly with respect to Defendant signatories and representatives of entities which were alleged fund managers and/or holders of

Sedona stock. Accordingly, the motions to dismiss Sedona's Twelfth Claim for Relief as against

Defendants Rhino, Vasinkevich, Boris, Tohn, Smith, Badian, Sims, the Batliner Defendants,

Hassan, and the UltraFinanz Defendants, are denied.


The Motions to Dismiss Sedona's Civil Conspiracy Claim are Granted in Part

      The Supreme Court has noted that "a plaintiff [can] bring suit for civil conspiracy

only if he [has] been injured by an act that was itself tortious." Beck, II v. Prupis, 529 U.S. 494,

501 (2000) (citations omitted).  There is no cognizable claim for civil conspiracy on its own

under New York law, a rule that is well-settled among the courts. See, e.g., Endovasc Ltd., Inc.

v. J.P. Turner & Co., LLC, et al., No. 02 Civ. 7313(LAP), 2004 WL 634171, at *14 (S.D.N.Y.

Mar. 20, 2004) ("There is no cognizable claim for the tort of civil conspiracy in New York.");

Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC, 223 F. Supp. 2d 474, 490

(S.D.N.Y. 2002) ("It is well-settled that New York law does not recognize an independent cause

of action for civil conspiracy.").  However, New York law recognizes civil conspiracy as a cause

of action derivative of an underlying tort claim. See Fisher v. Big Squeeze (N.Y.), Inc., 349 F.

Supp. 2d 483, 488 (E.D.N.Y. 2004) ("A claim for conspiracy to commit a tort is recognized in

New York only to the extent that the plaintiff well pleads the underlying tort.").

      Here, Sedona asserts its civil conspiracy to commit fraud claim against all

Defendants in the action.  However, Sedona has only properly alleged securities and common

law fraud claims against Defendants Ladenburg, Rhino, Badian, Tohn, Boris, Vasinkevich, the

Amro Defendants, Markham, Pershing, Westminster, and Frankel. Thus, as to all other

Defendants, there can be no viable civil conspiracy cause of action, and the Court accordingly

grants their motions to dismiss Plaintiff's Sixth Claim for Relief, with leave to replead.

As for the Defendants against whom there remain viable fraud claims, a properly pled claim for civil conspiracy requires allegations of "(1) a corrupt agreement between two or more persons, (2) an overt act, (3) their intentional participation in the furtherance of a plan or purpose, and (4) the resulting damage." Melnitzky v. Rose, 299 F. Supp. 2d 219, 227 (S.D.N.Y. 2003). Although Sedona has alleged sufficiently an overt act of fraud with resulting damage to Plaintiff, there are no allegations of an express agreement among these particular Defendants to intentionally participate in a conspiracy to defraud Sedona. Nonetheless, "[t]he lack of an express allegation of an agreement is not fatal to the plaintiff[']s conspiracy claims. The courts have held that disconnected acts, when taken together, may satisfactorily establish a conspiracy." First Fed. Sav. & Loan Assoc. v. Oppenheim, Appel, Dixon & Co., 629 F. Supp. 427, 443-44 (S.D.N.Y. 1986).

Sedona asserts that "[t]he conspiracy is evidenced by, among other things, the many connections and interrelationships between the defendants herein and the pattern of 'death spiral' financing schemes caused by the defendants and their affiliates." (Compl. ¶ 134.) Indeed, Sedona's allegations of (1) significant relationships between Ladenburg, Vasinkevich, Tohn, Badian, Boris, and Rhino prior to Ladenburg's affiliation with Sedona; (2) Ladenburg and Vasinkevich's role in introducing the Amro Defendants to Sedona as investors; (3) Ladenburg having knowledge of Rhino's alleged fraudulent activity in general; (4) Ladenburg and Rhino as known manipulators of stock; and (5) the trading relationships and knowledge of impropriety between Westminster, Frankel, and Pershing, are sufficient for an inference of a conspiracy. Accordingly, the motion to dismiss Sedona's sixth claim for relief is denied as to Ladenburg,

Rhino, Badian, Tohn, Boris, Vasinkevich, the Amro Defendants, Markham, Pershing, Westminster, and Frankel.

