UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

SEDONA CORPORATION,

       Plaintiff,

  -v-                                    No.  03 Civ. 3120 (LTS)(THK)

LADENBURG THALMANN & CO., INC., et al.,

       Defendants.

--------------------------------------------------------x

**OPINION AND ORDER**[1]

APPEARANCES:

WHITE AND WILLIAMS LLP
  By:  Carl Selden Koerner, Esq.
One Penn Plaza
250 West 34th St, Suite 1801
New York, New York 10119

*Attorneys for Plaintiff*

HEARD, ROBINS, CLOUD, LUBEL &
GREENWOOD, LLP
  By: Denman Heard, Esq.
      Sean Greenwood, Esq.
910 Travis, Suite 2020
Houston, TX 77002

*Attorneys for Plaintiff*

CHRISTIAN SMITH & JEWELL
  By: Gary M. Jewell, Esq.
     James Christian, Esq.
     Stephen R. Smith, Esq.
     Scott R. Link, Esq.
2302 Fannin, Suite 500
Houston, TX 77002

*Attorneys for Plaintiff*

TATE MOERER & KING, LLP
  By: Richard Tate, Esq.
206 South 2nd Street
Richmond, TX 77469

*Attorneys for Plaintiff*

---

[1] *The ECF system provides notice of the entry of this Order to each party that has both entered an appearance in this case and registered with ECF.  The ECF-registered attorneys are responsible for providing notice to any co-counsel whose e-mail addresses are not reflected on the ECF docket for this case, and Plaintiff's counsel, upon receiving notice of this Order, is hereby ordered to fax or otherwise deliver promptly a copy to all parties who are not represented by ECF-registered counsel.  A certificate of such further service shall be filed within 5 days from the date hereof. Counsel who have not registered for ECF are ordered to register immediately as filing users in accordance with the Procedures for Electronic Case Filing.*

MARYANN PERONTI, ESQ.
380 Rector Place, Suite 6A
New York, NY 10280

*Attorney for Plaintiff*

ARKIN KAPLAN LLP
  By: Howard J. Kaplan, Esq.
      Sean R. O'Brien, Esq.
590 Madison Avenue, 35th Floor
New York, NY 10022

NIEHAUS LLP
  By: Paul Robert Niehaus, Esq.
1359 Broadway, Suite 2001
New York, NY 10018

*Attorneys for Defendants Ladenburg
Thalmann & Co. and David Boris*

DLA PIPER RUDNICK GRAY CARY US
LLP (NYC)
  By: Caryn G. Mazin, Esq.
      Howard S. Schrader, Esq.
1251 Avenue of the Americas
New York, New York 10020

*Attorneys for Defendants Westminster
Securities Corporation, Rhino Advisors, Inc.,
Amro International, S.A., Roseworth Group
Ltd., Cambois Finance Inc. and Thomas
Badian*

THE LAW OFFICE OF SHELDON
EISENBERGER
  By: Sheldon Eisenberger, Esq.
30 Broad Street, 27th Floor
New York, New York 10004

*Attorneys for Defendants Markham Holdings
Ltd. and J. David Hassan*

HANLY CONROY BIERSTEIN &
SHERIDAN, LLP
  By: Thomas I. Sheridan, III, Esq.
112 Madison Avenue
New York, NY 10016

*Attorneys for Plaintiff*

PROSKAUER ROSE LLP
  By: Stephen L. Ratner, Esq.
1585 Broadway
New York, NY 10036

*Attorney for Defendant Pershing, LLC*

BAHN, HERZFELD & MULTER, LLP
  By: Richard L. Herzfeld, Esq.
555 Fifth Avenue, 14th Floor
New York, NY 10017

*Attorneys for Defendant Wm. V. Frankel &
Co., Inc.*

SILLER WILK LLP
  By: Jay S. Auslander, Esq.
675 Third Avenue, 9th Floor
New York, NY 10017

*Attorneys for Defendants Thomas Tohn,
Michael Vasinkevich, and Joseph Smith*

LAURA TAYLOR SWAIN, United States District Judge

In this securities action brought by Plaintiff Sedona Corporation ("Plaintiff" or "Sedona"), the Court previously granted in part the Defendants' motions to dismiss the First Amended Complaint ("FAC"), dismissing some of Plaintiff's claims with leave to replead. Familiarity with that decision, as well as with the Court's decision resolving the parties' motions for reconsideration of that decision, is presumed.  See Sedona Corp. v. Ladenburg Thalmann & Co., Inc., No. 03 Civ. 3120 (LTS)(THK), 2005 WL 1902780 (S.D.N.Y. Aug. 9, 2005) (hereinafter "Sedona I"); Sedona Corp. v. Ladenburg Thalmann & Co., Inc., No. 03 Civ. 3120 (LTS)(THK), 2006 WL 2034663 (S.D.N.Y. July 29, 2006) (hereinafter "Sedona II").

Plaintiff thereafter filed a Second Amended Complaint ("SAC").  The SAC asserts largely the same claims for relief, in the same order, against various combinations of the Defendants, with the following exceptions: Plaintiff's Section 20(a) claim is now its Eighth Claim for Relief, Plaintiff sues for rescission of the Settlement Agreement releases as its Ninth Claim for Relief against Amro, Roseworth, Cambois, Rhino and Badian, and Plaintiff raises a claim of fraudulent inducement in the procurement of the releases as its Tenth Claim for Relief against those parties.