## Sedona Has Not Adequately Pled Tortious Interference with Contract and Tortious Interference with Business Relations

In its third claim for relief, Sedona alleges that all Defendants in the action have tortiously interfered with certain of Sedona's contracts and with its business relationships with other entities, as a result of Defendants, "with knowledge and forethought, dr[iving] down the price of Sedona's stock so much that it precluded Sedona from obtaining additional financing . . . [and] from maximizing its ability to profit from certain contracts." (Compl. ¶ 120-21.) Sedona's Complaint fails to plead sufficient facts to state a cause of action in this regard. The third claim will therefore be dismissed with leave to replead.

### *Tortious Interference with Contract*

"[W]here there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior." NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc., 664 N.E.2d 492, 496 (N.Y. 1996). The elements of a properly pled tortious interference with contract claim under New York law are: "(a) that a valid contract exists; (b) that a third party had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." Millar v. Ojima, 354 F. Supp. 2d 220, 229-30 (E.D.N.Y. 2005) (quoting Finley v. Giacobbe, 79 F.3d 1285, 1294 (2d Cir. 1996)). A plaintiff

must also "identify a specific contractual term that was breached." Id. (quoting Risley v. Rubin, 708 N.Y.S.2d 377, 378 (1st Dep't. 2000)). Further, allegations of causation are required, as the plaintiff "must allege in the complaint that there would not have been a breach but for defendants' conduct." Aim Int'l Trading, L.L.C. v. Valcucine S.P.A., IBI, L.L.C, No. 02 Civ. 1363(PKL), 2003 WL 21203503, at *4 (S.D.N.Y. May 22, 2003).

In support of its tortious interference with contract claim, Sedona alleges that Defendants drove Sedona's stock price down "to such a level that it [sic] substantially precluded SEDONA from maximizing its ability to profit from certain contracts, including those agreements with existing partners, acquired targets such as Acxiom Corporation, and potential partners, implementing various parts of its business plan, completing transactions with third parties or obtaining additional financing." (Compl. ¶ 120; see also id. ¶ 121.) Knowledge and causation are alleged as follows: "Defendants . . . knew or should have known that their actions described above would proximately cause SEDONA to be unable to complete such business or financing transactions." (Id. ¶ 122.)

Plaintiff's allegations are plainly insufficient to address the most basic elements of the tortious interference with contract cause of action. Even if the Court construed Sedona's references to "agreements with existing partners, acquired targets such as Acxiom Corporation, and potential partners" as allegations identifying specific contracts, Sedona fails to allege any breaches of those contracts. The Complaint is also devoid of allegations that any specific Defendants had knowledge of any specific contracts, or that any Defendant intentionally and improperly procured the breach of any contract.

*Tortious Interference with Business Relations*

"Where there has been no breach of an existing contract, but only interference with prospective contract rights, . . . the plaintiff must show more culpable conduct on the part of the defendant." NBT Bancorp Inc., 664 N.E.2d at 496 (citations omitted). "[A]s a general rule, the defendant's conduct must amount to a crime or an independent tort." Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1103 (N.Y. 2004). Under New York law, in order to plead a valid claim of tortious interference with business relations, Sedona must allege that "(1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured." Discover Group, Inc. v. Lexmark Int'l, Inc., 333 F. Supp. 2d 78, 86 (E.D.N.Y. 2004) (quoting Goldhirsh Group, Inc. v. Alpert, 107 F.3d 105, 108-09 (2d Cir. 1997)). Sedona must further allege "relationships with specific third parties with which the [defendants] interfered," that those relationships were "in existence at the time of the interference," and "how the defendant[s] interfered in those relationships." Aim Int'l, at *22.