Groupings of Defendants Ladenburg, Boris, Vasinkevich, Tohn, Smith, Amro, Roseworth, Cambois, Rhino, Badian, Markham, Hassan, Westminster, Pershing and Frankel (collectively, the "Moving Defendants") have moved separately to dismiss some or all of the claims asserted against them in the SAC (hereinafter "motion(s) to dismiss the SAC").  Defendants Amro, Rhino, Roseworth, Cambois and Badian request that, should the Court deny their motion to dismiss, the Court compel arbitration of any remaining claims asserted against them or, in the alternative, strike Plaintiff's jury demand.  After the Second Circuit decided ATSI Commen's, Inc. v. The Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007), the Moving Defendants submitted a joint

memorandum in further support of their motions to dismiss and arguing for dismissal of additional claims on the basis of <u>ATSI</u>, and Plaintiff filed a memorandum in response.[2]  The Court has considered thoroughly all of the parties' submissions.

For the reasons that follow, the Moving Defendants' motions to dismiss the SAC are granted, and the motion to compel arbitration and to strike Plaintiff's jury demand is denied as moot.

DISCUSSION

After <u>Sedona I</u> and <u>Sedona II</u> were issued, and after the parties had fully briefed the Moving Defendants' motions to dismiss the SAC, the Supreme Court held in <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955, 1974 (2007), that, in order to survive a motion to dismiss pursuant to Rule 12(b)(6), the complaint must plead "enough facts to state a claim to relief that is plausible on its face."  <u>Ruotolo v. City of New York</u>, 514 F.3d 184, 188 (2d Cir. 2008) (quoting <u>Twombly</u>, 127 S. Ct. at 1974).  This plausibility standard was recently reaffirmed.  <u>See</u> <u>Ashcroft v. Iqbal</u>, --- S. Ct. ---, 2009 WL 1361536, *12 (May 18, 2009).

With respect to the pleading standards of Rule 8, a complaint must have "more than

---

[2]     The motion to dismiss filed by Pershing is docketed under Docket Entry No. 272. The motion to dismiss filed by Westminster is docketed under Docket Entry No. 274. The motion to dismiss filed by Amro, Roseworth, Cambois, Badian and Rhino is docketed under Docket Entry No. 276, and their request to compel arbitration or, in the alternative, to strike Plaintiff's jury demand is docketed under Docket Entry No. 278.  The motion to dismiss filed by Frankel is docketed under Docket Entry No. 282. The motion to dismiss filed by Hassan and Markham is docketed under Docket Entry No. 285.  The motion to dismiss filed by Tohn, Vasinkevich and Smith is docketed under Docket Entry No. 288.  Ladenburg's motion to dismiss was made by way of a brief, docketed under Docket Entry No. 317, submitted after <u>ATSI</u> was decided, and is directed only at the First, Second, Third, Fourth, Fifth, Sixth and Eighth Claims for Relief as asserted against Ladenburg (i.e., all the claims asserted against Ladenburg except for the Seventh Claim for Relief).

an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 2009 WL 1361536, at *12.

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause

of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of

'further factual enhancement.'" Id. (citations omitted).


Ninth and Tenth Claims for Relief

             Defendants Amro, Roseworth, Cambois, Rhino and Badian (collectively, the

"Release Defendants") move to dismiss Plaintiff's Ninth and Tenth Claims for Relief, which

concern the releases executed by Plaintiff as to these Defendants.  (SAC ¶ 199.)  As the Court

explained in Sedona II, a party repudiating a release must choose one of the following three

options: "(1) he may return the consideration paid for the release, thereby rescinding the

transaction; (2) he may sue for a rescission and offer to return the consideration; or (3) he may

retain the consideration and sue at law for his damages." Sedona II, 2006 WL 2034663, at *6

(quoting Inman v. Merchants Mut. Cas. Co., 74 N.Y.S.2d 87, 89 (Sup. Ct. 1947)).  Plaintiff's Ninth

Claim for Relief elects the second option (see SAC ¶ 275 (Plaintiff "hereby offers . . . to restore the

consideration allegedly received by it in exchange for rescission of the Releases . . . .")), and seeks

rescission on the bases of lack of consideration and fraudulent inducement.[3]  The Tenth Claim for

Relief elects the third option (see SAC ¶ 291 ("SEDONA was harmed because it released the

Released Parties for a lesser sum than it would have received if not for the fraud.")), and seeks

---

[3]      See SAC ¶¶ 276-77 ("SEDONA seeks rescission of the Releases as a result of the
Released Parties' failure to provide any consideration for the Releases.  SEDONA
seeks rescission of the Releases as a result of the Released Parties['] fraudulent
conduct.").

damages on the basis of fraudulent inducement.[4]

Plaintiff's attempt to invoke fraudulent inducement as a basis for repudiation of the releases, however, was already rejected by the Court in Sedona I.  Plaintiff raises no argument concerning fraudulent inducement that was not raised in its previous submissions in connection with the motions to dismiss the FAC, or that was not already addressed substantively by Sedona I, and the allegations in the FAC that precluded Plaintiff from alleging fraudulent inducement reappear in largely the same form in the SAC.  Accordingly, for substantially the reasons articulated in Sedona I, Plaintiff's claims for rescission or damages (as asserted in the Ninth and Tenth Claims for Relief) in connection with the releases are dismissed insofar as they are premised on a theory of fraudulent inducement.