Here, Sedona alleges that Defendants' actions "interfered with the . . . business relationships of SEDONA with all entities who SEDONA intended would become business partners, transaction targets and/or financiers, and have jeopardized those relationships and contracts and caused SEDONA to lose credibility in those relationships." (Compl. ¶ 123.) However, Sedona fails to identify which particular business relationships it claims were injured as a result of Defendants' alleged market fraud and manipulation, and whether any of the Defendants had knowledge of those relationships. Sedona also fails to adequately allege in the

Complaint that the Defendants intentionally interfered with those business relationships. Sedona's third claim for relief is, accordingly, dismissed as to all Defendants, with leave to replead.

## Sedona's Breach of Contract Claim is Dismissed

Sedona's breach of contract claim is dismissed for the following reasons. In order to assert a valid breach of contract claim, the "complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168, 177 (2d Cir. 2004) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 347 (2d Cir. 1996)); Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC, et al, 223 F. Supp. 2d 474, 490 (S.D.N.Y. 2002). The complaint must also "allege the provisions of the contract upon which the claim is based." Valley Cadillac Corp. v. Dick, 661 N.Y.S.2d 105, 106 (4th Dep't. 1997). Thus, "at a minimum, the terms of the contract, each element of the alleged breach and the resultant damages," must be alleged. Kaplan v. Aspen Knolls Corp., 290 F. Supp. 2d 335, 337 (E.D.N.Y. 2003). Although a plaintiff is required only to make a "short and plain statement" of the breach of contract claim pursuant to Rule 8(a)(2), the plaintiff still must "give the defendant fair notice of what plaintiff's claim is and the grounds upon which it rests." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 515 (2002) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

In its seventh claim for relief, Sedona alleges that Defendants Ladenburg, Markham, Aspen, Boris, and the Amro Defendants were in material breach of various written

and oral agreements. Specifically, Sedona claims that Ladenburg and the Ladenburg Investors "failed to fully fund [the] contract" underlying the Engagement Letter up to $50 million dollars. (Compl. ¶ 136.) In addition, Sedona alleges that Ladenburg and the Ladenburg Investors breached most of their oral and written agreements with Sedona, and that they engaged in unspecified "acts that were not in the best interest of Sedona." (Id. ¶ 137.)

With regard to the Engagement Letter, to the extent Ladenburg and Boris are the only signatories thereon, Sedona has adequately pled three of the four required elements of a breach of contract claim. The Complaint alleges the existence of the Engagement Letter, that Ladenburg and Boris breached the agreement through their failure to procure the $50 million dollar funding, and that Sedona was "damaged in the amount of at least $160 million by defendants' breach of contract, in addition to attorney's fees and interest pursuant to the contract transactional documents."[13] (Id. ¶ 138.) However, the Complaint fails to allege that Sedona adequately performed under the contract. Therefore, the Court dismisses the breach of contract claim as against the named Defendants herein without prejudice, to the extent the claim includes a breach of the Engagement Letter, with leave to replead.

*"Oral and Written Agreements"*

Although Sedona provides a laundry list of alleged breaches, the Court, and the Defendants, are left to guess which of myriad alleged oral and written agreements Ladenburg, Boris, Markham, Aspen, and the Amro Defendants are charged with breaching, much less what specific provisions of those agreements were breached. In addition to not identifying which

---

[13] The Complaint is not clear, however, as to whether the damages pled represent the aggregate total damages from all the alleged breaches, made by all the defendants.

agreements are referred to in this claim for relief, Sedona states that "most," but not all of the

agreements, were breached thus leaving the reader confused as to both the identity and terms of

the specific agreements and which of the defendants were alleged to have entered into them.

Hence, the Complaint does not provide Markham, Aspen, the Amro Defendants, and Ladenburg

and Boris, in relation to contracts other than the Engagement Letter, with sufficient notice of the

breach of contract charges lodged against them.

Accordingly, the Defendants' motions to dismiss Plaintiff's breach of contract

claim are granted, but Plaintiff has leave to replead.