Plaintiff's theory, asserted in the Ninth Claim for Relief, that the releases should be voided for lack of consideration, is also invalid as a matter of law.  Under New York law, which governs the releases, see Sedona I, 2005 WL 1902780, at *5, a release is enforceable even in the absence of consideration so long as it is given in writing.  See N.Y. Gen. Oblig. Law § 15-303 (West 2001) ("A written instrument which purports to be a total or partial release of all claims, debts, demands or obligations, or a total or partial release of any particular claim, debt, demand or obligation, . . . shall not be invalid because of the absence of consideration or of a seal.").  Plaintiff's reliance on Chaput v. Unisys Corp., 964 F.2d 1299, 1301 (2d Cir. 1992), is misplaced, as that case dealt with a release solely in the context of an antidiscrimination claim arising under federal law.  See Shain v. Center for Jewish History, Inc., No. 04 Civ. 1762 (NRB), 2006 WL 3549318, *5 n.9 (S.D.N.Y. Dec. 6, 2006) (applying Chaput to require consideration in order for

---

[4]    See SAC at 83 ("Tenth Claim for Relief: Fraudulent Inducement in Procurement of Releases").

release to be enforceable but only as to plaintiff's <u>federal</u> antidiscrimination claim, while noting

plaintiff's concession that, with respect to her New York state law claim, the New York General

Obligations Law precluded her from arguing that the release was unenforceable for lack of

consideration).  Neither <u>Chaput</u> nor the New York case upon which it relied addressed Section 15-

303, and the New York case relied upon did not address releases at all.  <u>See</u> <u>Weiner v. McGraw-

Hill</u>, 57 N.Y.2d 458 (N.Y. 1982).  Accordingly, Plaintiff's effort to rescind the releases for lack of

consideration must fail.

 The Ninth and Tenth Claims for Relief are, accordingly, dismissed in their entirety

as against the Moving Defendants.


<u>The Releases Preclude Plaintiff's Claims Against Amro, Roseworth, Cambois, Rhino and Badian</u>

 In <u>Sedona I</u>, the Court stated in clear terms that Plaintiff could seek rescission of the

releases on a theory of duress and, in <u>Sedona II</u>, the Court provided Plaintiff an opportunity to

articulate such a theory in the form of a cause of action.  The SAC does not, however, assert any

rescission claim premised on duress.  As the Ninth and Tenth Claims for Relief are dismissed and

Plaintiff has asserted no other viable cause of action for rescission or invalidation of the releases,

the Court concludes that the releases bar Plaintiff's claims against the Release Defendants.[5]

 As explained in <u>Sedona I</u>, the releases covered, <u>inter alia</u>, all claims that could have

been asserted and all controversies that may have occurred prior to the date of the releases, which

were executed in February 2002.  (SAC ¶ 194.)  For the reasons explained in the Court's earlier

---

[5] The releases preclude the claim against Badian because they explicitly apply to the officers, directors, employees or agents of the signatories, and Plaintiff alleges that Badian acted on behalf of Rhino.

decisions and in the discussion that follows, the SAC's generalized allegations of stock-related misbehavior, even where premised on post-February 2002 conduct, are plainly insufficient to state valid claims under any of the statutes and legal principles Plaintiff has invoked.  Accordingly, Plaintiff's claims against Defendants Amro, Roseworth, Cambois, Rhino and Badian are dismissed in their entirety.[6]


*The ATSI Case*

      In the same year that its <u>Twombly</u> decision was issued, the Supreme Court decided <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 127 S. Ct. 2499 (2007), in which the Court held, with respect to the pleading standard in PSLRA cases, that "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." <u>Id.</u> at 2509.  For an inference of scienter to be strong, "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Id.</u> at 2510.

      Thereafter, the Second Circuit decided <u>ATSI Commcn's, Inc. v. The Shaar Fund, Ltd.</u>, 493 F.3d 87 (2d Cir. 2007), applying <u>Twombly</u> and <u>Tellabs</u> to a private securities action asserting Section 10(b) claims.  The plaintiff in that case, ATSI Communications, Inc. ("ATSI"), alleged that the defendants had perpetrated a classic "death spiral" scheme against it.  In that connection, ATSI alleged that the defendants had manipulated the market and made false representations to ATSI in connection with their acquisition of convertible preferred stock in ATSI,

---

[6]     In light of the dismissal of all of Plaintiff's claims against the Release Defendants, the remainder of the discussion of Plaintiff's claims in this Opinion relates only to those claims as asserted against the other Defendants.

that they would not sell ATSI stock short.  The convertible preferred stock permitted the defendant recipients, after a certain point in time, to convert such stock into a number of shares of common stock, pursuant to a formula under which the number of shares of common stock received on conversion increased as the common stock price decreased.  ATSI, 493 F.3d at 95.  ATSI alleged that the defendants entered into these agreements with the intent to engage in massive short selling of the stock, resulting in the manipulation downward of ATSI's stock price, which in turn would permit the defendants to cover their short sales with the returns on their conversions, maximized by the plummeting stock prices.  Id.

ATSI, however, did not allege any specific acts of short selling by the defendants. ATSI, 493 F.3d at 97.  Rather, it made circumstantial allegations, claiming that 30 out of 38 companies in which the defendants invested experienced stock price declines indicative of a death spiral financing scheme, that the other companies' stock sales soared and stock values plummeted after defendants' investment agreements were executed (with specific numbers illustrating these trends), and that the companies' stock prices reacted negatively to positive news.  Id.  ATSI alleged that these trends could only be explained by the defendants' aggressive short sales following their respective investments.  Id.  Lastly, ATSI alleged that the defendants engaged in "wash trades, matched trades, phantom shares, and other manipulative trading."  Id. at 105.

The Second Circuit held that the complaint failed to state Section 10(b) market manipulation and misrepresentation claims under the particularity standards established by the PSLRA and Rule 9(b) and as explained by Tellabs.  These deficiencies were relevant to both the plaintiff's obligation to explain with particularity the deception at issue as well as the plaintiff's obligation to plead scienter.  See ATSI, 493 F.3d at 102 ("in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation.").  Two of the deficiencies

discussed by the Second Circuit in ATSI are equally significant here.