## Sedona's Negligence, Negligent Misrepresentation, and Breach of Fiduciary Duty Claims Fail as a Matter of Law

Defendants Ladenburg, Markham, Rhino, and the Amro Defendants assert that

Sedona's common law claims are precluded by the Martin Act, N.Y. Gen. Bus. Law, Art. 23-A, §

352 (McKinney 1996), which is New York State's securities, or "blue sky," law. Plaintiff

contends that the Martin Act should not apply herein because, for example, the alleged negligent

misrepresentations "were not made in connection with the purchase or sale of securities in New

York, as they (i) were made to Sedona at its Pennsylvania offices and (ii) involved, among other

things, the legitimacy of defendants and whether or not the manipulative actions were taking

place." (Compl. ¶ 154.) It is true that a necessary prerequisite for a Martin Act preemption of a

common law securities fraud claim is that the underlying transaction was "within or from" New

York. N.Y. Gen. Bus. Law § 352-c(1); Lehman Bros. Commercial Corp. v. Minmetals Int'l

Non-Ferrous Metals Trading Co., 179 F. Supp. 2d 159, 162 (S.D.N.Y. 2001) (recognizing that a

finding "that the transactions were . . . "within or from" New York, [is] a nexus expressly required under the Martin Act"). The scope of the Martin Act, however, includes more the actual purchase or sale of securities within or from New York. Related investment advice and negotiation over securities are activities within the Martin Act's purview, as are any

> (a) . . . fraud, deception, concealment, suppression, false pretense . . .;
> (b) . . . promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;
> (c) . . . representation or statement which is false, where the person who made such representation or statement: (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made; where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities . . . , regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted.

N.Y. Gen. Bus. Law § 352-c(1) (McKinney 1996).

According to the Complaint, much of the activity Plaintiff alleges involved negligence, misrepresentations, or breach of fiduciary duty occurred in the course of investment advice and negotiations concerning securities, such as the convertible debentures and related agreements. For example, allegedly negligent misrepresentations included misrepresentations as to "the meritorious nature of the advisory and consulting services performed by Ladenburg." (Compl. ¶ 154.) Next, with respect to the negligence claim, Sedona alleges that Ladenburg was negligent in its duty "to negotiate on behalf of Sedona, to advise Sedona with respect to negotiations engaged in directly by Sedona regarding contract terms which would be in the best interest of Sedona, [as well as] to monitor trading activities in Sedona stock and to advise Sedona regarding such trading activities." (Id. ¶ 151.) Finally, in Plaintiff's breach of fiduciary duty claim, Sedona alleges that Ladenburg breached its duty to provide the investment and financial

advisory services detailed in its engagement letter. (Id. ¶ 144.)

The Complaint alleges that Ladenburg, an entity situated in New York, conducted many of the complained of transactions with Sedona via telephone and mailings (including the Engagement Letter) from New York. In addition, the underlying securities, though registered to Sedona, a Pennsylvania company, were allegedly manipulated and sold short in New York markets. Further, in alleging proper venue in the Complaint, Sedona states that "a substantial part of the events or omissions giving rise to the claims herein occurred in [the Southern District of New York]." (Id. ¶ 31.)

Thus, on the face of the Complaint, the allegations Sedona uses as the foundation for its common law claims involve activity contemplated by the Martin Act, and that have a sufficient nexus with New York. Cf. Lehman Bros. Commercial Corp., 179 F. Supp. 2d at 165 (determining that the negotiation of the sale of securities between traders located in London, Hong Kong, and Beijing did not meet the Martin Act requirement of within or from New York).

Plaintiff further argues that, even if the conduct on which its common law claims are based fall within the scope of the Martin Act, Plaintiff's claims are not preempted by that Act. Plaintiff cites the decisions in Scalp & Blade, Inc. v. Advest, Inc., 722 N.Y.S.2d 639, 640 (4th Dep't. 2001), and Cromer Fin. Ltd. v. Berger, No. 00 Civ. 2498(DLC), 2001 WL 1112548, at *4 (S.D.N.Y. Sept. 19, 2001), which held that the Martin Act did not abrogate claims of breach of fiduciary duty and negligent misrepresentation (Scalp & Blade), and negligence and gross negligence (Cromer). See Scalp & Blade, 722 N.Y.S.2d at 640 ("Nothing in the Martin Act . . . precludes a plaintiff from maintaining common-law causes of action based on such facts as might give the Attorney General a basis for proceeding civilly or criminally against a defendant under