First, with respect to ATSI's Section 10(b) market manipulation claims, the Second Circuit noted that the complaint had failed to identify the means by which the market was actually manipulated. See ATSI, 493 F.3d at 104 ("Nowhere does ATSI particularly allege what the defendants did -- beyond simply mentioning common types of manipulative activity -- or state how this activity affected the market in ATSI's stock.").  In setting forth the relevant pleading standard, the Second Circuit held that, while a plaintiff "need not plead manipulation to the same degree of specificity as a plain misrepresentation claim," ATSI, 493 F.3d at 102, "a manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants" and the complaint must set forth, "to the extent possible, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." Id. (citation omitted). Manipulation, the Court explained, "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." Id. at 100 (quoting Ernst & Ernst, 425 U.S. 185, 199 (1976)).  The plaintiff must show that

> an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security.  The deception arises from the fact that investors are misled to believe 'that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators.'

Id. (quoting Gurary v. Winehouse, 190 F.3d 37, 45 (2d Cir. 1999)).  In identifying such manipulative activity, courts "generally ask whether a transaction sends a false pricing signal to the market." Id. at 100.  In this connection, the Second Circuit explained that "short selling -- even in high volumes -- is not, by itself, manipulative," because it "enhances pricing efficiency by helping to move the prices of overvalued securities toward their intrinsic values." ATSI, 493 F.3d at 101.

"[S]hort selling must be combined with something more to create a false impression of how market participants value a security." Id. at 101.  Furthermore, "purchasing a floorless convertible security is not, by itself or when coupled with short selling, inherently manipulative.  Such securities provide distressed companies with access to much-needed capital and, so long as their terms are fully disclosed, can provide a transparent hedge against a short sale." Id.  Because ATSI's complaint premised its market manipulation theory almost entirely on allegations of short sales following the purchase of floorless convertible securities, market manipulation was not adequately alleged.

Second, the Second Circuit found that the plaintiff had failed to allege with any specificity that the defendants actually engaged in short selling, either of ATSI's stock, or of the stock of companies in which defendants had invested in the past.  See ATSI, 493 F.3d at 104 (the plaintiff failed to adequately plead "that the defendants engaged in any short sales or other potentially manipulative activity").  As a result, ATSI also failed adequately to plead its misrepresentation claim since the allegedly misleading nature of the representations and the corresponding scienter element were premised substantially on the same allegations of short selling, both of ATSI stock and of the stock of prior alleged victims.  With respect to ATSI's stock, the circumstantial factors noted in the complaint, such as fluctuating stock prices and trade volume, the negative price reactions to positive news, and the opportunities for manipulation created by the convertible preferred stock arrangements, were held insufficient to raise an inference that manipulative short selling had in fact occurred.  See id. at 103 ("One does not observe constant prices or trading volumes in the stock markets."); id. ("ATSI pleads no particular connection between the negative reaction of the stock price and anything the defendants did.  Adopting ATSI's reasoning would subject large holders of convertible preferred stock to the risk of suit . . . whenever

the stock price does not react to news as the issuer expects."); id. (the fact that "a legitimate investment vehicle, such as a convertible preferred stock . . . , [could create] an opportunity for profit through manipulation" is a circumstance "present for any investor in floorless convertibles"). With respect to the alleged prior victims, ATSI's attempt to substantiate its claims of fraudulent conduct with allegations of the defendants' participation in past death spiral schemes similarly failed, as the complaint did not "allege with particularity what, if anything, the defendants did to cause the decline [in share price of the alleged prior victims]; it simply offers a generalized allegation that the defendants engaged in death spiral financing combined with a detailed definition of how death spiral financing works." ATSI, 493 F.3d at 106.  The fact that the purported victims' stock prices fell after the defendants invested in them created no reasonable inference of short sales, since "[n]o inference of sabotage is available from the circumstance that some (or many) risky investments come to nothing."  Id.

The Moving Defendants argue that Tellabs and ATSI warrant the dismissal of Plaintiff's First, Second and Fifth Claims for Relief as against several of the Defendants, notwithstanding the Court's prior rulings as to some of those Defendants in Sedona I.  (See Br. at 2 n.1 ("Certain defendants did not move to dismiss the securities fraud claims in the SAC because of the Court's prior rulings.  In light of Tellabs and ATSI, however, this Court may properly consider the additional bases for dismissal discussed herein . . . .").)  The Court has now considered and applied ATSI (as well as Tellabs, Twombly and Iqbal) in determining whether all of Plaintiff's fraud claims against the Moving Defendants should be dismissed.[7]

---

[7]     Plaintiff filed a memorandum of law in response, arguing that some of the Moving Defendants -- Ladenburg, Vasinkevich and Tohn -- are precluded from moving for dismissal of certain claims based on Tellabs and ATSI because they failed to move for
(continued...)

First, Second and Fifth Claims for Relief As Asserted Against Ladenburg, Boris, Vasinkevich,
Tohn, Smith, Markham and Hassan

          Plaintiff's First and Fifth Claims for Relief (for Section 10(b)/Rule 10b-5 liability on

the basis of misrepresentations and omissions, and common law fraud and deceit principles,

respectively) are asserted against Defendants Ladenburg, Markham, Aspen, Tohn, Boris,

Vasinkevich and Smith, while the Second Claim for Relief (for Section 10(b)/Rule 10b-5 liability

on the basis of market manipulation) is asserted against all Defendants.  All of the Moving

Defendants seek dismissal of these claims as asserted against them.