the Martin Act."); <u>Cromer</u>, at *4 ("[T]here is nothing . . . in the text of the Martin Act itself to indicate an intention to abrogate common law causes of action."). The <u>Cromer</u> and <u>Scalp & Blade</u> decisions have, however, been described as "solitary islands in a stream of contrary opinion." <u>Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC</u>, No. 02 Civ. 0767(LBS), 2003 WL 22052894, at *4 (S.D.N.Y. Sept. 2, 2003). Both <u>Scalp & Blade</u>'s and <u>Cromer</u>'s determinations that the text of the Martin Act does not include support for preclusion of common law claims are insufficiently persuasive in the face of substantial contrary authority.

The Martin Act provides the New York Attorney-General with the sole discretion to investigate securities violations within or from the state of New York. <u>See</u> N.Y. Gen. Bus. Law § 352 (1). Allowing private plaintiffs to pursue a related cause of action "is not consistent with the legislative scheme underlying the Martin Act." <u>CPC Int'l Inc. v. McKesson Corp.</u>, 514 N.E.2d 116, 119 (N.Y. 1987). In particular, causes of action related to a plaintiff's securities fraud claim that do not include scienter as an essential element are typically preempted by the Martin Act, in contrast to a claim requiring intent, such as a claim for common law fraud. <u>See, e.g.</u>, <u>Nanopierce</u>, at *4 ("[N]egligent misrepresentation and breach of fiduciary duty claims . . . like the Martin Act itself, do not require proof of deceitful intent; common law fraud, however, does.") This is because allowing a plaintiff to go forward on such a claim "would effectively permit a private action under the Martin Act." <u>Dujardin v. Liberty Media Corp.</u>, 359 F. Supp. 2d 337, 355 (S.D.N.Y. 2005). Indeed, the weight of authority holds that common law claims of negligent misrepresentation, negligence, and breach of fiduciary duty arising from securities fraud are preempted by the Martin Act. <u>See, e.g.</u>, <u>Dujardin</u>, 359 F. Supp. 2d at 354-55 (dismissing a negligent misrepresentation claim as preempted by the Martin Act); <u>Marcus v.</u>

Frome, 329 F. Supp. 2d 464, 475-76 (S.D.N.Y. 2004) (same); Spirit Partners, L.P. v.

audiohighway.com, No. 99 Civ. 9020(RJW), 2000 WL 685022, at *6 (S.D.N.Y. May 25, 2000)

(same); Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co., No. 02 Civ. 1230(LMM), 2002

WL 31027550, at *10 (S.D.N.Y. Sept. 10, 2002) (same); Nanopierce, at *2-*3 (same); Gabriel

Capital, L.P. v. Natwest Fin., Inc., 137 F. Supp. 2d 251, 266-67 (S.D.N.Y. 2000) (dismissing a

negligence claim as violative of the Martin Act); Nairobi Holdings Ltd. v. Brown Bros. Harriman

& Co., No. 02 Civ. 1230(LMM), 2002 WL 31027550, at *10 (S.D.N.Y. Sept. 10, 2002)

(dismissing a breach of fiduciary claim as violative of the Martin Act); Bibeault v. Advanced

Health Corp., No. 97 Civ. 6026(RJW), 1999 WL 301691, at *10 (same), disagreed with on other

grounds by Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc., __ F.3d __, 2005 WL

1619852, at *6 (2d Cir. July 12, 2005).  Further, the Second Circuit has considered the preclusive

nature of the Martin Act and determined that "principles of federalism and respect for state

courts' interpretation of their own laws counsel against ignoring the rulings of those New York

courts that have taken up the issue."  Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 190

(2d Cir. 2001) (upholding district court dismissal of a breach of fiduciary duty claim pursuant to

the Martin Act).