          The Second Claim for Relief, concerning market manipulation, must be dismissed

because the SAC fails to plead with any particularity precisely <u>how</u> the Defendants' alleged actions

deceived the market.  As the Second Circuit noted in <u>ATSI</u>, the mere fact that short sales occurred,

either by itself or in conjunction with the fulfillment of convertible securities agreements, does not

mean that investors in the market have been misled.  To the extent that the SAC appears to premise

its manipulation theory on the fact that the investment agreements in this case contained an explicit

promise not to sell short, and that therefore the market would be led to attribute the massive selling

of Sedona stock to deficiencies in the intrinsic quality of Sedona stock rather than aggressive short

selling by the investors in violation of the agreements, the manipulation claim fails because specific

allegations of actual short selling by the Defendants are missing, as the Court explains in more

detail below.  Similarly, the SAC's vague references to various manipulative techniques are

---

    [7](...continued)
        dismissal of those claims in the first place, when the SAC was filed.  (Opp'n at 4-5.)
        These Defendants, however, reasonably declined to repeat arguments seeking
        dismissal of certain claims which the Court had already considered and rejected in
        <u>Sedona I</u> and <u>Sedona II</u>.  Defendants' later request for relief was warranted and is
        appropriately considered in light of the intervening, controlling case law on which it
        is based.

unsubstantiated by any particularized allegations.[8]  Therefore, market manipulation has not been

sufficiently plead, nor are there sufficient allegations of conscious wrongdoing or recklessness that

would raise a strong inference of scienter.  Accordingly, the Second Claim for Relief as asserted

against the Moving Defendants must be dismissed.

Plaintiff's First and Fifth Claims for Relief concerning misrepresentations are

similarly premised almost entirely on allegations of Defendants' short selling activities, but the

SAC simply does not contain specific allegations of actual short selling, or of culpable participation

in short selling, on the part of Ladenburg, Boris, Vasinkevich, Tohn, Smith, Markham or Hassan[9]

that are sufficient to meet the standards articulated in <u>ATSI</u>.[10]  Plaintiff alleges that the volume of

---

[8]     The following allegation, set forth in Paragraph 172 of the SAC, is characteristic of the sort of conclusory allegations of manipulative activity found throughout the SAC:

It is the belief of SEDONA that this pattern was due to the defendants herein (in addition to others) manipulating SEDONA stock by illegally selling short, failing to deliver securities of SEDONA, laddering the offer to prevent any upward momentum, illegally selling shares at the bid price as if they were actual "long" shares, not reporting large volumes of illegal stock trading outside of the marketplace, intimidating bonafide purchasers, engaging in other non-economically feasible transactions, in most cases, selling stock they did not own, entering into massive counterfeit sales and using multiple manipulation techniques to control the free market pricing of SEDONA's stock.

[9]     Although Plaintiff does not raise its First and Fifth Claims for Relief against Hassan, Plaintiff's failure to allege with specificity that Hassan engaged in short sales is relevant to the Court's ruling, already discussed, that Plaintiff failed to plead its Second Claim for Relief as to Hassan with the requisite particularity.

[10]    Specific examples of short selling are provided with respect to Andreas Badian, who is not a defendant in this case, and Rhino, the claims against which have been dismissed because of the releases, by way of direct allegations as well as reliance upon quotations from an SEC complaint (<u>e.g.</u>, SAC ¶¶ 30, 164), but there are no particularized allegations beyond the mere association of other Moving Defendants with Rhino that would suggest that any other Moving Defendant had any relevant

(continued...)

sales in Sedona's stock skyrocketed after the convertible agreements were executed (e.g., SAC ¶¶ 57, 103), that Sedona's stock price plummeted following these sales (e.g., SAC ¶¶ 58, 104), and that Sedona's stock price reacted negatively to positive news (e.g., SAC ¶¶ 168, 172).  However, as explained in ATSI, these types of circumstantial allegations, even if supported by specific numbers illustrating these trends, are insufficient to support an inference that Defendants engaged in short selling because volatility in the stock market is not unusual.  Nor does the fact that Defendants had the potential to gain tremendous profit from their convertible preferred stock arrangement (e.g., SAC ¶ 108), by itself, warrant a reasonable inference that they engaged in a manipulative scheme. See ATSI, 493 F.3d at 106 ("ATSI and the defendants simply entered into mutually beneficial financing transactions.").  Plaintiff relies on allegations of past death spiral schemes perpetrated by some of the Defendants to suggest a pattern, or an intent on the part of the Defendants to break their promises not to sell short, but such allegations are similarly insufficient to demonstrate manipulative short selling or the requisite scienter with respect to Sedona stock.  Like the SAC's allegations in connection with Sedona, the allegations regarding past death spiral schemes consist solely of a listing of the time of investment in a particular company and the corresponding after-investment drop in stock price.  (SAC ¶ 61.)

        The SAC, like the complaint in ATSI, "fails to allege with particularity, what, if anything, the defendants did to cause the decline[s]."  ATSI, 493 F.3d at 106; see also id. ("No inference of sabotage is available from the circumstance that some (or many) risky investments come to nothing.").  Therefore, the allegations fail sufficiently to state that the representations at issue were false when made, nor do they raise a strong inference of scienter.  See ATSI, 493 F.3d at

---

[10](...continued)
        knowledge or participated culpably in these transactions.

105 ("While the failure to carry out a promise in connection with a securities transaction might constitute breach of contract, it does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform." (quotation and citation omitted)).

In light of the foregoing, the First, Second, and Fifth Claims for Relief are dismissed as against Ladenburg, Boris, Vasinkevich, Tohn, Smith, Markham and Hassan.