   In light of myriad holdings supporting preemption, as well as this Court's recent

decision in Dujardin v. Liberty Media Corp., 359 F. Supp. 2d 337 (S.D.N.Y. 2005), the Court

declines Plaintiff's request to follow the Cromer and Scalp & Blade decisions with respect to its

common law claims sounding in negligence and breach of fiduciary duty, and accordingly

dismisses Plaintiff's Ninth, Tenth, and Eleventh Claims For Relief as precluded by the Martin

Act.

<u>Sedona May Not Assert A Claim for Relief Pursuant to Section 15(c)(1) of the Exchange Act</u>

In its Eighth Claim for Relief, Sedona seeks disgorgement of profits Defendants made from their allegedly fraudulent conduct, and restitution for the damages Sedona incurred as a result of such alleged conduct. Sedona asserts this claim under three separate sections of the Exchange Act: (1) Section 3(a)(4)-(5) of the Exchange Act, as amended 15 U.S.C. § 78c(a)(4)-(5), which provides the definitions for the terms "broker" and "dealer"; (2) Section 28(a) of the Exchange Act, as amended 15 U.S.C. 78bb(a), which states that the "rights and remedies provided by [the Exchange Act] shall be in addition to any and all other rights and remedies that may exist at law or in equity"; and (3) Section 15(c)(1), as amended 15 U.S.C. § 78o(c)(1), which prohibits brokers and dealers from using fraudulent means to "effect any transaction in, or to induce or attempt to include the purchase or sale of, any security . . . otherwise than on a national securities exchange of which it is a member."

Here, the Court need not address the issues of whether the Defendants in this action are "brokers" and/or "dealers" as defined by the statute, and if so, whether those Defendants have conducted transactions proscribed by Section 15(c)(1). The Second Circuit has made clear that Section 15(c)(1) "does <u>not</u> create a private cause of action." <u>Philips, Appel & Walden, Inc.</u>, 867 F.2d 776, 777 (2d Cir. 1989). While there is case law in this district suggesting that a party may go forward on a Section 15(c)(1) cause of action, those decisions were rendered in the context of actions brought by the SEC, which is a government entity, rather than a private litigant. <u>See, e.g.</u>, <u>SEC v. Tanner</u>, No. 02 Civ. 0306(WHP), 2003 WL 21523978 (S.D.N.Y. July 3, 2003); <u>SEC v. Follick</u>, No. 00 Civ. 4385(KMW)(GWG), 2002 WL 31833868 (S.D.N.Y. Dec. 18, 2002). The Court therefore dismisses Sedona's eighth cause of action in its

entirely, with prejudice.

Further, to the extent Sedona seeks disgorgement solely as a remedy under its federal securities fraud claims, since the Court has dismissed the underlying claims as to certain Defendants, Sedona may not seek such remedy as to those Defendants on its current pleading. See Follick, at *8 ("As for the possibility of disgorgement, the appropriateness of this remedy is properly determined only in the event [a defendant] is found liable for the violations of the securities laws.").


Plaintiff's Motions to Lift the PSLRA Discovery Stay are Denied as Moot

Also before the Court are Plaintiff's three separate motions to lift the automatic discovery stay imposed under the PSLRA during the pendency of a motion to dismiss. Pursuant to the PSLRA,

> In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

15 U.S.C.A. § 78u-4(b)(3)(B) (West 2005). The instant opinion and order resolves all of the pending motions to dismiss. Accordingly, Plaintiff's motions to lift the PSLRA discovery stay are denied as moot.[14] See, e.g., In re Sterling Foster & Co., Inc., Sec. Litig., 222 F. Supp. 2d 216, 288 (E.D.N.Y. 2002) (finding moot Plaintiff's motion to lift the PSLRA automatic discovery stay since there were no longer any pending motions remaining in the litigation).

---

[14]    This Order denies as moot all of Plaintiff's motions to lift the PSLRA discovery stay, which have been docketed as numbers 155, 189, and 206.