Second Claim for Relief As Asserted Against Frankel

With respect to Frankel, the SAC proffers the following allegations in support of Plaintiff's market manipulation claim.  Frankel, a market maker, had made only one Sedona trade on December 7, 2000, prior to Sedona's announcement that day that it had entered into a customer service agreement with IBM.  After the announcement, Frankel made 106 sale trades for 138,800 shares, the stock price fell, and Frankel then performed an "after-hours cleanup trade" by purchasing 155,000 shares.  (SAC ¶ 169.)  Similarly, on other days, Frankel sold shares during the day and, after the stock price dropped, purchased a similar volume of shares in an "after-hours cleanup trade purchase."  (Id. ¶ 170.)  In the months of October to December 2000, Frankel's trades accounted for about 30% of all the volume of Sedona's shares.  (Id. ¶ 173.)

Plaintiff's allegations concerning Frankel fail to explain with any particularity how Frankel's actions deceived investors as to the intrinsic value of Sedona's shares.  The SAC lacks any explanation as to how Frankel's ability to make a profit by selling high and buying low misled the market,[11] nor do the facts suggest any conscious wrongdoing or recklessness that would give

---

[11]    The SAC adds that Frankel's "trading technique is described in the SEC Complaint."
(continued...)

rise to a strong inference of scienter.[12]  The mere fact that Frankel effected such a large volume of trades in Sedona's stock is also not indicative of anything manipulative.  See ATSI, 493 F.3d at 105 (mere fact that Trimark was the principal market maker in ATSI's stock is insufficient to plead manipulation with particularity, or to raise a strong inference of scienter).  Accordingly, Plaintiff's Second Claim for Relief is dismissed as against Frankel.

Second Claim for Relief As Asserted Against Westminster and Pershing

_____The SAC alleges that Westminster shared office space with Rhino, that it was an "active" broker-dealer for Rhino and other Defendants, and that it traded over 1,800,000 shares of Sedona stock as a non-reporting market maker.  (SAC ¶ 174.)  The SAC also asserts a belief that Westminster, with cooperation from its prime broker, Pershing, "illegally converted short positions into false long positions, disguised the delivery of conversion shares of Sedona to co-conspirators to cover illegal short positions, and knowingly participated in manipulating the stock of Sedona up or down."  (Id. ¶ 175.)  With respect to Pershing, the SAC alleges that it was a "primary violator in

_____

[11](...continued)
(SAC ¶ 169.)  The burden of pleading manipulation with particularity rests with Plaintiff, not with Defendants and not with the Court, and cannot be satisfied through generalized references to other litigants' allegations.  Cf. ATSI, 493 F.3d at 106 ("ATSI cannot sufficiently plead fraud by simply providing a method for the defendant to discover the underlying details.  If ATSI had access to the details necessary to make these allegations, it must plead them and not just tell the defendants to go find them.").

[12]     Even if the SAC intended to allege that Frankel itself aggressively sold stock short (and the SAC does not, as there are no specific allegations of Frankel's borrowing of stock or the naked selling of stock it did not actually have), there is no allegation that Frankel promised Sedona or anyone that it would not sell Sedona's stock short.  See ATSI, 493 F.3d at 101 ("short selling -- even in high volumes -- is not, by itself, manipulative.").  Nor is there any particularized allegation that Frankel culpably participated in the short selling by Rhino or other parties.

the fraudulent scheme" because it had "access to confidential information of Westminster and Rhino, and the power to determining whether or not to clear their transactions." (Id. ¶ 179.)  The SAC alleges that "Pershing was more than the clearing agent for Westminster.  It was a direct participant in the illegal scheme to artificially manipulate and decrease the market price of Sedona's stock." (Id.)  The SAC adds that, when Rhino acted upon its conversion rights on behalf of Amro, Rhino directed Sedona to remit the conversion shares to Pershing.  (Id. ¶¶ 186-87.)

Plaintiff's allegations that Westminster and Pershing "illegally converted short positions into false long positions" and committed other bad acts are wholly conclusory, and the few particularized allegations concerning Pershing fail to raise a strong inference of scienter. Pershing's mere access to unspecified confidential information, and its power to determine whether or not transactions could be cleared, fail to raise any inference that Pershing knowingly participated in Rhino's short selling activities or had any intent to otherwise manipulate the market.  Even if Pershing had power to determine whether or not a transaction should be cleared, the SAC is devoid of any allegations as to when or under what criteria Pershing would decide to clear a particular trade.  The fact that Pershing held the remitted conversion shares on behalf of Rhino suggests no inference of conscious wrongdoing.  Even taking these allegations together, the SAC fails to raise any inference of intent that is at least as compelling as competing, nonculpable inferences, such as the inference that Rhino itself misled Pershing into clearing trades it otherwise would not have. The allegations as to Westminster are similarly conclusory in nature (i.e., that it was an "active" broker-dealer for Rhino), and the allegations that it shared office space with Rhino and traded large volumes of Sedona stock fail to raise any strong suggestion of conscious wrongdoing or recklessness that would constitute a strong inference of scienter.

For these reasons, the Second Claim for Relief is dismissed as against Defendants

Westminster and Pershing.  See ATSI, 493 F.3d at 105 (allegations that Trimark "knew or should have known of the manipulation" and that the plaintiff believed that Trimark "was a cooperating broker-dealer" were insufficient to explain manipulation or raise a strong inference of scienter).

Fourth and Sixth Claims for Relief - the Pennsylvania Act and Common Law Civil Conspiracy Claims

Because Plaintiff has failed to plead a viable securities or common law fraud claim against Defendants Ladenburg, Boris, Vasinkevich, Tohn, Smith, Markham, Hassan, Westminster, Pershing or Frankel, Plaintiff has also failed to plead a violation of the Pennsylvania Act or a derivative conspiracy claim as to them, and accordingly the Moving Defendants' motion to dismiss is granted as to the Fourth and Sixth Claims for Relief.