<u>Plaintiff's Request to Replead is Granted</u>

The aforementioned defects in the Complaint may be cured if Plaintiff repleads certain claims for relief in accordance with the applicable pleading requirements. The Court is accordingly granting Plaintiff's request to replead, within 20 days from the date of this Opinion and Order, those claims and causes of action that have been dismissed without prejudice. <u>See, e.g.</u>, <u>Olsen v. Pratt & Whitney Aircraft, A Div. of United Technologies Corp.</u>, 136 F.3d 273, 276 (2d Cir. 1998) ("Plaintiffs whose complaints are dismissed pursuant to Rule 9(b) are typically given an opportunity to amend their complaint.")

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss Plaintiff's Claims for Relief are denied in part and granted in part as follows: (1) Defendant Ladenburg's motion to dismiss is granted as to Claims for Relief Three, Four, Seven, Eight, Nine, Ten, and Eleven, and denied as to Claims for Relief One, Two, Five, and Six; (2) Defendant Rhino's motion to dismiss is granted as to Claims for Relief Three, Four, Eight, and Eleven, and denied as to Claims for Relief One, Two, Five, Six, and Twelve; (3) the Amro Defendants' motions are granted as to Claims for Relief One, Three, Four, Five, Seven, Eight, and Eleven, and denied as to Claims for Relief Two, and Six; (4) Pershing's motion to dismiss is granted as to Claims for Relief Three, Four, and Eight, and denied as to Claims for Relief Two and Six; (5) Westminster's motion to dismiss is granted as to Claims for Relief Three, Four, and Eight, and denied as to Claims for Relief Two and Six; (6) Frankel's motion to dismiss is granted as to Claims for Relief Three, Four, and Eight, and denied as to Claims for Relief Two and Six; (7) Markham's motion to

dismiss is granted as to Claims for Relief One, Three, Four, Five, Seven, Eight, and Eleven, and denied as to Claims for Relief Two and Six; (8) the UltraFinanz Defendants' motions to dismiss are granted as to Claims for Relief Two, Three, Four, Six, and Eight, and denied as to Claim for Relief Twelve; (9) the Batliner Defendants' motions to dismiss are granted as to as to Claims for Relief Two, Three, Four, Six, and Eight, and denied as to Claim for Relief Twelve; (10) Creon's motion to dismiss is granted as to all Claims for Relief asserted against it; (11) Badian's motion to dismiss is granted as to Claims for Relief Two, Three, Four, and Eight, and denied as to Claims for Relief One, Five, Six, and Twelve; (12) Tohn's motion to dismiss is granted as to Claims for Relief Two, Three, Four, and Eight, and denied as to Claims for Relief One, Five, Six, and Twelve; (13) Boris' motion to dismiss is granted as to as to Claims for Relief One, Three, Four, Five, Seven, and Eight, and denied as to Claims for Relief Two, Six, and Twelve; (14) Vasinkevich's motion to dismiss is granted as to as to Claims for Relief Two, Three, Four, and Eight, and denied as to Claims for Relief One, Five, Six, and Twelve; (15) Smith's motion to dismiss is granted as to as to Claims for Relief One, Two, Three, Four, Five, Six, and Eight, and denied as to Claim for Relief Twelve; (16) Sims' motion to dismiss is granted as to all Claims for Relief asserted against him, except for Claim for Relief Twelve, which is denied; and (17) Hassan's motion to dismiss is granted as to as to Claims for Relief Two, Three, Four, Six, and Eight, and denied as to Claim for Relief Twelve.

Defendants Tohn, Vasinkevich, and Smith's motions for costs and disbursements in this action are denied. Plaintiff's motions for partial relief from the PSLRA discovery stay are denied as moot.

Plaintiff is given 20 days from the date of this Opinion and Order to file and serve

an amended complaint repleading those causes of action that are dismissed without prejudice. If no such timely amended pleading is served and filed with respect to a claim or cause of action, such claim or cause of action will be dismissed with prejudice and without further advance notice.

     SO ORDERED.


Dated: New York, New York
      August 8, 2005

 

                                    LAURA TAYLOR SWAIN
                                    United States District Judge