Eighth Claim for Relief - the Section 20(a) Claim

Only Andreas Badian, who is not a defendant in this case, and Rhino, the claims against which have been dismissed because of the releases, are alleged to have engaged in specific instances of short selling.  (See, e.g., SAC ¶¶ 30, 164.)[13]  Even assuming arguendo that such allegations are sufficient to state a primary Section 10(b) violation, however, there are no allegations plausibly demonstrating that Ladenburg, Boris, Vasinkevich, Tohn, Smith, Markham, Hassan, Westminster, Pershing or Frankel controlled Rhino or Andreas Badian in any way.  None of the tangential references to these Defendants' associations or interactions with Rhino plausibly plead control and, for substantially the reasons discussed in connection with the First, Second and

---

[13]     Rhino is also alleged to have sold shares of Sedona stock short on behalf of Amro, but there is no allegation that Amro was itself aware of, or authorized, such a sale.  The SAC, in fact, explicitly attributes this short sale to Rhino employees.  (SAC ¶ 164.)

Fifth Claims for Relief, the SAC does not plausibly plead culpable participation on the part of these Defendants.  Accordingly, Plaintiff's Eighth Claim for Relief is dismissed as against Defendants Ladenburg, Boris, Vasinkevich, Tohn, Smith, Markham, Hassan, Westminster, Pershing and Frankel.


Third Claim for Relief - the Common Law Tortious Interference with Contract and Tortious Interference with Business Relations Claims

          Following the Court's dismissal without prejudice of Plaintiff's tortious interference with contract claims, Plaintiff added allegations in the SAC concerning a contract between Sedona and Sanchez Computer Associates ("Sanchez") that was allegedly terminated as the result of Defendants' actions.  (SAC ¶¶ 141-143.)  Even assuming arguendo that the termination of a contract qualifies as a "breach" under the law governing this tort, and even if the allegation that the Sanchez contract was terminated as a result of Defendants' actions is taken as true, the SAC contains no allegations that would plausibly suggest that any Defendant specifically intended to cause Sanchez to terminate that contract.  See Millar v. Ojima, 354 F. Supp. 2d 220, 229-30 (E.D.N.Y. 2005) (citation omitted) (elements include intentional procurement of breach).  Accordingly, Plaintiff's tortious interference with contract claims are dismissed.

          Plaintiff's claim for tortious interference with business relations similarly fails.  The SAC specifies the key business relationships alleged to have been hindered and alleges that some of the Defendants knew that Sedona's prospective business customers were in the process of adopting Sedona's software for their respective companies and that the adverse news about Sedona would cause these entities to hold off on purchasing Sedona's software.  (SAC ¶¶ 144-52.)  However, while the SAC refers to Defendants' knowledge of Sedona's business model generally, at no point

does the SAC actually allege that Defendants knew about the specific business relationships identified in the SAC.  See Sedona I, 2005 WL 1902780, at *19 (plaintiff failed to identify the business relationships harmed and whether Defendants had knowledge of those relationships). Moreover, Plaintiff's generalized allegations of short selling with the intent to drive down Sedona's stock price do not suffice to state plausibly that Defendants' intent was to interfere with these particular business relationships.  Therefore, Plaintiff's tortious interference with business relations claims are dismissed.

For the above reasons, the motions to dismiss are granted as to the Third Claim for Relief as asserted against the Moving Defendants.

Seventh Claim for Relief as Against Markham - Breach of Contract

Defendant Markham moves to dismiss Plaintiff's breach of contract claim against it.[14]  Plaintiff's breach of contract allegations as to Markham are found in Paragraphs 250, 251 and 253 of the SAC.

In Paragraph 250 of the SAC, Plaintiff alleges that Markham agreed to fund "up to $50 Million, as is evidenced by the March 8, 2000 Ladenburg Letter," and that Markham and other Defendants "herein failed to fully fund this contract."  The SAC earlier alleges that the March 8, 2000 Ladenburg Letter codified an agreement by Sedona to increase its shelf registration to $50

---

[14]   The SAC asserts a breach of contract claim against Markham, Ladenburg, Aspen, Boris and some of the Release Defendants.  The claim against Boris was dismissed with prejudice in Sedona II, and Plaintiff does not address in its opposition papers its apparently inadvertent inclusion of Boris in the SAC's Seventh Claim for Relief. Ladenburg and Aspen do not move for dismissal of this claim as against them, and the claims against the Release Defendants were dismissed.  Therefore, the Court need only address Markham in connection with this claim.

million, that Sedona did so in anticipation of the $50 million in investment promised by Ladenburg, and that Markham and other Defendants "never had any intention of funding any significant portion of this $50 Million." (SAC ¶ 77.) It is, however, not at all clear from the SAC exactly what provision of what contract (i.e., the March 8, 2000 Ladenburg Letter itself or some previous oral agreement) Markham is alleged to have breached. If the promise at issue was to fund "up to $50 Million," there are no allegations in the SAC as to why Markham's purchase of Sedona stock (see SAC ¶ 78) did not fulfill its promise to fund "up to $50 Million." If the allegedly breached provision was a promise to fund a "significant portion" of the $50 million (or a representation that Markham intended to fund such a portion), the SAC contains no allegation as to what a "significant portion" is or why Markham's investment in Sedona did not satisfy the "significant portion" requirement, and if the provision at issue concerned Sedona's commitment to increase its shelf registration to $50 million, it is not clear what Markham promised in exchange for Sedona's commitment and how Markham broke that promise. Even under the more relaxed pleading standards of Rule 8, the complaint must still "allege the provisions of the contract upon which the claim is based[, and,] at a minimum, the terms of the contract, each element of the alleged breach and the resultant damages." Sedona I, 2005 WL 1902780, at *20 (citations and quotations omitted). Plaintiff's vague and somewhat inconsistent pleadings fail to identify a contractual provision whose breach is also supported by allegations in the SAC and, as such, do not give Markham "fair notice of what plaintiff's claim is and the grounds upon which it rests." Id. (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 515 (2002)). Accordingly, Plaintiff does not state a breach of contract claim premised on Paragraph 250 of the SAC.

Paragraph 253 of the SAC alleges that Markham breached the Convertible Preferred Stock and Warrants Purchase Agreement by "engaging in short-selling and failing to ensure that its

trading was in compliance with state and federal laws, contrary to the terms of the agreement."
Although this allegation references a promise to not engage in short selling, there are no factual
allegations in the SAC concerning Markham's alleged short selling activity.  The SAC's bare
reference to Markham's "engaging" in short-selling is conclusory and amounts to nothing more
than a recitation of the breach element in Plaintiff's breach of contract claim.  See Iqbal, 2009 WL
1361536, at *14 (allegation that defendant was the "principal architect" of a policy that targeted Arab
Muslim men, and allegation that another defendant was "instrumental" in its adoption and execution,
were conclusory and nothing more than a formulaic recitation of the elements of a constitutional
discrimination claim).  Similarly, the assertion that Markham "failed to ensure that its trading was in
compliance with state and federal laws," is entirely conclusory and is not entitled to the
presumption of truth at the Rule 12(b)(6) motion to dismiss stage.  See id.  Accordingly, Plaintiff
fails to state a breach of contract claim as premised on Paragraph 253 of the SAC.

Paragraph 251 of the SAC also attempts to implicate Markham in a host of other
alleged breaches of various contracts, but it contains the same laundry list of alleged breaches (i.e.,
"Not being an accredited investor," "Failing to obtain the best price for SEDONA stock") with the
same sweeping reference to unspecified "oral and written agreements" asserted in the FAC, that
was specifically found by the Court in Sedona I to have failed in stating a breach of contract claim.
(Compare SAC ¶ 251 with FAC ¶ 137.)  Accordingly, Plaintiff's breach of contract claim against
Markham cannot be premised on Paragraph 251 of the SAC.

Because none of the breach of contract allegations as to Markham succeeds in
stating a breach of contract claim under the relevant standards, Markham's motion to dismiss is
granted as to the breach of contract claim asserted against it.

Motion to Compel Arbitration and Strike Jury Demand

The Release Defendants move to compel arbitration or, in the alternative, to strike Plaintiff's jury demand.  However, the Release Defendants assert that they are requesting the Court to compel arbitration only if the Court would have denied their motion to dismiss.  Because the Court has granted their motion to dismiss the SAC as to them, the Release Defendants' motion to compel arbitration and to strike the jury demand is denied as moot.

Order to Show Cause

Defendants Aspen, Sims, Ultrafinanz AG, Dr. Batliner and Partner, Creon, Gassner, Dr. Herbert Batliner, and Rieden have not moved for dismissal of the SAC.  However, the factual allegations asserted against them are at least as vague and attenuated as those asserted against the Defendants discussed in this decision.  Therefore, the Court will enter a separate order directing Plaintiff to show cause why the Court should not dismiss Plaintiff's claims against these Defendants for substantially the reasons articulated in this decision.

Leave to Replead as to Ladenburg, Boris, Vasinkevich, Tohn and Smith

Plaintiff requests leave to replead, but only as to Ladenburg, Boris, Vasinkevich, Tohn and Smith.[15]  That application is granted.  Because Plaintiff has not requested leave to replead as to the other Moving Defendants, the dismissal of Plaintiff's claims as to Amro, Roseworth, Cambois, Rhino, Badian, Markham, Hassan, Frankel, Westminster and Pershing is with prejudice.

---

[15]     Plaintiff also requests leave to replead its Pennsylvania Act causes of action to include reference to another statutory provision, but that request is denied since the Fourth Claim for Relief has been dismissed on other grounds.

<u>CONCLUSION</u>

For the foregoing reasons, the Second Amended Complaint is dismissed in its entirety as against Defendants Boris, Vasinkevich, Tohn, Smith, Markham, Hassan, Amro, Roseworth, Cambois, Rhino, Badian, Westminster, Pershing and Frankel.  Defendant Ladenburg's motion to dismiss the First, Second, Third, Fourth, Fifth, Sixth and Eighth Claims for Relief as asserted against it is granted.[16]  The dismissal of Plaintiff's claims as asserted against Ladenburg, Boris, Vasinkevich, Tohn and Smith is without prejudice, and the dismissal of all other claims is with prejudice.  The motion to compel arbitration or, in the alternative, to strike the jury demand, is denied as moot.

The Clerk of Court is respectfully requested to terminate Docket Entry Nos. 272, 274, 276, 278, 282, 285 and 288, and to terminate Defendants Boris, Vasinkevich, Tohn, Smith, Markham, Hassan, Amro, Roseworth, Cambois, Rhino, Badian, Westminster, Pershing and Frankel in connection with the caption of this case.

Plaintiff is given 21 days from the date of this Opinion and Order to file and serve a Third Amended Complaint repleading those causes of action that are dismissed without

---

[16]   As noted above, Ladenburg does not move for dismissal of the Seventh Claim for Relief as asserted against it.

prejudice. If no such timely amended pleading is served and filed with respect to a claim or cause

of action, such claim or cause of action will be dismissed with prejudice and without further

advance notice.

SO ORDERED.

Dated: New York, New York
    May 27, 2009

LAURA TAYLOR SWAIN
United States District Judge